**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **THE MITCHELL COMPANY, INC.,** | ) | |
| **MODEL HOMES, LLC, and HEXAGON** | ) | |
| **INVESTMENTS, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION NO 08-0342-KD-C** |
| | ) | |
| **JOSEPH J. CAMPUS III,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| **v.** | ) | |
| | ) | |
| **JOHN B. SAINT,** | ) | |
| | ) | |
| **Additional Counterclaim Defendant.** | ) | |

**ORDER**

This matter is before the Court on Campus' Motion for Partial Summary Judgment (Docs. 24, 25, 26), Plaintiff The Mitchell Co., Inc.'s Response in opposition (Docs. 30, 31), Campus' reply thereto (Doc. 35), and related briefing (Docs. 49, 50).  For the reasons set forth herein, Campus' motion for partial summary judgment on his claim for advancement of fees is **GRANTED (Count I)**.  Campus' motion for summary judgment on his claim for fees on fees is **DENIED (Count II)**.

**I.**     **Background**

**A.**     **Procedural History**

Plaintiffs are comprised of The Mitchell Co., Inc. ("TMC") and Model Homes, LLC and Hexagon Investments, LLC ("the LLCs").  (Doc. 1 at 1-2).  TMC is a comprehensive real estate development company and Campus' former employer.  (Id.)  TMC is an Alabama corporation with its principal place of business in Mobile, Alabama.  (Id.)  Model Homes, LLC is an Alabama LLC with its principal place of business in Mobile, Alabama.  (Id.)  Model Homes' members assist with

home sales and real estate transactions and are or were shareholders, directors or officers of TMC. (Id.)  Hexagon Investments, LLC is an Alabama LLC with its principal place of business in Mobile, Alabama.  (Id.)  Hexagon's members assist with home sales and real estate transactions and are or were shareholders, directors or officers of TMC.  (Doc. 1 at 1-2).  Plaintiffs allege that the LLCs were established to provide additional compensation to a select group of employees who were also directors, officers or shareholders, and who "would be performing special services for the Mitchell Company for its long range success."  (Id. at 2).

Defendant Joseph J. Campus, III ("Campus") is a former member of both LLCs as well as former employee, director and officer of TMC (Executive Vice-President and Head of Single Family Home Division).  (Id. at 1-2).  Campus is a Florida citizen.  (Id. at 2).  Counterclaim Defendant John B. Saint ("Saint") is the President of TMC and Manager of both LLCs.  (Id.)

Plaintiffs initiated this action on June 16, 2008, filing a Complaint against Campus for equitable relief and to obtain a declaration of rights and obligations.  (Doc. 1).  In so doing, Plaintiffs seek an order that the LLCs maintain in trust certain real properties in its possession which "shall sum to a value" approximately equal with the "Pawlowski" valuation (approximately $1,250,000) "until the measure of Campus' obligation to disgorge himself of increased valuation while he was engaged in faithless service for TMC" is determined.  (Id.)  TMC alleges that granting the requested relief will protect Campus' maximum possible interest (if no disgorgement is ordered), the LLCs' interests (by not liquidating the real property) and TMC's interest and the interests of fairness (in avoiding Campus' possible wasting, hiding or spending of the money).  (Doc. 1 at 7).

On July 28, 2008, Campus filed his Answer, a motion to add John B. Saint as a party, and counterclaims asserting (in part) that Plaintiffs should be required to advance him legal fees and

expenses (pursuant to the terms of an indemnity agreement executed with TMC) incurred in connection with a related lawsuit (the "underlying action") pending in this Court (The Mitchell Co. Inc. v. Joseph J. Campus, III, CV 07-177-KD-C (S.D. Ala. Mar. 7, 2007)). (Docs. 15, 16). Campus' counterclaim seeks to determine his rights to an advancement of legal fees/expenses incurred in defense of CV 07-177 (the underlying action) pursuant to the Indemnity Agreement with TMC; to determine his rights to require the two LLCs to purchase his membership interests; to obtain equitable relief to prevent injury to him as a result of Model Home LLC's actions to liquidate assets and make unsecured loans to TMC (wasting the LLC's assets and impairing its ability to buy his membership interest as required by the Operating Agreement); and to recover damages for the conduct of Saint, TMC and both LLCs. (Doc. 15 at ¶¶ 1-2).

On August 22, 2008, Campus filed a motion for partial summary judgment, asserting that he is entitled to summary judgment on his claims for reimbursement of his defense expenses in the underlying action as well as a declaration that his defense in that action must be provided at TMC's expense (i.e., advancement of his legal expenses and recovery for the fees he has incurred in having to seek advancement). (Docs. 24, 25, 26). On September 2, 2008, Plaintiffs filed their Answer to Campus' counterclaim. (Doc. 28). On September 11, 2008, TMC filed its opposition to Campus' motion for summary judgment. (Docs. 30, 31). On September 19, 2008, Campus filed his reply to TMC's opposition. (Doc. 35). On September 22, 2008, the Court issued the Rule 16(b) Scheduling Order, setting the deadline for motions for leave to amend pleadings for October 1, 2008. (Doc. 36). On September 23, 2008, the Court granted Campus' motion to add John B. Saint as a counterclaim defendant. (Doc. 37). On September 30, 2008, TMC filed a motion for leave of court to amend its original Answer to Campus' counterclaim, to add the following Thirty-Second Defense:

3

> Campus' counterclaims for advancement of legal expenses and "fees on fees" are barred, as the claims were compulsory counterclaims in the lawsuit styled The Mitchell Company, Inc. v. Joseph J. Campus, III, case number CV 07-177-KD-C, pending in the U.S. District Court for the Southern District of Alabama ("the Underlying Action"), and Campus failed to timely plead these compulsory counterclaims in the Underlying Action.

(Doc. 38).

On October 1, 2008, Campus filed a motion for leave of court to amend his original counterclaim, to plead two additional counterclaims concerning advancement and indemnification (Counts III and IV). (Doc. 39). TMC did not file a response to Campus' motion for leave to amend his counterclaim. On December 29, 2008, the Court granted Campus' motion to amend his counterclaim, and denied TMC's motion to amend as futile because the advancement counterclaim was not compulsory in the underlying case. (Doc. 47). On January 5, 2009, Campus filed his amended counterclaim. (Doc. 48). On January 20, 2009, Plaintiffs filed their Answer thereto. (Doc. 52).

## B.    <u>Factual History</u>

From June 6, 1990 or February 13, 1991[1] through March 7, 2007, Campus was employed by TMC as one of its officers, namely, the Executive Vice-President and Head of Single Family Home Division. On March 7, 1994, Campus was elected Executive Vice-President of TMC. (Doc. 35 at Ex. B). On August 1, 1994, Campus and TMC executed an Indemnity Agreement in consideration of Campus' agreement to "become, or remain his capacity as, an officer" of TMC. (Doc. 25 at Ex. A). The Indemnity Agreement provides both that TMC <u>shall</u> indemnify Campus for expenses and fees which result from <u>any</u> claims arising from his agreement to serve as an officer and his

---

[1] The parties set forth different start dates.

performance of duties as an officer and that TMC <u>shall</u> conduct, at its expense, his defense, in the event that suit is brought against him with respect to any covered claim.  (<u>Id</u>. at Ex. A at ¶¶ 1, 4). The Indemnity Agreement provides that it shall <u>not</u> apply to any expenses or fees incurred in any action or proceeding which results in a final order or judgment against Campus and in favor of TMC or any person/entity on behalf of TMC, but only where liability is established in such final order or judgment based upon Campus' negligence, gross negligence or intentional misconduct.  (<u>Id</u>.) Specifically, the Indemnity Agreement states, in relevant part, as follows:

> 1.  The Company shall indemnify and hold harmless [Campus] . . . against loss or liability, including reasonable expenses and attorneys fees, which result from any claim arising from:
>
> > (1)     the agreement of [Campus] . . . to serve as an officer of the Mitchell Group; and
> >
> > (2)     the performance by [Campus] . . . of duties as an officer of the Mitchell Group;
>
> provided, however, that this Indemnity Agreement shall not apply to any expenses, costs, penalties or the like which are incurred in any action or proceeding which results in a final order or judgment against [Campus] . . . and in favor of the Mitchell Group or any person or entity on behalf of the Mitchell Group, but only where liability is established in such final order or judgment as based upon [Campus'] . . . negligence, gross negligence or intentional misconduct.
>
> * * *
>
> 3.  [Campus] . . . shall use best efforts to notify the Company within a reasonable time of all material claims which are subject to this Indemnity Agreement, and shall make no payment thereon or settlement in respect thereof unless such notification shall first have been given and the Company shall not have provided a defense or the Company or the Mitchell Group not otherwise have assumed the burden of responding to such claims.
>
> 4.  In the event suit is brought against the Indemnitee with respect to any claim covered by this Indemnity Agreement, the company shall conduct, at its expense, the defense thereof. [Campus] . . . shall cooperate in the defense of such claims to the extent reasonably required by the Company.  The Company's liability for any expenses of litigation incurred by the Indemnitee shall extend only to such expenses as shall have been incurred following notification . . . .

* * *

(Id. at ¶¶ 1, 3, 4).

TMC alleges that in March 2007, Campus admitted that he had received around $1.7 million from transactions in which TMC purchased real estate from Campus' friends and associates. (Doc. 30 at 3-4; Doc. 31 at Ex. A). On March 7, 2007, TMC terminated Campus and filed the underlying action (CV 07-177) alleging that he breached his fiduciary duties and/or was negligent in performance of his duties (pocketing a purported $1.7 million for five properties) (CV 07-177). (Id.) TMC asserts that its investigators have since concluded that, beginning in or about 2005, Campus devised and began carrying out a scheme in which he secretly participated in the purchase of various properties and then resold the properties to TMC without disclosing his private interest, at a substantial profit to Campus and his co-conspirators.  (Doc. 30 at 4-5; Doc. 31 at Ex. A).

On April 9, 2007, Campus filed an action in this Court in which he sued the LLCs (along with others) seeking an injunction and an accounting of his interest (Joseph J. Campus, III v. Bentley Oaks, LLC, et al., CV 07-257-KD-C (S.D. Ala. Apr. 9, 2007)); his suit was dismissed on November 6, 2007, for lack of diversity jurisdiction.  (CV 07-257, Doc. 36).  Subsequently, related to Campus' withdrawal from both LLCs, the parties engaged in a valuation process pursuant to the LLCs' Operating Agreements.  (Doc. 1 at Exs. B-1, B-2).  On June 2, 2008, the results of a May 26, 2008 valuation (the Pawlowski valuation) of Campus' share of the LLCs were presented to the two LLCs through a letter sent by Campus' attorney; the valuation concluded that as of November 30, 2007, Campus' share of Model Homes was $1,152,450, and his share of Hexagon was $96,642.  (Doc. 1 at ¶¶ 17-18 and Exs. B-3, B-4).  Through this notification, Campus' attorney demanded full payment of these valuation amounts, or notification of the LLCs' intentions to make installment payments, within 10 business days.  (Id.)  On June 25, 2008, Campus, through his attorney, made a claim for

advancement and indemnification against TMC, citing the Indemnity Agreement, and representing that "[i]f, at some time in the future, [TMC] . . . obtains a final order or judgment against Campus based on Campus' negligence, gross negligence or intentional misconduct, then Campus will repay and refund to [TMC] . . . any expenses, costs, or penalties that [TMC] . . . has incurred pursuant to the Indemnity Agreement."  (Doc. 25 at Ex. C).

## II.   Analysis

## A.   Applicable Law

Summary judgment should be granted only if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).[2]  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary

---

[2]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).

judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its

burden, the court must stop short of weighing the evidence and making credibility determinations

of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d

994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations

omitted).  The mere existence of any factual dispute will not automatically necessitate denial of

summary judgment; rather, only factual disputes that are material preclude entry of summary

judgment.  Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir.

2004), cert. den., 534 U.S. 1081 (2005).

## B.    Discussion[3]

Campus seeks partial summary judgment with regard to his advancement claim and "fees

on fees" claim (for fees incurred in pursuing the claim).  Specifically, Campus contends that TMC's

claims against him in the underlying action fall squarely within the scope of the Indemnity

Agreement as "covered claims," such that he is entitled to a summary judgment declaration that his

defense in the underlying action must be provided at TMC's expense unless or until an entry of a

final judgment against him in the underlying action.  In response, TMC contends that: 1) the

---

[3]    The Court has been unable to find any helpful Alabama case law discussing the issue of
corporate advancement in a context such as this case.  The guidance from Alabama consists of that which
is provided for in the actual indemnification and advancement statutes themselves -- the Revised Alabama
Business Corporation Act ("RABCA"), Ala. Code § 10-2B-8.50 et seq. and its predecessor, the Alabama
Business Corporation Act ("the former Act"), Ala. Code 10-2A-21 et seq.  As a result, the Court has
reviewed persuasive case law from other courts, including the state courts of Delaware where corporate
issues are regularly litigated.  See, e.g., Hardy v. Jim Walter Homes, Inc., 2007 WL 174391, *6 (S.D. Ala.
Jan. 18, 2007) (finding that reasoning in case law from other jurisdictions can be persuasive in the
absence of Alabama law); Molinari v. Tuskegee Univ., 339 F. Supp. 2d 1293 (M.D. Ala. 2004) (same).
Delaware law is also helpful because its advancement statute (8 Del C. § 145(e)) is similar to the former
Alabama Business Corporation Act (which governs here for those reasons discussed herein), as it only
requires that an officer provide an undertaking to repay to obtain advancement of legal expenses.

Indemnity Agreement does not apply due the nature of Campus' actions (intentional misconduct/negligence), because it violates the public policy prohibiting agreements which purport to indemnify or advance expenses for such conduct and because the claims are not based on his performance of duties as an officer; 2) the Indemnity Agreement does not provide for advancement and/or advancement followed by reimbursement as required by law and moreover is ambiguous; 3) requiring TMC to conduct Campus' defense would lead to absurd results such as TMC having the power to select his counsel and control his defense; 4) the Indemnity Agreement violates public policy in light of the Revised Alabama Business Corporation Act ("RABCA"), Ala. Code § 10-2B-8.50 et seq.; 5) Campus' advancement claim is barred by the doctrines of unjust enrichment, unclean hands and faithless servant; 6) Campus is not entitled to recovery of "fees on fees;" and 7) even if the Indemnity Agreement requires advancement, Campus is not entitled to reimbursement for any expenses incurred prior to June 25, 2008.

### 1.   The Indemnity Agreement applies

TMC contends that the Indemnity Agreement does not apply because the claims against Campus in the underlying action are not based on his performance of duties as a TMC officer.  TMC also asserts that the Indemnity Agreement does not apply due to the nature of Campus' alleged actions (intentional misconduct/negligence), and to find that it did, would violate Alabama's public policy prohibiting agreements which purport to indemnify or advance expenses for such conduct.

First, TMC's contention that its claims against Campus are not based on his performance of duties as a TMC officer lacks merit.  In the underlying action, TMC alleges that Campus breached his duties and/or was negligent in performance of his duties to TMC by asserting claims against him for fraud, breach of fiduciary duty, civil conspiracy and other claims related to his role/status as a

9

TMC officer (*i.e.*, allegedly deficient performance as a TMC officer), and that at all times relevant, Campus was employed as TMC's officer.  TMC alleges that Campus is liable for failing to discharge or perform the duties owed to TMC and for acting contrary to his obligations and duties as an officer and director to the detriment of TMC.  Pursuant to the terms of the Indemnity Agreement, Campus is the covered indemnitee, and TMC agreed to indemnify Campus for any "covered claims" which include "any claim arising from[]" his agreement to serve as an officer for TMC and the performance of his duties as an officer of TMC.  (Doc. 25 at Ex. A at ¶ 1, 4).[4]  The underlying action is accordingly a covered proceeding because TMC's claims against him arise from Campus' agreement to serve, or performance of duties, as a TMC officer.  (Id. at ¶ 1).  In brief, Campus is the indemnitee; Campus has incurred "expenses of litigation" arising from his agreement to serve, or service, as a TMC officer; and the Indemnity Agreement applies to "any claims arising from" Campus' agreement to serve, or performance of his duties, as a TMC officer.  In sum, TMC's claims against Campus are based on his performance as an officer and the Indemnity Agreement applies to, and covers, the claims against him in his "covered" capacity.  See, e.g., Zaman v. Amedeo Holdings, Inc., 2008 WL 2168397, *17 (Del. Ch. May 23, 2008); Delucca v. KKAT Mgmt., L.L.C., 2006 WL 224058, *7-8  (Del. Ch. Jan. 23, 2006); Weinstock v. Lazard Debt Recovery GP, LLC, 2003 WL 21843254, *1 (Del. Ch. Aug. 8, 2003); Reddy v. Electronic Data Systems Corp., 2002 WL

---

[4]  The Indemnity Agreement, by its terms, incorporates claims related to Campus' failure to perform those same duties, or non-performance.  The two cannot be separated as TMC suggests.  To follow TMC's logic would mean that TMC contracted to indemnify Campus only for claims against him for his "*good*" performance, and that begs the question of why there would be any litigation against him in the first place.  Accordingly, TMC's claims against Campus in the underlying action are "covered claims" under the Indemnity Agreement.  See, e.g., Barrett v. American Country Holdings, Inc., 2008 WL. 2476186 (Del. Ch. June 20, 2008) (providing that a defendant who faces claims of official wrongdoing and who is owed advancement rights is entitled to have those rights honored so he can defend his good name and personal wealth).

1358761, *5-6 (Del. Ch. Jun. 18, 2002).

Second, Alabama law provides that agreements that purport to indemnify another for the consequences of the other's acts or omissions are "carefully scrutinized" and such agreements are enforceable only if the indemnity provisions are "unambiguous and unequivocal." See, e.g., Royal Ins. Co. of America v. Whitaker Contracting Corp., 824 So.2d 747, 750-751 (Ala. 2002); Royal Ins. Co. of America v. Whitaker Contracting Corp., 242 F.3d 1035, 1041 (11th Cir. 2001); City of Montgomery v. JYD Int'l, Inc., 534 So.2d 592, 594 (Ala. 1988).   However, the Indemnity Agreement does *not* do this.  To the contrary.  The Indemnity Agreement specifically and clearly provides that it shall *not* apply to any action/proceeding that results in a final order/judgment against Campus based upon his intentional misconduct, negligence or gross negligence.  This exception to indemnity is only triggered when there has been a final determination that Campus is liable for negligence, gross negligence or intentional misconduct.  (Doc. 25 at Ex. A at ¶ 1).  There has not been any final order/judgment entered against Campus.  Accordingly, because the underlying action is ongoing and no final judgment or order has been entered, this exception has not been triggered and the Indemnity Agreement applies.

## 2.      The Indemnity Agreement provides for advancement

The present dispute concerns the terms of a contract between TMC and Campus – the Indemnity Agreement.  The Indemnity Agreement states that Alabama law applies to any dispute arising from same.  (Doc. 25 at Ex. A at ¶ 7).  Alabama law construes contracts to give effect to the parties' intent and when a contract's terms are plain and unambiguous, there is no room for construction and the contract must be enforced as written.  See, e.g., Hall v. Am. Indemn. Group, 648 So.2d 556, 559 (Ala. 1994); Ex parte Conference America, Inc., 713 So.2d 953, 956 (Ala.

1998).   The general rule of contract law is that if a written contract exists, the parties' rights are controlled by that contract.  Mobil Oil Corp. v. Schlumberger, 598 So.2d 1341, 1345-1346 (Ala. 1992).  If the contract is ambiguous, however, the contract is construed against the party whose language is being construed (against the drafter).[5]  See, e.g., Whitaker, 242 F.3d at 1041-1042; Brown Mech. Contractors, Inc. v. Centennial Ins. Co., 431 So.2d 932, 946 (Ala. 1983).  Specific to indemnity contracts, all ambiguity or doubt is to be resolved in favor of the indemnified party.  See, e.g., Louisville & N.R. Co. v. Cullman Warehouse, Inc., 147 So. 421, 423 (Ala. 1933).  Indemnity agreements between private parties are valid where "the parties knowingly, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify the other, including indemnity against the indemnitee's own wrongs, if expressed in clear and unequivocal language."  Industrial Tile, Inc. v. Stewart, 388 So.2d 171, 176 (Ala. 1980).  In Brown, the Alabama Supreme Court instructed that three factors are to be considered by a court interpreting an indemnity agreement: (1) "contractual language," (2) "identity of the draftsman of the language," and (3) "the indemnitee's retention of control."  Brown, 431 So.2d at 946.  While particular language in an indemnity agreement is not required, the requisite intent of the parties must be clear.  Brown, 431 So.2d at 946; Royal Ins. Co. of Am., 242 F.3d 1035.  The exception to this general rule is that "[w]here both parties to a contract are sophisticated business persons advised by counsel and the contract is a product of negotiations at arm's length between the parties, we find no reason to automatically construe ambiguities in the contract against the drafter."  Western Sling & Cable Co. v. Hamilton, 545 So.2d 29, 32 (Ala. 1989).

---

[5]  Campus contends that TMC drafted the Indemnity Agreement.  While TMC asserts that Campus has submitted no evidence to support that contention, significantly, TMC does not deny that it is the drafter.  Rather, TMC states that if it were, that is irrelevant under the facts of this case.  Due to the clear language of the Indemnity Agreement, however, the Court need not resolve that question here.

TMC contends that Campus is not entitled to advancement because the Indemnity Agreement contains no advancement provision, adding that even if it does, the provision is ambiguous and cannot be invoked because it does not contain a reimbursement mechanism as required by law. Pursuant to the terms of the Indemnity Agreement, TMC and Campus contracted for *mandatory* payment of Campus' defense expenses as follows:

> 4. ***In the event suit is brought against [Campus] . . . with respect to any claim covered by this Indemnity Agreement, the company shall conduct, at its expense, the defense thereof. [Campus] . . . shall cooperate in the defense of such claims to the extent reasonably required by the Company***. The Company's liability for any expenses of litigation ***incurred*** by [Campus] . . . shall extend only to such expenses as shall have been ***incurred*** following notification . . . .

(Doc. 25 at Ex. A at ¶ 4 (emphasis added)). The Indemnity Agreement applies to covered claims, which are claims that have not yet reached the point of a final order or judgment (*i.e.*, ongoing proceedings). While not stating the word "advancement" and not specifically providing a separate paragraph entitled "advancement of legal expenses," the Indemnity Agreement provides for advancement. Paragraph 4 unequivocally states that if an action with respect to any covered claim is brought against Campus, TMC *shall* conduct Campus' defense at its own expense (*i.e.*, pay for the expenses incurred) and that Campus shall cooperate in the defense to the extent his participation is reasonably required. The Indemnity Agreement is not ambiguous with regard to these requirements. Thus, TMC contracted to conduct Campus' defense, at its expense (*i.e.*, pay for Campus' defense), for actions which have not yet concluded – meaning that TMC contracted to pay Campus' defense expenses until such time. This contractual language cannot be reasonably construed to mean anything other than TMC agreed to pay for Campus' defense *in advance*.

Moreover, TMC contends that the Indemnity Agreement does not comply with existing law because the advancement provision does not provide a mechanism by which legal expenses could

be advanced to Campus and then repaid to TMC in the event that Campus is ultimately found liable. The Court has been unable to find any Alabama case law holding that contracting parties, who provide for advancement in a contract, must also include some mechanism for reimbursement in the contract. Similarly, neither Alabama's revised advancement statute ("RABCA") (upon which TMC relies) nor the former Alabama Business Corporation Act ("the former Act") require that a mechanism for reimbursement be included in a contract between private parties, only that a corporate officer provide an undertaking to repay before the expenses are advanced.[6]  RABCA provides for permissive advancement if an officer, *inter alia*, provides a written undertaking to repay. <u>Ala</u>. <u>Code</u> § 10-2B-8.53(a)(2).[7]  Alabama's former statute has only one requirement for permissive advancement – that an officer provide an undertaking for repayment. <u>Ala</u>. <u>Code</u> § 10-2A-21(e) (former Act) (requiring only "an undertaking . . . to repay . . . if and to the extent that it shall be ultimately determined that (the director) is not entitled to be indemnified[]").  The fact that the Indemnity Agreement lacks a requirement for Campus to repay then does not, as TMC claims, lead to the conclusion that the parties did not contemplate advancement at all and/or that the Indemnity Agreement does not comply with applicable law.  Indeed, due to the non-exclusive nature of both RABCA and the former statute, the undertaking requirement is met through the contract's

---

[6] Whether under RABCA or the former Act, Alabama's indemnification and advancement statutes apply to existing domestic corporations organized under any general or special law of the State of Alabama, in addition to that which may be contained in corporate bylaws, articles of incorporation or resolution, a contract, or otherwise.  <u>Ala</u>. <u>Code</u> § 10-2B-8.58(a); <u>Ala</u>. <u>Code</u> § 10-2A-21(f); <u>Ala</u>. <u>Code</u> § 10-2B-17.01; <u>Ala</u>. <u>Code</u> § 10-2A-334.  TMC is a domestic corporation organized under the laws of the State of Alabama and the Indemnity Agreement provides that it shall be governed by the laws of the State of Alabama.  (Doc. 1 at 1-2; Doc. 15 at Ex. A at ¶ 7).  As such, the Indemnity Agreement is subject to Alabama's indemnification and advancement statutes.

[7] RABCA also has two other requirements that are discussed <u>infra</u>.

compliance with the statute (whichever may apply).[8]

In sum, it is clear what TMC and Campus contracted to do, and it is clear what TMC and Campus did not contract to do. The Indemnity Agreement contains a provision providing for TMC's _mandatory_ payment of the costs of Campus' defense. This contract provision renders mandatory TMC's duty to pay for his defense before the litigation concludes – _i.e_., in advance. See, e.g., Citadel Holding Corp. v. Roven, 603 A.2d 818, 823 (Del. 1992); Delucca, 2006 WL 224058, *13. Accordingly, TMC cannot now "seek to escape the consequences of [its] own contractual freedom[]" by "[r]egretting the broad grant of mandatory advancement they forged on a clear day . . . [and] seek[ing] to have the judiciary ignore the plain language of the[] contract[] and generate an after-the-fact judicial contract that reflects their current preference." Delucca, 2006 WL 224058, *2.

### 3.   Requiring advancement does not produce absurd results

TMC asserts that requiring advancement would lead to absurd results such as TMC having the power to choose Campus' counsel and Campus having a duty to cooperate with TMC in its action against Campus, due to the phrase "conduct . . . the defense" in Paragraph 4 of the Indemnity Agreement. This is because TMC contends that the word "conduct" should be read in the context of third-party claims (the type of claim that it asserts was envisioned for such a provision) so that it means much more than "pay for." Nothing in either Indemnity Agreement or the advancement language contained therein, provides for its application to _only_ third-party claims.

Paragraph 1 of the Indemnity Agreement states that it covers _any_ claims against Campus arising from Campus' agreement to serve, and performance, as a TMC officer, stating that it shall

---

[8] See discussion infra where the Court finds that the former statute, not RABCA, applies to this contract.

not apply only if there is a final order or judgment against Campus (for negligence, gross negligence or intentional conduct) and in favor of the Mitchell Group or any person or entity on behalf of the Mitchell Group. (Doc. 25 at Ex. A at ¶ 1). Paragraph 4 of the Indemnity Agreement requires TMC to conduct Campus' defense – for those claims – at its expense. (Id. at ¶ 4). Paragraph 3 adds that Campus shall use his best efforts to notify TMC within a reasonable time of those claims and shall make no payment or settlement "unless such notification shall first have been given and the Company shall not have provided a defense or the Company . . . not otherwise assumed the burden of responding to such claims." (Id. at ¶ 3). A reading of these paragraphs suggests that the parties envisioned not only third-party actions but a direct action by TMC against Campus (Paragraph 1) and moreover, that they intended for something more than mere payment of Campus' defense (*i.e.*, that in addition to paying for Campus' defense, TMC would also assume the burden of providing his defense and defend him), but this does not mean absolute control. To characterize the provision in the manner that TMC suggests (that TMC would have the power to control Campus' defense, to hire and fire his attorney, review his legal bills, render legal service to him and take custody of and review his personal documents, etc.) would open the door to violations of the Model Rules of Professional Conduct governing attorney-client representation, insofar as counsel would then simultaneously represent both TMC and Campus. As such, even if the Court were to determine that the term "conduct the defense" means that TMC has total control over Campus' defense and selection of his counsel, the counsel "conducting" Campus' defense would still owe his or her undivided loyalty to his client, Campus, not TMC, such that TMC could in no way interfere with

16

that relationship.[9]  Accordingly, the finding that the Indemnity Agreement provides for advancement of legal expenses is not an unreasonable construction; rather, it is a reasonable construction of the terms of the Agreement itself.  It would be an unreasonable construction of the contract to conclude that TMC's mandatory contractual duty to pay for Campus' defense would also mean that TMC can control all aspects of his defense in litigation which TMC has pursued against Campus.

Finally, TMC contends that the phrase "conduct . . . the defense" in Paragraph 4 of the Indemnity Agreement "cannot be interpreted out of context" to mean "pay for the defense."  (Doc. 30 at 14-15).  This argument is unpersuasive.  There is no need to interpret Paragraph 4 out of context because it specifically states that TMC "_**shall** conduct the defense, **_at its own expense_**_[.]" In sum, TMC contractually promised to pay for Campus' defense (expenses incurred) with respect to any claim covered by the Indemnity Agreement (*i.e.*, an action or proceeding which has not yet resulted in a final order or judgment – an ongoing action).[10]

---

[9]  For example, Rule 1.7(a) provides that a lawyer shall not represent a client if the representation involves a concurrent conflict of interest, which exists if the representation of one client will be directly adverse to another client or there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.  Additionally, Rule 1.8(f) provides that a lawyer shall not accept compensation for representing a client from one other than the client unless the client gives informed consent; there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and information relating to representation of a client is protected as required by Rule 1.6. Moreover, Rule 5.4(c) (Professional Independence of a Lawyer) provides that "[a] lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."

[10]  Delaware courts have consistently found that a corporation may bind itself in advance, through its bylaws or by contract, to advance the costs of litigation incurred by present or former directors or officers.  See, e.g., Kapoor v. Fujisawa Pharm. Co., Ltd., 1994 WL 233947 (Del. Super. May 10, 1994) (noting that a corporation can make advancement mandatory by agreement); Citadel, 603 A.2d at 823 (finding that a corporation made advancements "mandatory" by "providing [in its agreement] that expenses shall be paid in advance"); Dunlap v. Sunbeam Corporation, 1999 WL 1261339 (Del. Ch. Jul. 9, 1999) (finding that a corporation's by-laws required advancement).

**4.      Permitting advancement is not contrary to public policy**

The rights conferred by advancement must be construed broadly in light of the "policy goal of assuring corporate officers and directors that their corporation will absorb the risks that may result from performance of their duties."  Perconti v. Thornton Oil Corp., 2002 WL 982419, *3 (Del. Ch. May 3, 2002).  As articulated in Reddy, 2002 WL 1358761, *5-6 (granting summary judgment for advancement of litigation expenses):

> . . . . It is not uncommon for corporate directors, officers, and employees to be sued for breach of the fiduciary duty of loyalty, and to have to defend claims that they took official action for the primary purpose of diverting corporate resources to their own pocketbooks-in the form of contractual compensation benefits (e.g., severance payments or stock options) or an unfair return on a self-dealing transaction. Therefore, ***it is highly problematic to make the advancement right of such officials dependent on the motivation ascribed to their conduct by the suing parties. To do so would be to largely vitiate the protections afforded by [the statute] . . . and contractual advancement rights***.
>
> . . . . ***At the time that an advancement dispute ripens, it is often the case that the corporate board has drawn harsh conclusions about the integrity and fidelity of the corporate official seeking advancement***. The board may well have a firm basis to believe that the official intentionally injured the corporation. It therefore is reluctant to advance funds for his defense, fearing that the funds will never be paid back and resisting the idea of seeing further depletion of corporate resources at the instance of someone perceived to be a faithless fiduciary.[ ]
>
> ***But, to give effect to this natural human reaction as public policy would be unwise***. Imagine what [the company] . . . believes to be unthinkable: that [it] . . . is in fact wrong about [the officer] . . . . What if he in fact did not do anything that was even grossly negligent? In that circumstance, it would be difficult to conceive of an argument that would properly leave him holding the bag for all of his legal fees and expenses resulting from two cases centering on his conduct as an employee of [the company] . . . . ***That result would make the promise made to [the officer] . . . an illusory one***.

Id. (footnote and citations omitted, emphasis added).

In Alabama, "[t]he true test to determine whether a contract is unenforceable because of public policy is 'whether the public interest is injuriously affected in such substantial manner that

private rights and interests should yield to those of the public.'" <u>Goodwin v. George Fischer Foundry Systems, Inc.</u>, 769 F.2d 708, 713 (11th Cir. 1985) (citations omitted). "The meaning of the phrase 'public policy' is vague and variable[,] . . . [h]owever, '[g]enerally speaking, the public policy of a state is to be found in its constitution, its statutes, the decision of, or settled rules laid down by, it[s] courts, and the prevailing social and moral attitudes of the community.'" <u>Id.</u> The Alabama legislature has decided, as a matter of public policy, to allow corporations to advance legal fees to officers. <u>Ala</u>. <u>Code</u> § 10-2A-21; <u>Ala</u>. <u>Code</u> § 10-2B-8.53. "In so doing, it has endorsed the view that advancement, along with indemnity, is a worthwhile mechanism for attracting talented individuals to corporate service, notwithstanding the inevitable cost to corporations and the risk that some officers who are not ultimately entitled to indemnity will nonetheless receive advances." <u>Westar Energy, Inc. v. Lake</u>, 552 F.3d 1215, 1227 (10th Cir. Jan. 21, 2009). The public interest, as determined by the Alabama legislature, would therefore be served, rather than injuriously affected, by protecting Campus' right to advancement. <u>Id</u>.

Moreover, advancement and indemnification are two distinct but related legal concepts.[11] "Advancement is a distinct right complementary to the right to indemnification . . . . [and] [i]ndemnification and advancement work in tandem to encourage talented individuals to serve as

---

[11] <u>See</u>, <u>e.g.</u>, <u>In re Adelphia Communications Corp.</u>, 323 B.R. 345, 375-376 (Bkrtcy. S.D.N.Y. 2005) (footnotes omitted):

. . . . Advancement is a species of loan-"essentially simply a decision to advance credit"[]-to an officer or director pending later determination of that person's right to receive and retain indemnification. The corporation maintains the right to be repaid all sums advanced, if the individual is ultimately shown not to be entitled to indemnification [ ] . . . By contrast, indemnification refers to the ultimate obligation of the corporation-not infrequently imposed as a mandatory matter by statute [ ] or bylaws-to bear the costs of defense and any ultimate fines, settlement, or damages awards, imposed upon an officer or director after a final determination of the merits of the claims asserted against that officer or director.[ ] The right to be indemnified for expenses will depend upon factors quite independent of the decision to advance expenses . . . .

corporate officers . . . . [as] [c]orporate service entails the risk of civil and criminal liability, and

corporations may be willing to assume the expenses of defending such suits to attract talented

employees." Westar, 555 F.3d at 1225.  Allowing for advancement, when parties have contracted

for such, is sound public policy because:

> . . . . "a person who serves as an entity in a representative capacity should not be
> required to finance his or her own defense." [ ] Advancement "provides corporate
> officials with immediate interim relief from the personal out-of-pocket financial
> burden of paying the significant on-going expenses inevitably involved with
> investigations and legal proceedings." [ ] ***Advancement is necessary because
> "[w]hether a corporate officer has a right to indemnification is a decision that
> must necessarily await the outcome of the investigation or litigation." [ ]
> Advancement "fills the gap . . . so the corporation may shoulder . . . interim costs."
> [ ] "The value of the right to advancement is that it is granted or denied while the
> underlying action is pending." [ ] . . . .***

Westar Energy, Inc. v. Lake, 493 F. Supp. 2d 1126, 1139 (D. Kan. 2007), *rev'd on other grounds*,

Westar, 552 F.3d 1215 (footnotes and citations omitted and emphasis added).  See also Homestore,

Inc. v. Tafeen, 888 A.2d 204 (Del. Supr. 2005) (finding that the corporate officer was entitled to

advancement of costs to defend himself in the underlying cases regardless of whether his conduct

was motivated by personal greed).

### 5.  The Former Act, not RABCA, governs the Indemnity Agreement

TMC contends that the Indemnity Agreement and its advancement provision are governed

by the Revised Alabama Business Corporation Act ("RABCA"), not the Alabama Business

Corporation Act ("the former Act").  From this premise, TMC asserts that a finding by this Court

that the Indemnity Agreement allows for advancement would conflict with RABCA § 10-2B-8.53

and public policy, because Alabama law forbids advancement to a corporate officer or director if

"the facts then known" indicate that he has not acted in good faith and in the corporation's best

interests. (Doc. 30 at 18-20).  TMC adds that it has conducted an investigation which concluded that

Campus engaged in "egregious acts of self-dealing, fraud, and other intentional misconduct to the detriment of TMC[.]" (Id. at 19). TMC contends further, that because the Indemnity Agreement does not contain RABCA's requirement of a determination that "the facts then known"– along with two other statutory requirements (written affirmation of good faith belief and a written undertaking to repay) – the Indemnity Agreement, as written, is void for public policy.[12]  (Id. at 18-20).

TMC's position is rooted in a faulty premise.  RABCA does not govern the Indemnity Agreement.  The Indemnity Agreement was executed on August 1, 1994.  RABCA only became effective at 12:01 a.m. on January 1, 1995.[13]  RABCA was thus not in effect at the time the parties contracted.  While RABCA supersedes the former Act as of its effective date – *January 1, 1995* – the former Act is controlling in this case, because the Indemnity Agreement was executed five months prior to RABCA's passage.  See, e.g., Kradel v. Piper Industries, Inc., 60 S.W.3d 744, 749 (Tenn. 2001); Barclays Leasing, Inc. v. National Business Systems, Inc., 750 F. Supp. 184, 189, n.2

---

[12]  RABCA, Section 10-2B-8.53(a)(1)-(3), provides that three requirements must be met before a corporation may pay for, or reimburse, the reasonable expenses incurred by a director who is party to a proceeding in advance of final disposition of the proceeding (*i.e.*, advancement of fees/expenses): 1) the director furnishes the corporation with a written affirmation of good faith belief that he has met the standard of conduct described in Section 10-2B-8.51; 2) the director furnishes the corporation a written undertaking, executed personally or on the director's behalf, to repay the advance if it is ultimately determined that the director did not meet the standard of conduct, or is not otherwise entitled to indemnification under Section 10-2B-8.51(d) unless indemnification is approved by the court under Section 10-2B-8.54; and 3) a determination is made that the facts then known to those making the determination[] would not preclude indemnification under Division E of this article.

[13]  The Revised Model Business Corporation Act, Model Bus. Corp. Act § 8.50 et seq., has been adopted in whole or in part by a number of states, including Alabama (§ 10-2B-8.50 et seq.). The former Alabama Business Corporation Act ("the former Act"), Ala. Code § 10-2A-1 et seq., was based on an earlier Model Business Corporation Act. See Ala. Code 10-2B-1.01 (Supp. 1994) (Commentary).  The Revised Alabama Business Corporation Act ("RABCA") replaces the former Act; RABCA was adopted by the Alabama Legislature on March 21, 1994 and became effective on January 1, 1995.  Ala. Code, Chapter 2B, Commentary (**Effective date.** – The act which added this chapter becomes effective at 12:01 a.m. on January 1,1995[]"); Ala. Code § 10-2A-74 (1987) (repealed Jan. 1, 1995, Ala. Code §§ 10-2B-1.01 to 17.03 (Supp. 1994)).

(W.D.N.C. 1990); American Vending Services, Inc. v. Morse, 881 P.2d 917, 920, n.8 (Utah App. 1994).  Cf. Lumbermens Mut. Cas. Co. v. Borden Co., 268 F. Supp. 303, 306 (S.D.N.Y. 1967).  A review of Alabama case law assessing retroactive application of statutes and RABCA's savings clause (Section 10-2B-17.03) underscores this finding.

In Alabama, there are only two circumstances when a statute can be applied retroactively: 1) when the statute contains an express statutory provision or clear legislative intent that the enactment apply retroactively; or 2) the statute is remedial.  See, e.g., Jones v. Casey, 445 So.2d 873, 875 (Ala. 1983).  Remedial statutes are those which impair no contract or vested right and do not disturb past transactions but preserve and enforce the right and heal defects in existing laws prescribing remedies.  Id.  See also Ex parte Bonner, 676 So.2d 925, 926-927 (Ala. 1995) (noting that "retrospective application of a statute is generally not favored, absent an express statutory provision or clear legislative intent that the enactment apply retroactively as well as prospectively," with the exception of remedial statutes). There is no indication that the statute is remedial in nature, and TMC does not address this issue.

RABCA does not expressly provide for its retroactive application and there is no legislative intent that the enactment apply retroactively, nor does TMC assert as much.  Moreover, RABCA contains a savings clause that provides that its repeal of the former Act is not effective to "*any* ratification, *right*, remedy, privilege, *obligation*, or liability *acquired*, accrued, *or incurred* under the statute *before its repeal*."  Ala. Code § 10-2B-17.03(a)(2).

TMC asserts that RABCA's savings clause means that only previously-accrued actions are governed by the former Act and that Campus' action for indemnification had "not yet accrued" and that his action for advancement "accrued only upon his being sued" such that the savings provision

cannot be used to place his claims under the governance of the former Act.  (Doc. 49 at 2-4).  The Court cannot agree.  The savings clause is not limited to accrual of an action.  Rather, it provides that any right or obligation acquired or incurred under the former statute before its repeal will not be affected (*i.e.*, the former Act will govern such pre-existing rights or obligations).  TMC overlooks the fact that Campus' contractual rights and obligations (just as TMC's) under the Indemnity Agreement were acquired or incurred five months before the repeal.  See, e.g., Kradel, 60 S.W.3d at 749-750 (stating that "a plain reading of this statute [a savings clause identical to Alabama's] indicates that it seeks only to preserve the then-existing status quo respecting any rights or remedies already existing under the old act, and this statute simply does not permit the conclusion that the new act must apply to rights and remedies . . . .").  These rights and obligations existed at the time of the formation of the Indemnity Agreement and were present contingent contractual rights.  See, e.g., In re Delta Holdings, Inc., 2004 WL 1752857, *7 (Del. Ch. Jul. 26, 2004) (concluding that potential claims for advancement and indemnity are present contingent contractual rights by stating that "[i]ndemnification rights (including the right to advancement) that are contained in a mandatory, expansive indemnification provision, are present contractual rights, contingent only on meeting the requirements [of the statute][]").  "The indemnification provision, in a nutshell, says that if certain events occur, the corporation *shall* provide funds to those covered under the provision[] [–] [t]his is the very definition of a contingent claim, which is '[a] claim that has not yet accrued and is dependent on some future event that may never happen.'"  Id. (emphasis in original).  See also e.g., Burnsed Oil Co., Inc. v. Grynberg, 2008 WL 906820, *6 (S.D. Miss. Mar. 31, 2008); Home Health Care Affiliates of Mississippi, Inc. v. North American Indem. N.V., 299 F. Supp. 2d 645, 655 (N.D. Miss. Jan. 12, 2004) (stating that the plaintiffs entered into a contractual relationship with the

defendants prior to the formal repeal of the statute and thus, by the time repeal was given effect the plaintiffs' rights had vested and were memorialized in the contract terms); In re WorldCom, Inc. Securities Litigation, 293 B.R. 308, 318-319 (S.D.N.Y. 2003) (noting that the district court referenced a collection of cases recognizing the contingent contractual rights of indemnity and contribution); Oates v. Equitable Assurance Society of the U.S., 717 F. Supp. 449, 451 (S.D. Miss. 1988) (providing that statutes subsequently enacted do not affect vested contractual rights); Dale Baker Oldsmobile, Inc. v. Fiat Motors of North America, Inc., 1984 WL 14133, *5 (W.D. Mich. Nov. 2, 1984) (concluding that a statute was inapplicable to contractual agreements entered into prior to its effective date because it would, in part, impact vested rights). See also Scarborough v. Travelers Ins. Co., 718 F.2d 702, 714 (5th Cir. 1983) (stating that a statute, though it operates retroactively, would not be given that effect if it impaired obligations of contracts or disturbed a party's vested rights (*i.e.*, that subsequently repealed statutes will not affect already established contractual rights)).

Specifically, Campus' indemnification and advancement rights were acquired or incurred upon formation of the Indemnity Agreement on August 1, 1994 with TMC.  Based on the terms of the Indemnity Agreement, TMC requested that Campus be employed as an officer of TMC and Campus "agreed to do so upon [the] condition that [TMC] indemnify him against certain liabilities which may arise from [his] agreement to serve, or service, as an officer of [TMC]."  (Doc. 25 at Ex. A at 1 (emphasis added)).  Campus conditioned his employment with TMC, to serve as a TMC officer, on the execution of the Indemnity Agreement, and TMC agreed to that condition.  The Indemnity Agreement provides that TMC and Campus agreed to mandatory indemnification and mandatory advancement "in consideration of [Campus'] agreement to serve as an officer of [TMC]

and for other good and valuable considerations[.]" (Doc. 25 at Ex. A at 1-3 (stating that TMC "shall indemnify" and "shall conduct, at its expense, the defense[]"). Campus' contractual rights to pursue potential indemnity and advancement – and TMC's obligations for same – cemented upon the formation and execution of the Indemnity Agreement in August of 1994. Indeed, these are present contingent contractual rights for Campus. And where such a mandatory provision providing for the advancement of legal expenses exists, the rights of the potential recipient of such advancement is enforced as a contract. See, e.g., Tafeen, 2004 WL 556733, *10. While the indemnification and advancement necessarily concern some event in the future relative to the contract (i.e., whether that be litigation the very next day or 20 years later), the parties' respective rights and obligations existed and attached at the time that the Indemnity Agreement was formed.

If the Court were to follow TMC's logic and find otherwise, that would essentially mean that no contractual rights or obligations can exist unless or until there is litigation (that, in essence, there is no agreement between parties until someone sues), and that conclusion would eviscerate the purpose behind such corporate agreements. Accordingly, RABCA's subsequent passage in 1995 cannot impair Campus' contingent contractual rights, or this Court's ability to enforce same.

Having concluded as such, the Court must now address the statutory requirements for advancement under the former Act, as this is the subject of Campus' summary judgment motion for advancement of legal expenses. To obtain advancement under the former Act, an officer is required only to provide an undertaking to repay the advance in the event it is ultimately determined that he does not meet the indemnification standard. Specifically, Section 10-2A-21(e) of the Act (the corollary to RABCA's Section 10-2B-8.53(a)) requires only "an undertaking . . . to repay . . . if and to the extent that it shall be ultimately determined that (the director) is not entitled to be

indemnified."  Ala. Code § 10-2B-8.53, Commentary(1) (stating that "Ala. 10-2A-21(e) required

only "an undertaking . . . to repay . . . if and to the extent that it shall be ultimately determined that

(the director) is not entitled to be indemnified[]").  The former Act has no requirement for an officer

to provide a written affirmation of good faith belief that he has met the standard of conduct.  The

former Act has no requirement for a determination of "facts then known" to be conducted by the

corporation.  TMC concedes this much.  (Doc. 49 at 4).  Thus, to comply with the former Act and

Alabama's law on advancement, to then obtain advancement of the expenses of his defense from

TMC, Campus need only fulfill the undertaking to repay requirement.

On June 25, 2008, Campus' attorney provided TMC with a written undertaking, executed

on Campus' behalf, stating that he will repay the expenses if there is ultimately a judgment issued

against him: "[i]f, at some time in the future, [TMC] . . . obtains a final order or judgment against

Campus based on Campus' negligence, gross negligence or intentional misconduct, then Campus

will repay and refund to [TMC] . . . any expenses, costs, or penalties that [TMC] . . . has incurred

pursuant to the Indemnity Agreement."  (Doc. 25 at Ex. C).  TMC has conceded in its opposition

that "[u]nder the former Act, advancement required only an undertaking to repay the advance if it

was ultimately determined he did not meet the indemnification standard[] [and in this case] Campus'

attorney has provided such a statement on his behalf, arguably satisfying the former statute . . . . ."

(Doc. 49 at 4).  Thus, due to the absence of a genuine issue of material fact, Campus is entitled to

summary judgment on his advancement claim.

Further, the former Act contains a non-exclusivity provision stating that advancement

provided by statute shall not be deemed exclusive of, and shall be in addition to, any advancement

rights provided for in contract, bylaws or otherwise.  Ala. Code § 10-2A-21(f) (the former Act); Ala.

<u>Code</u> § 10-2B-8.58(a) and Cmt. (RABCA).  This allows corporations to grant, and contract for, indemnification and advancement rights over and above that which is provided for in the statute. The former Act provides for permissive advancement.   The Indemnity Agreement provides for mandatory advancement.  This mandatory advancement requirement is consistent with the statute.

Finally, TMC's claim that Campus is not entitled to advancement because he will not be entitled to indemnification lacks merit.  TMC's position presumes that it has already prevailed on its, as yet, unproven claims.  TMC's position also discounts that entitlement to advancement is independent of the merits of the suit for which the money is sought, and is a remedy independent of the remedy of indemnification.

  6.  <u>The doctrines of faithless servant, unjust enrichment and unclean hands, do not bar Campus' advancement claim</u>

TMC contends that the doctrines of unjust enrichment, faithless servant and unclean hands, bar Campus' equitable claim for advancement, citing <u>Edwards v. Allied Home Mortg. Capital Corp.</u>, 962 So.2d 194, 210 (Ala. 2007) (stating, following a jury trial, that the trial court's determination that an agent will justly forfeit all rights to compensation if he is found to be guilty of bad faith to the principal was proper).  There has been no trial.  There have been no "findings" with regard to Campus' alleged conduct.  There has been no determination --whatsoever – regarding his liability. Additionally, Campus has repeatedly denied liability to TMC, as well as TMC's allegations against him.  Moreover, the issue before the Court is not Campus' purported bad conduct, because at this point, only his right to advancement under the terms of the Indemnity Agreement, not indemnification, is at issue.  This means that even if the Court views TMC's allegations in the light most favorable to the corporation, Campus' alleged conduct is irrelevant, such that any doctrines premised on same are simply inapplicable.  <u>See</u>, <u>e.g.</u>, <u>Reddy</u>, 2002 WL 1358761, *9; <u>Porter v.</u>

Provident Bankshares Corp., 2007 WL 2688224, *6 at n.6 (E.D. Va. Sept. 4, 2007). An officer's

entitlement to advancement is a matter independent of the merits of the suit for which the money is

sought and the right to advancement is not dependent upon the right to indemnification. See, e.g.,

Citrin, 455 F.3d at 751; Morgan v. Grace, 2003 WL 22461916, *2 (Del. Ch. Oct. 29, 2003); Reddy,

2002 WL 1358761, *9; Citadel, 603 A.2d at 822. Indeed, "[t]he scope of an advancement

proceeding . . . is limited to [just that – ] determining the [narrow] issue of entitlement in accordance

with the corporation's own uniquely crafted advancement provisions." Tafeen, 888 A.2d at 214

(footnote omitted). See also Delucca, 2006 WL 224058, *11 (noting that "[t]he right to

advancement does not go away simply because the entity from which advancement is sought is

alleging that the [officer] . . . has committed perfidious acts against it[]").

### 7.   Campus is not entitled to fees on fees

Campus asserts that he is entitled to recovery of "fees on fees" (the fees incurred in having

to file this action to enforce his advancement rights), citing the "any claim" language of Paragraph

1 of the Indemnity Agreement (that TMC shall indemnify Campus "against any loss or liability,

including reasonable expenses and attorneys['] fees, *which result from any claim arising from the*

*agreement* . . ."), and Delaware case law.[14] (Doc. 25 at Ex. A at ¶ 1 (emphasis added)). The terms

---

[14]   See, e.g, Fasciana v. Electric Data Sys. Corp., 829 A.2d 178, 181, note 13 (Del. Ch. 2003)
(finding that the right to advancement is important and that when a corporate official is entitled to
advancement and the corporation wrongfully refuses to honor his request and as a result, the officer needs
to bring a claim to enforce his contractual right, "then it seems plain . . . that reasonable fees on fees are in
order. The fact is that the right to advancement is no less of a . . . right than the ultimate right to
indemnification[]"); Stifel Fin. Copr. v. Cochran, 809 A.2d 555, 561 (Del. Supr. 2002) (concluding that
allowing indemnification for expenses incurred by a director in pursuing his indemnification rights
recognizes the reality that the corporation itself is responsible for putting the director through the process
of litigation and that by allowing for fees on fees recovery, corporations will be prevented from using
their deep pockets to wear down a former corporate official). See also Weaver v. SeniMax Media, Inc.,
2004 WL 243163, *6 (Del. Ch. Jan. 30, 2004) (concluding that recovery for fees on fees is a right of the

of the Indemnity Agreement do not expressly address recovery for fees on fees (for fees incurred to enforce the contractual right to either advancement or indemnification).

While there is an absence in Alabama of case law addressing fees incurred in establishing the right to advancement of legal expenses, the Alabama Supreme Court has held that recovery of "fees on fees" for seeking the right to indemnification is generally not permissible. Stone Bldg. Co. v. Star Elec. Contractors, Inc., 796 So.2d 1076, 1091 (Ala. 2000) (holding that the allowance of attorney fees is limited to the defense of the claim indemnified against and does not extend to services rendered in establishing the right of indemnity). The general rule is that, in the absence of express language giving the indemnitee such a right, an indemnitee cannot recover its attorney's fees incurred in establishing its right to indemnification. See also Southeast Environmental Infrastructures, L.L.C. v. Rivers, 2008 WL 2554382 (Ala. Jun. 27, 2008) (holding that a contractor could not recover, under an indemnity agreement with a subcontractor, attorney fees for services rendered to establish his right to indemnification). In other jurisdictions that have disallowed "fees on fees," courts have noted that "fees and expenses incurred in establishing the existence of an obligation to indemnify [ ] are not by their nature a part of the claim indemnified against[;] [r]ather, they are costs incurred in suing for a breach of contract, to wit, the failure to indemnify[] [and thus,] fees and expenses incurred in establishing the indemnity obligation fall within the ordinary rule requiring a party to bear his own expenses of litigation." Peter Fabrics, Inc. v. S.S. Hermes, 765 F.2d 306, 317 (2d Cir. 1985) (citations omitted). Accordingly, unless the agreement provides for fees on fees, they are not allowed under Alabama law.

---

party materially successful in asserting an advancement or indemnification claim).

Paragraph 4 of the Indemnity Agreement requires TMC to pay the expenses of Campus' legal defense for covered claims.  Paragraph 1 of the Indemnity Agreement defines covered claims and also expressly requires TMC to indemnify Campus against any loss or liability including reasonable expenses and attorneys fees which result from any claim arising from his agreement to serve as a officer of TMC and the performance of his duties as a TMC officer.  The Court disagrees with Campus that the fees incurred in establishing his right to advancement of fees is a loss or liability arising from Campus' agreement to serve as a TMC officer.  Rather the claim arises from TMC's breach of its commitment to defend Campus' covered claims, at TMC's expense.  The breach of contract claim is not the result of Campus' service as an officer of TMC and is not an indemnified claim.  For these reasons, Campus is not entitled to recover from TMC "fees on fees" – the fees he has incurred in having to file this action to enforce his advancement rights.

### 8.     Campus is not entitled to pre-June 25, 2008 expenses

The Indemnity Agreement provides that Campus shall use best efforts to notify TMC within a reasonable time of all material claims which are subject to the Indemnity Agreement.  (Doc. 25 at. Ex. A at ¶ 3).  TMC initiated the underlying action against Campus on March 7, 2007.  (Doc. 1, CV 07-177).  On March 15, 2007, Campus' counsel sent a letter to TMC's counsel, requesting copies of indemnification policies in its possession (among other things).  (Doc. 35 at 2, n.2 and Ex. A).  While the record indicates correspondence between the opposing parties thereafter, there is no indication that TMC responded to Campus' counsel's request and/or that Campus specifically asserted that TMC's claims against him were subject to the Indemnity Agreement.  On June 25, 2008, however, Campus, through his attorney, made a specific claim for advancement and

indemnification against TMC, citing the Indemnity Agreement, and representing that "[i]f, at some time in the future, [TMC] . . . obtains a final order or judgment against Campus based on Campus' negligence, gross negligence or intentional misconduct, then Campus will repay and refund to [TMC] . . . any expenses, costs, or penalties that [TMC] . . . has incurred pursuant to the Indemnity Agreement."  (Doc. 25 at Ex. C).

TMC asserts that even if the Indemnity Agreement requires advancement, Campus is not entitled to reimbursement of the expenses he incurred in the underlying action prior to June 25, 2008 – the date of the letter from his attorney.  TMC is correct.  Pursuant to the terms of the Indemnity Agreement, in order to obtain advancement, Campus was required to, first, notify TMC of the material claims which were subject to the Indemnity Agreement.  (Doc. 25 at Ex. A at ¶¶ 3-4). While Campus' counsel requested a copy of any indemnification policies in March 2007 and communicated with opposing counsel thereafter, there is no indication in that letter or other correspondence of record, that Campus made a specific claim that the underlying action was subject to the Indemnity Agreement and/or that he made a claim for advancement against TMC, until June 25, 2008.  As such, Campus is entitled to be reimbursed only for the expenses incurred after June 25, 2008.

**III.   <u>Conclusion</u>**

To prevail on his motion for partial summary judgment, Campus must demonstrate that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.  As in most advancement disputes, summary judgment practice is an efficient and appropriate method to decide this case, as the relevant and narrow question turns on the application of the terms of the

corporate agreement setting forth the purported right to advancement and the pleadings in the proceedings for which advancement is sought.  Campus has established that under the terms of the Indemnity Agreement, there are no genuine issues of material fact and he is entitled to advancement.

While a corporation may determine that other concerns outweigh the goals promoted by advancement of legal expenses, such that advancement should be made optional or should not be permitted at all, here, TMC did not make this choice.  Rather, TMC chose, and more importantly contracted, to be 100% responsible for the legal expenses incurred by Campus defending *any* claims pertaining to his status as an officer of TMC.  While TMC has raised numerous contentions in its opposition to Campus' motion (notably with regard to indemnification and concerning Campus' alleged wrongdoing, which Campus disputes), TMC has failed to demonstrate the existence of a genuine issue of material fact which would preclude entry of summary judgment on the narrow issue of advancement.  See, e.g., Reddy, 2002 WL 1358761, *3-4.  The pertinent question for this summary judgment then, has been not whether Campus may later be found to have engaged in negligence, gross negligence or intentional conduct, but rather, whether he has demonstrated that TMC has denied a right to advancement to which he is entitled.  The merits of the underlying action are irrelevant to whether advancement (and fees on fees for having to seek same) must be awarded here and now.  As noted in DeLucca, "[t]he right to advancement does not go away simply because the entity from which advancement is sought is alleging that . . . [the corporate officer] has committed perfidious acts against it.  Indeed, it is precisely in the circumstance where a business official is accused of serious wrongdoing that the right to advancement is critical, as that right secures the fund for the official to defend [him]self."  Delucca, 2006 WL 224058, *11.  In sum,

TMC's Indemnity Agreement with Campus provides for mandatory payment of his defense costs for covered claims.  If it is ultimately determined that Campus' conduct is not indemnifiable due to negligence, gross negligence or intentional misconduct, then Campus will have to repay any expenses advanced.  Unless or until such final order or judgment is issued, however, TMC is required to pay and advance the defense costs to Campus.  The court is not in a position, after the fact, to relieve the parties of the burdens of the contract that they executed and that now, one party, wishes had been drafted differently.

Based upon the foregoing, the Court finds Campus' motion for partial summary judgment as to his advancement claim is **GRANTED** to the extent explained herein.  Campus' motion for summary judgment on his claim for fees on fees is **DENIED.**

**DONE** and **ORDERED** this the 3rd day of March, 2009.

 /s/ **Kristi K. DuBose**
**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**