**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

THE MITCHELL COMPANY, INC.,  :
et al.,

           :

  Plaintiffs,

           :

vs.               CA 08-0342-KD-C

           :

JOSEPH J. CAMPUS, III,

           :

  Defendant.

vs.              :

JOHN B. SAINT,       :

  Additional Counterclaim Defendant.

**REPORT AND RECOMMENDATION**

  This cause is before the undersigned upon specific reference by United States District Judge Kristi DuBose, made pursuant to 28 U.S.C. 636(b)(3) (*see* Doc. 71, at 7), "for the handling of all issues related to the preliminary injunctive relief" granted in favor of defendant Campus, as well as expedited enforcement of that relief "and resolution of any remaining disputes as to what constitutes reasonable expenses (including Campus' pending request for entry of a stay)." (*Id.*) Upon consideration of The Mitchell Company's ("TMC's") brief and evidentiary submission regarding defense costs and in opposition to

staying the underlying action (Doc. 75), the defendant's brief regarding the amount of reasonable defense expenses due from TMC and whether a stay should be ordered (Doc. 76), the response brief filed by defendant Campus (Doc. 79), TMC's response brief (Doc. 80), the parties' oral arguments on June 29, 2009, Campus' response to the Order dated June 29, 2009 (Doc. 83), TMC's response to the June 29, 2009 Order (Doc. 91), and all other pertinent materials contained in this file, the undersigned enters the following report and recommendation pursuant to the foregoing reference and Rule 54(d)(2)(D) of the Federal Rules of Civil Procedure ("By local rule, the court may establish special procedures to resolve fee-related issues without extensive evidentiary hearings. Also, the court may refer issues concerning the value of services to a special master under Rule 53 without regard to the limitations of Rule 53(a)(1), and may refer a motion for attorney's fees to a magistrate judge under Rule 72(b)[1] as if it were a dispositive pretrial matter.").

---

[1]    "A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense[.] . . . The magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact." Fed.R.Civ.P. 72(b)(1).

## FINDINGS OF FACT

1.    TMC, Model Homes, LLC, and Hexagon Investments, LLC filed a complaint in this Court for equitable relief and declaration of rights and obligations against Joseph J. Campus, III on June 16, 2008. (Doc. 1)

15.    On April 9, 2007, Campus filed suit against the LLCs . . . seeking an injunction and accounting of his interest in the LLCs . . . .

16.    Campus' suit was dismissed November 6, 2007, as Campus prematurely filed his Complaint. Because one hundred and eighty (180) days have passed following Campus' notice of withdrawal, complete diversity exists, and the issues herein are ripe for determination. Related to Campus' withdrawal, the parties have engaged in a valuation process pursuant to the LLC's Operating Agreements.

17.    On May 26, 2008, the valuation process was completed with respect to one of the valuation dates, November 30, 2007. Campus' share of Model Homes was valued at $1,152,450 as of that date and his share of Hexagon was valued at $96,642. Collectively, these are referred to as "the Pawlowski valuation."

18.    On June 2, 2008, counsel for Campus sent letters to the LLCs demanding full payment of these amounts (or notification of the LLCs' intentions to make installment payments) within ten business days.

### Request for Equitable Relief

.        .        .

20.    Plaintiffs LLCs object to making payments based on the amounts established in the Pawlowski valuation. These

3

amounts should be greatly reduced, if not eliminated, because of Defendant's actions. Further, the Pawlowski report does not take into account the unique nature of the assets of the LLCs and the timing of the withdrawal.

<u>The Validity of Defendant's Interests in the LLCs is Dubious and the Subject of Current Litigation Seeking Defendant Disgorge Himself of the Same.</u>

21.     By virtue of his position as an officer of the Mitchell Company, Campus became a member of the LLCs. Campus paid only a minimal fee for membership in each LLC. Campus would not have been offered the opportunity to join either LLC if not for his role as an officer and director of the Mitchell Company. Further, if the Mitchell Company had known of Campus' activities that were a violation of his fiduciary duties to the Mitchell Company, he would not have been offered membership in the LLCs. Campus' interests in Model Homes and Hexagon were part of his compensation with the Mitchell Company that were tied to his fiduciary role in his capacity as employee, officer and director.

22.     Campus obtained his position with the LLCs by virtue of his suppression of his activities that were contrary to the best interest of the LLCs, as well as the Mitchell Company.

23.     On March 7, 2007, the Mitchell Company filed suit against Campus, seeking damages for his disloyal service to the Company . . . . This litigation is ongoing. The Mitchell Company seeks, *inter alia*, disgorgement of wages paid and business opportunities granted to Campus during the period of his faithless service.

24.     The Mitchell Company Suit demonstrates an actual and real controversy regarding the proper ownership of the money ordered to be paid to Campus by the LLCs' valuation, which was completed without regard for the ongoing litigation in The Mitchell Company Suit. In the near future, it is

4

likely that Campus will have to disgorge some or all of this amount based on the outcome of the Mitchell Company suit. Therefore, while the legitimacy of Campus' interest in the LLCs is litigated, the LLCs should not be compelled to turn over the value of that contested interest until such litigation is concluded.

**Prayer for Relief**

25.    Plaintiffs, pursuant to 28 U.S.C. § 2201 *et seq.* and Rule 57 of the Federal Rules of Civil Procedure, thus seek a declaratory judgment as to the rights and obligations of the parties hereto.

26.    In recognition of the fact that Campus' entitlement to any interest in the current value of the LLCs is the subject of ongoing litigation, Plaintiffs pray this Court enter an Order that the LLCs maintain in trust certain real properties in their possession which shall sum to a value approximately equal with the Pawlowski valuation amounts until such time as the measure of Campus' obligation to disgorge himself of increased valuation while he was engage in faithless service for the Mitchell Company. Doing so will protect Campus' maximum possible interest (if no disgorgement is ordered), the LLCs' interests (by not liquidating real property–the source of most of its assets–at losses during an economic and housing slump), and The Mitchell Company's interest and the interests of fairness (in avoiding Campus' possible wasting, hiding, or spending money which is rightfully The Mitchell Company's).

**WHEREFORE,** the premises considered, Plaintiffs pray the Court will enter an Order protecting the interests of all parties as well as the interests of justice in ensuring that all parties have a complete opportunity to resolve the issue of disgorgement in the ongoing litigation.

(*Id.* at 3 & 4-7 (internal citations and footnotes omitted; emphasis in original))

2.    Campus filed his answer and counterclaim on July 28, 2008.

(Doc. 15) On October 1, 2008, the defendant filed a motion for leave to amend his counterclaim. (Doc. 39) This motion was granted by the court on December 29, 2008 (Doc. 47) and the amended counterclaim of Campus was filed on January 5, 2009 (Doc. 48).

## Facts

### A.    Campus' Rights to Indemnification from TMC

10.    From June 6, 1990 to March 7, 2007, TMC employed Campus as an Executive Vice President and Head of its Single Family Home Division.

11.    On August 1, 1994, Campus and TMC entered into an Indemnity Agreement[2] . . . whereby TMC agreed to

---

[2]    The Indemnity Agreement reads as follows:

WHEREAS, the Company has requested that the Indemnitee become, or remain in his capacity as, an officer of the Company and of certain of its affiliates, including, without limitation, the corporate general partners of Mitchell Equities (collectively, the "Mitchell Group"), and the Indemnitee has agreed to do so upon condition that the Company indemnify him against certain liabilities which may arise from the Indemnitee's agreement to serve, or service, as an officer of the Mitchell Group;

NOW THEREFORE, in consideration of the Indemnitee's agreement to serve as an officer of the Mitchell Group and for other good and valuable considerations, the receipt and sufficiency of which are acknowledged by the parties hereto, the Company and the Indemnitee agree as follows:

1.    The Company shall indemnify and hold harmless the Indemnitee, his heirs, successors and assigns, against loss or liability, including reasonable expenses and attorney['] fees, which result from any claim arising from:

(1)    the agreement of the Indemnitee to serve as an

officer of the Mitchell Group; and

(2)     the performance by the Indemnitee of duties as an officer of the Mitchell Group;

provided, however, that this Indemnity Agreement shall not apply to any expenses, costs, penalties or the like which are incurred in any action or proceeding which results in a final order or judgment against the Indemnitee and in favor of the Mitchell Group or any person or entity on behalf of the Mitchell Group, but only where liability is established in such final order or judgment as based upon the Indemnitee's negligence, gross negligence or intentional misconduct.

2.      Notwithstanding any provision in this Agreement to the contrary, this Indemnity Agreement shall not cover ay amounts paid or incurred as the result of claims which could have been enforced against the Indemnitee had the Indemnitee not agreed to become or remain an officer of the Mitchell Group.

3.      The Indemnitee shall use best efforts to notify the Company within a reasonable time of all material claims which are subject to this Indemnity Agreement, and shall make no payment thereon or settlement in respect thereof unless such notification shall first have been given and the Company shall not have provided a defense or the Company or the Mitchell Group not otherwise have assumed the burden of responding to such claims.

4.      In the event suit is brought against the Indemnitee with respect to any claim covered by this Indemnity Agreement, the Company shall conduct, at its expense, the defense thereof. The Indemnitee shall cooperate in the defense of such claims to the extent reasonably required by the Company. The Company's liability for any expenses of litigation incurred by the Indemnitee shall extend only to such expenses as shall have been incurred following notification as described in paragraph 3 above.

5.      If any provision of this Indemnity Agreement is found to be invalid or unenforceable, then, to the extent possible, all other remaining provisions of this Indemnity Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

6.      This Indemnity Agreement and the rights and duties of the parties

7

indemnify Campus against loss or liability, including expenses and attorneys' fees, incurred by Campus in defending any claims arising from Campus' agreement to serve as an officer of TMC and his performance of his duties as an officer of TMC. The Indemnity Agreement also provides that TMC shall, at its expense, defend Campus against such claims.

12.    On March 7, 2007, TMC terminated Campus and filed the Underlying Action against Campus alleging, among other things, that Campus breached his fiduciary duties to TMC and/or was negligent in the performance of his duties.

13.    Since the Underlying Action was initiated, Campus has denied TMC's accusations of wrongdoing and vigorously defended against TMC's claims. As a result, Campus has incurred and paid substantial litigation expenses.

14.    On June 25, 2008, Campus, through counsel, sent a letter to counsel for TMC addressing TMC's obligation to indemnify Campus against expenses incurred defending the Underlying Action, requesting acknowledgment of TMC's obligation to fund Campus' defense, and acknowledging Campus' obligation to repay any expenses incurred by TMC on behalf of Campus in the event that the Underlying Action results in a final judgment in TMC's favor.

---

hereto shall not be assignable by either party hereto, other than by operation of law or succession, and any attempt to assign this Indemnity Agreement shall render it void and unenforceable. All terms and provisions of this Indemnity Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Indemnitee and of the Company.

7.    This Indemnity Agreement shall be governed by the laws of the State of Alabama, to the extent Federal law does not apply.

(Doc. 80, Exhibit A)

15.    To date, TMC has not acknowledged its obligations under the Indemnity Agreement or provided any substantive response whatsoever to Campus' indemnification letter.

.      .      .

## COUNT I
## DECLARATORY JUDGMENT: CAMPUS' RIGHTS UNDER THE INDEMNITY AGREEMENT
### (*Against TMC*)

.      .      .

35.    The Indemnity Agreement TMC executed in favor of Campus requires TMC to pay Campus' defense expenses incurred defending claims arising from Campus' service as an officer of TMC.

36.    As TMC's claims in the Underlying Action pertain to Campus' conduct in his capacity as an officer of TMC, the Underlying Action is a covered proceeding and TMC is obligated to pay Campus[] for all expenses incurred defending the Underlying Action.

37.    As of the date of this filing, TMC has not substantively responded to Campus' indemnification letter.

38.    TMC's failure and refusal to acknowledge or confirm its obligation to fund Campus' defense in connection with the Underlying Action is without justification and is in violation of Campus' rights under the Indemnity Agreement and Alabama law.

39.    There is an actual, justiciable controversy between Campus and TMC as to the obligations of TMC under the Indemnity Agreement.

40.     Accordingly, Campus is entitled to a summary declaration that TMC is obligated to fund Campus' defense of the Underlying Action.

## COUNT II
## INDEMNIFICATION FOR EXPENSES INCURRED PURSUING COUNTERCLAIMS PERTAINING TO TMC'S INDEMNIFICATION OBLIGATIONS
### (*Against TMC*)

.          .          .

42.     Campus is entitled to advancement of legal fees and expenses incurred with respect to the Underlying Action pursuant to the Indemnity Agreement. Campus is also entitled as a matter of law to recover his legal fees and expenses incurred in enforcing his rights under the Indemnity Agreement ("fees on fees") herein.

43.     There is an actual, justiciable controversy between Campus and TMC as to the obligation of TMC to pay "fees on fees."

44.     Accordingly, Campus is entitled to summary declaration that TMC must indemnify Campus and pay all "fees on fees" incurred in prosecuting his indemnification counterclaim against TMC herein.

## COUNT III-DECLARATORY JUDGMENT:
## CAMPUS' RIGHTS TO ADVANCEMENT IN THE INSTANT ACTION
### (*Against TMC*)

.          .          .

46.     In the Instant Action, Plaintiffs TMC, Model Homes, and Hexagon's [] claims are also based on Campus' alleged "violation of his fiduciary duties to the Mitchell

10

Company" as an officer and director.

47.     According to Plaintiffs, due to Campus' "disloyal service" to TMC, Model Homes and Hexagon should be able to avoid or (at least) delay their respective obligations to pay Campus[] for the fair value of his membership interest in each respective LLC while the Underlying Action is ongoing.

48.     As the claims in the Instant Action also pertain to Campus' conduct in his capacity as an officer of TMC, the Instant Action is likewise a covered proceeding and TMC is obligated to pay Campus[] for all expenses incurred defending the Instant Action.

49.     Therefore, on September 25, 2008, counsel for Campus sent a letter to counsel for TMC requesting advancement of legal expenses because the claims asserted in the Instant Action triggered Campus' right to advancement under the Indemnity Agreement.

50.     TMC's counsel denied Campus' request.

51.     TMC's failure and refusal to fund Campus' defense in connection with the Instant Action is without justification and is in violation of Campus' rights under the Indemnity Agreement and Alabama law.

52.     There is an actual, justiciable controversy between Campus and TMC as to the obligations of TMC under the Indemnity Agreement.

53.     Accordingly, Campus is entitled to a summary declaration that TMC is obligated to fund Campus' defense of the Instant Action.

**COUNT IV-INDEMNIFICATION ("FEES ON FEES"):
EXPENSES INCURRED PURSUING COUNTERCLAIMS**

**PERTAINING TO TMC'S ADVANCEMENT OBLIGATIONS
IN THE INSTANT ACTION
(*Against TMC*)**

.     .     .

55.    Campus is entitled to advancement of legal fees
and expenses incurred defending against the Instant Action
pursuant to the Indemnity Agreement. Campus is also entitled
as a matter of law to recover his legal fees and expenses
incurred in enforcing his rights under the Indemnity Agreement
("fees on fees") herein.

56.    There is an actual, justiciable controversy between
Campus and TMC as to the obligation of TMC to pay "fees on
fees."

57.    Accordingly, Campus is entitled to summary
declaration that TMC must indemnify Campus and pay all "fees
on fees" incurred in prosecuting his advancement counterclaim
against TMC for defense expenses incurred in the Instant
Action.

(*Id.* at ¶¶ 10-15, 35-40, 42-44, 46-53 & 55-57 (internal citations omitted;

footnote added))

3.    Prior to the filing of his amended counterclaim,[3] that is, on

August 22, 2008, Campus moved for partial summary judgment in his favor

as to Counts I and II of his originally-stated counterclaim. (Doc. 24) On

---

[3]    The amended counterclaim added a new Count III, seeking a declaratory
judgment as to his rights to advancement in the instant action and a new Count IV, seeking
indemnification of "fees on fees" or the expenses incurred while pursuing defendant's
counterclaims relating to TMC's advancement obligations to him in the instant action. (*Compare*
Doc. 47, at 12-13 *with* Doc. 48)

December 9, 2008, Campus filed a motion to dismiss the plaintiffs' complaint.

(Doc. 44)

4.      On March 3, 2009, the Court entered an order granting Campus'

motion for partial summary judgment on Count I of his counterclaim, relating

to advancement of fees but denying his motion with respect to his claim for

fees on fees (Count II). (Doc. 54)

> While not stating the word "advancement" and not specifically providing a separate paragraph entitled "advancement of legal expenses," the Indemnity Agreement provides for advancement. Paragraph 4 unequivocally states that if an action with respect to any covered claim is brought against Campus, TMC *shall* conduct Campus' defense at its own expense (*i.e.,* pay for the expenses incurred) and that Campus shall cooperate in the defense to the extent his participation is reasonably required. The Indemnity Agreement is not ambiguous with regard to these requirements. Thus, TMC contracted to conduct Campus' defense, at its expense (*i.e.,* pay for Campus' defense), for actions which have not yet concluded– meaning that TMC contracted to pay Campus' defense expenses until such time. This contractual language cannot be reasonably construed to mean anything other than TMC agreed to pay for Campus' defense *in advance*.

.      .      .

> In sum, it is clear what TMC and Campus contracted to do, and it is clear what TMC and Campus did not contract to do. The Indemnity Agreement contains a provision providing for TMC's *mandatory* payment of the costs of Campus' defense. This contract provision renders mandatory TMC's duty to pay for his defense before the litigation concludes – *i.e.,* in advance. Accordingly, TMC cannot now seek to escape the consequences

13

of [its] own contractual freedom[] by [r]egretting the broad grant of mandatory advancement they forged on a clear day . . . [and] seek[ing] to have the judiciary ignore the plain language of the[] contract[] and generate an after-the-fact judicial contract that reflects [its] current preference.

.    .    .

A reading of [] paragraphs [1, 3, and 4 of the Indemnity Agreement] suggests that the parties envisioned not only third-party actions but a direct action by TMC against Campus [] and moreover, that they intended for something more than mere payment of Campus' defense (*i.e.,* that in addition to paying for Campus' defense, TMC would also assume the burden of providing his defense and defend him), but this does not mean absolute control. To characterize the provision in the manner that TMC suggests (that TMC would have the power to control Campus' defense, to hire and fire his attorney, review his legal bills, render legal service to him and take custody of and review his personal documents, etc.) would open the door to violations of the Model Rules of Professional Conduct governing attorney-client representation, insofar as counsel would then simultaneously represent both TMC and Campus. As such, even if the Court were to determine that the term "conduct the defense" means that TMC has total control over Campus' defense and selection of his counsel, the counsel "conducting" Campus' defense would still owe his or her undivided loyalty to his client, Campus, not TMC, such that TMC could in no way interfere with that relationship. Accordingly, the finding that the Indemnity Agreement provides for advancement of legal expenses is not an unreasonable construction; rather, it is a reasonable construction of the terms of the Agreement itself. It would be an unreasonable construction of the contract to conclude that TMC's mandatory contractual duty to pay for Campus' defense would also mean that TMC can control all aspects of his defense in litigation which TMC has pursued against Campus.

14

.     .     .

To obtain advancement under the former Act [*i.e.*, the Alabama Business Corporation Act], an officer is required only to provide an undertaking to repay the advance in the event it is ultimately determined that he does not meet the indemnification standard. Specifically, Section 10-2A-21(e) of the Act (the corollary to RABCA's Section 10-2B-8.53(a)) requires only an undertaking . . . to repay . . . if and to the extent that it shall be ultimately determined that (the director) is not entitled to be indemnified. The former Act has no requirement for an officer to provide a written affirmation of good faith belief that he has met the standard of conduct. The former Act has no requirement for a determination of "facts then known" to be conducted by the corporation. TMC concedes this much. Thus, to comply with the former Act and Alabama's law on advancement, to then obtain advancement of the expenses of his defense from TMC, Campus need only fulfill the undertaking to repay requirement.

On June 25, 2008, Campus' attorney provided TMC with a written undertaking, executed on Campus' behalf, stating that he will repay the expenses if there is ultimately a judgment issued against him: [i]f, at some time in the future, [TMC] . . . obtains final order or judgment against Campus based on Campus' negligence, gross negligence or intentional misconduct, then Campus will repay and refund to [TMC] . . . any expenses, costs, or penalties that [TMC] . . . has incurred pursuant to the Indemnity Agreement. TMC has conceded in its opposition that [u]nder the former Act, advancement required only an undertaking to repay the advance if it was ultimately determined he did not meet the indemnification standard[] [and in this case] Campus' attorney has provided such a statement on his behalf, arguably satisfying the former statute . . . . Thus, due to the absence of a genuine issue of material fact, Campus is entitled to summary judgment on his advancement claim.

.     .     .

15

TMC's claim that Campus is not entitled to advancement because he will not be entitled to indemnification lacks merit. TMC's position presumes that it has already prevailed on its, as yet, unproven claims. TMC's position also discounts that entitlement to advancement is independent of the merits of the suit for which the money is sought, and is a remedy independent of the remedy of indemnification.

.    .    .

TMC contends that the doctrines of unjust enrichment, faithless servant and unclean hands, bar Campus' equitable claim for advancement . . . . There has been no trial. There have been no "findings" with regard to Campus' alleged conduct. There has been no determination – whatsoever – regarding his liability. Additionally, Campus has repeatedly denied liability to TMC, as well as TMC's allegations against him. Moreover, the issue before the Court is not Campus' purported bad conduct, because at this point, only his right to advancement under the terms of the Indemnity Agreement, not indemnification, is at issue. This means that even if the Court views TMC's allegations in the light most favorable to the corporation, Campus' alleged conduct is irrelevant, such that any doctrines premised on same are simply inapplicable. An officer's entitlement to advancement is a matter independent of the merits of the suit for which the money is sought and the right to advancement is not dependent upon the right to indemnification.

.    .    .

Campus asserts that he is entitled to recovery of "fees on fees" (the fees incurred in having to file this action to enforce his advancement rights) . . . . The terms of the Indemnity Agreement do not expressly address recovery for fees on fees (for fees incurred to enforce the contractual right to either advancement or indemnification).

While there is an absence in Alabama of case law

16

addressing fees incurred in establishing the right to advancement of legal expenses, the Alabama Supreme Court has held that recovery of "fees on fees" for seeking the right to indemnification is generally not permissible. The general rule is that, in the absence of express language giving the indemnitee such a right, an indemnitee cannot recover its attorney's fees incurred in establishing its right to indemnification. . . . Accordingly, unless the agreement provides for fees on fees, they are not allowed under Alabama law.

Paragraph 4 of the Indemnity Agreement requires TMC to pay the expenses of Campus' legal defense for covered claims. Paragraph 1 of the Indemnity Agreement defines covered claims and also expressly requires TMC to indemnify Campus against any loss or liability including reasonable expenses and attorney[']s fees which result from any claim arising from his agreement to serve as a officer of TMC and the performance of his duties as a TMC officer. The Court disagrees with Campus that the fees incurred in establishing his right to advancement of fees is a loss or liability arising from Campus' agreement to serve as a TMC officer. Rather the claim arises from TMC's breach of its commitment to defend Campus' covered claims, at TMC's expense. The breach of contract claim is not the result of Campus' service as an officer of TMC and is not an indemnified claim. For these reasons, Campus is not entitled to recover from TMC "fees on fees"– the fees he has incurred in having to file this action to enforce his advancement rights.

.      .      .

The Indemnity Agreement provides that Campus shall use best efforts to notify TMC within a reasonable time of all material claims which are subject to the Indemnity Agreement. TMC initiated the underlying action against Campus on March 7, 2007. On March 15, 2007, Campus' counsel sent a letter to TMC's counsel, requesting copies of indemnification policies in its possession (among other things). While the record indicates

correspondence between the opposing parties thereafter, there is no indication that TMC responded to Campus' request and/or that Campus specifically asserted that TMC's claims against him were subject to the Indemnity Agreement. On June 25, 2008, however, Campus, through his attorney, made a specific claim for advancement and indemnification against TMC . . . .

TMC asserts that even if the Indemnity Agreement requires advancement, Campus is not entitled to reimbursement of the expenses he incurred in the underlying action prior to June 25, 2008 – the date of the letter from his attorney. TMC is correct. Pursuant to the terms of the Indemnity Agreement, in order to obtain advancement, Campus was required to, first, notify TMC of the material claims which were subject to the Indemnity Agreement. While Campus' counsel requested a copy of any indemnification policies in March 2007 and communicated with opposing counsel thereafter, there is no indication in that letter or other correspondence of record, that Campus made a specific claim that the underlying action was subject to the Indemnity Agreement and/or that he made a claim for advancement against TMC, until June 25, 2008. As such, Campus is entitled to be reimbursed only for the expenses incurred after June 25, 2008.

.      .      .

The pertinent question for this summary judgment then, has been not whether Campus may later be found to have engaged in negligence, gross negligence or intentional conduct, but rather, whether he has demonstrated that TMC has denied a right to advancement to which he is entitled. The merits of the underlying action are irrelevant to whether advancement (and fees on fees for having to seek same) must be awarded here and now. . . . If it is ultimately determined that Campus' conduct is not indemnifiable due to negligence, gross negligence or intentional misconduct, then Campus will have to repay any

18

expenses advanced. Unless or until such final order or judgment is issued, however, TMC is required to pay and advance the defense costs to Campus. The court is not in a position, after the fact, to relieve the parties of the burdens of the contract that they executed and that now, one party, wishes had been drafted differently.

Based upon the foregoing, the Court finds Campus' motion for partial summary judgment as to his advancement claim is **GRANTED** to the extent explained herein. Campus' motion for summary judgment on his claim for fees on fees is **DENIED**.

(*Id.* at 13, 15, 16-17, 25-26, 27, 27-28, 28-31, 32 & 33 (internal citations and

most internal quotation marks omitted; emphasis in original))

5.     On March 24, 2009, Campus filed an emergency motion to hold

TMC in contempt and to require compliance with the Court's order of March

3, 2009 (Doc. 56).

As this Court has already recognized, "TMC chose, and more importantly contracted, to be 100% responsible for the legal expenses incurred by Campus defending *any* claims pertaining to his status as an officer of TMC." Unless and until it is determined that Campus is not entitled to indemnification, TMC must advance Campus's defense costs as ordered by the Court. TMC's defiance of the Court's Order must not be tolerated.

**WHEREFORE,** Campus requests that this Court:

A.     Order that TMC show cause as to why it should not be held in contempt of this Court;

B.     Order that TMC pay within seven (7) days all

19

defense costs, which Campus has incurred since June 25, 2008, in the amount of $91,526.53;

C.    Order that TMC pay Campus's defense costs each month within seven (7) days of receipt of invoices from Campus's counsel;

D.    Stay the Underlying Action until such time as TMC complies with its advancement obligations and pays Campus's defense costs;

E.    Award Campus his fees and costs in bringing this motion; and

F.    Award further relief as this Court deems necessary and appropriate to ensure obedience to its orders and prevent prejudice to Campus.

(*Id.* at 7 (internal citation and footnote omitted; emphasis in original)) The Court denied Campus' emergency motion by order dated April 9, 2009. (Doc. 61) "The Court's March 3, 2009 Order, granting partial summary judgment on Campus' counterclaim for advancement of defense expenses (Count I), was not issued in response to a claim or request for injunctive relief, nor was it accompanied by entry of a final Rule 54(b) judgment. Accordingly, TMC is not in contempt of this Court's Order [] as it now stands." (*Id.* at 2 (internal citation and footnote omitted))

6.    On May 4, 2009, Campus filed a motion for preliminary injunction and stay (Doc. 63).

20

Joseph J. Campus, III [] moves this Court to issue a preliminary injunction requiring The Mitchell Company [] to advance Campus' legal fees and expenses incurred in defense of claims asserted against him in . . . the "Underlying Action"[] and this action [] until further order of this Court and to stay these actions until TMC pays all expenses incurred and subject to advancement to date.

.    .    .

Campus respectfully prays that this Court grant injunctive relief requiring that the following procedures be followed until further order of this Court:

1.    Campus' counsel, Carlton Fields, P.A. and Johnstone, Adams, Bailey, Gordon & Harris, L.L.C. [], shall submit to TMC on a monthly basis invoices for legal fees and expenses which they determine in good faith are fees and expenses that are properly advanceable under this Court's March 3, 2009 Order. Campus' counsel's invoices shall include those fees and expenses for legal services provided in the Underlying Action since June 25, 2008 and in the Instant Action since September 25, 2008.

2.    TMC shall promptly pay the invoices of Carlton Fields and Johnstone Adams at their normal hourly rates. If TMC has objections to any of the invoices submitted, it shall specify those objections within ten (10) days of receipt. TMC shall also pay within ten (10) days of receipt of the invoices any portion of the invoices to which it does not object, but in no event shall TMC pay less than seventy-five (75%) of the fees submitted and all of the expenses.

3.    If TMC's objections cannot be resolved by the

21

> parties, the matter shall be submitted to Magistrate Judge Cassady for expedited resolution. TMC's right to ultimately challenge the reasonableness of Campus' fees shall be preserved until a final indemnification hearing.

.     .     .

> TMC should not be permitted to pursue its claims against Campus before this Court in the Underlying Action or the Instant Action, unless and until it honors its obligation to advance Campus' defense costs. Otherwise, the proceedings before this Court will become the means of oppression and vexation as Campus is forced to incur additional defense costs, which TMC is obligated to advance.

(*Id.* at 1 & 8-9 (internal citations and footnote omitted)) Following the filing of TMC's response in opposition (Doc. 68; *see also* Doc. 69), the Court entered an order on June 4, 2009 granting Campus' request for a preliminary injunction (Doc. 71).

> To be eligible for preliminary injunctive relief under Rule 65 of the <u>Federal Rules of Civil Procedure</u>, a movant must establish each of the following elements: 1) a substantial likelihood of success on the merits; 2) that irreparable injury will be suffered if the relief is not granted; 3) that the threatened injury to the movant outweighs the harm that the relief would inflict on the non-movant; and 4) that entry of the relief would not disserve the public interest. In the Eleventh Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites.

> The Court addresses each of these elements in turn. First,

22

Campus not only has shown a substantial likelihood of success on the merits of his advancement claim, but he has established _actual_ success on the merits of one of his claims as evidenced by this Court's prior ruling which awarded him advancement of expenses in the underlying action under the terms of the Indemnity Agreement.

Also, Campus seeks–for the first time–a determination concerning advancement of defense expenses in the instant action. In the instant action, Plaintiffs allege that their claims against Campus are based on his violation of fiduciary duties to TMC and set forth specific allegations revealing that their claims arise from Campus' performance of duties as TMC officer. While Campus set forth a count for such relief in his Amended Counterclaim, he did not seek summary judgment on this count, instead only seeking such relief with regard to his claim for advancement of defense expenses in the underlying action (CV 07-177). As such, in ruling on Campus' prior motion for partial summary judgment, the Court found that he was entitled to advancement of his expenses in the underlying action. Nevertheless, for those same reasons articulated in the Court's Order (_i.e._, because TMC contracted to be 100% responsible for the legal expenses incurred by Campus defending _any_ claims pertaining to his status as an officer of TMC, the Court finds that Campus' claim for advancement of defense expenses in the instant action is likely to succeed.

On the issue of irreparable harm, TMC contends that Campus has failed to show irreparable injury because he has not shown that he is unable to retain counsel from his own funds. However, the issue is not whether Campus has sufficient funds to pay for his defense. Rather, the issue is whether Campus will irreparably suffer a loss.

Pursuant to the Indemnity Agreement, Campus is contractually entitled to payment of his defense costs until there is a judicial determination that he has engaged in behavior that vitiates his right to indemnification. If the Court does not issue

injunctive relief requiring TMC to pay for the advances during the litigation, then Campus' advancement right will be eviscerated and rendered meaningless.

Third, Campus has shown that the threatened injury to him outweighs the harm that an injunction requiring advancement of expenses may cause TMC. The threatened injury to Campus is an irretrievable loss of a contractual right and having to pay for his own defense out of his own pocket. Interestingly, TMC's opposition is silent on this issue. In fact, apart from alleging that Campus has stolen from the company and engaged in wrongdoing, TMC does not address precisely how advancement of Campus['] legal expenses will harm TMC to such an extent as to outweigh any threatened injury to Campus. TMC's prospective harm, at worst, is that it runs the risk of non-payment if it is ultimately found that Campus is not entitled to indemnification *and* Campus is unable to pay the amounts advanced. TMC, however, contracted for such when it entered into the Indemnity Agreement with Campus, contracting to pay for his defense at its own expense. As such, Campus' threatened injury outweighs the harm to TMC.

Fourth, Campus has shown that an injunction will not disserve the public interest. Public policy favors honoring advancement agreements. . . . Alabama's public interest would be served by protecting Campus' right to advancement through the issuance of a preliminary injunction to enforce that right. . . .

In sum, Campus' Motion for Preliminary Injunctive Relief is **GRANTED** with respect to advancement of his defense expenses both in the underlying action (CV 07-177), as well as in the instant action (CV 08-342). Accordingly, TMC is hereby preliminarily enjoined from refusing to provide such expenses to Campus and is required to immediately pay the reasonable expenses of Campus' defense.

This matter is **REFERRED** to U.S. Magistrate Judge

> William E. Cassady for the handling of all issues relating to the preliminary injunctive relief granted herein, as well as its expedited enforcement and resolution of any remaining disputes as to what constitutes reasonable expenses (including Campus' pending request for entry of a stay).

(*Id.* at 3-6 & 6-7 (internal citations, quotations, and footnotes omitted; emphasis in original)) The same day this order was entered, Campus filed a motion for a hearing before the undersigned. (Doc. 72) Campus' motion for a hearing was granted by the undersigned on June 5, 2009. (Doc. 73)

> [P]laintiff The Mitchell Company, Inc. [] and defendant Campus are **ORDERED** to file briefs, with supporting evidence, on or before the close of business on **June 12, 2009** directed to the amount of reasonable defense expenses due Campus in the underlying action (CV 07-177) and this action (CV 08-342), as well as whether these actions should be stayed pending payment of the foregoing defense expenses. Thereafter, the interested parties are to each file their responses on or before the close of business on **June 19, 2009**. Briefing will then be **CLOSED**. Counsel for Campus and TMC are to appear for oral argument before the undersigned on **June 29, 2009** at **3:00 p.m.**, [in] Courtroom 3A, United States Courthouse, Mobile, Alabama.

(*Id.* at 2) TMC and Campus accomplished this briefing, as ordered (Doc. 75 (TMC's brief and evidentiary submission regarding defense costs and in opposition to staying the underlying action); Doc.76 (Campus' brief regarding the amount of reasonable defense expenses from TMC and whether a stay

should be ordered);[4] Doc. 79 (Campus' response brief);[5] Doc. 80 (TMC's

_____

[4]     Campus' brief reads, in relevant part, as follows:

The issues to be determined in the litigation between TMC and Campus are complex and extensive. In the Underlying Action alone, Campus has been called upon to answer and defend twelve causes of action that TMC has asserted against him pertaining to his conduct as an officer of TMC. Yet, after nearly a year of active litigation in both cases, Campus seeks only $296,127.70, which represents legal expenses incurred for discovery, legal research, preparation of pleadings, travel, and other pre-trial expenses.

     By comparison, TMC incurred $429,357.86 in attorney[']s fees and $205,614.54 in investigative costs incurred between August of 2006 and September of 2007 to investigate the underlying facts relative to TMC's claim. This comparison underscores the reasonableness of Campus' expenses due to be paid here.

.     .     .

     This Court must establish the guidelines and parameters to be followed by the parties with regard to advancement of Campus' legal expenses from this point forward. Campus suggests that the Court should impose a framework for future advancement very similar to the one utilized in the *Westar* case.

.     .     .

     For nearly two years, TMC has avoided its contractual obligation to advance Campus' expenses. As a result, Campus has incurred significant hardship and been prejudiced by being required to pay several hundred thousand dollars in defense costs, which should have been paid by TMC *at its expense*. . . . Having been required to pay for his own defense thus far because TMC has refused to fulfill its advancement obligations to date, Campus should not now be forced to incur further expenses defending against TMC's claims after this Court has ordered TMC to *immediately* advance Campus' expenses.

     If TMC does not *immediately* obey the Court's Orders, TMC should not be permitted to maintain its claims in this Court. Instead, a stay should be entered pursuant to the Court's authority to stay an action for a party's failure to pay costs as ordered. Moreover, permitting TMC to maintain its claims without advancing Campus' defense costs, would make the proceedings in this Court the means of

_____

oppression and vexation, a result which is to be avoided.

      In both *Wishneski* and *Matthews*, the courts held that the courts had authority to stay subsequent cases for failure to pay costs in prior cases. It logically follows then that, if a court can control its own proceedings by staying a second suit for failure to pay costs from a prior case, this Court can certainly control the proceedings in these pending actions through entry of a stay until TMC advances Campus' defense costs as ordered.

(*Id*. at 6-7, 7, 8 &  8-9 (internal citations, quotation marks, and footnotes omitted; emphasis in original))

    [5]    This brief reads, in part, as follows:

The cases relied upon by TMC [] do not address the standards governing advancement of reasonable attorneys' fees based on a contract, which is the issue presently before the Court for resolution. Accordingly, the cases cited by TMC are inapposite to this Court's determination of the reasonable amount of fees due to be advanced to Campus.

      .     .     .

      TMC argues for a reduction in the amount of costs that are due to be reimbursed arguing that reasonable attorneys' fees do not include overhead costs such as most paralegal expenses and copying costs. Here again, TMC supports its argument by citing to cases pertaining to statutory fee-shifting awards, not cases addressing contractual attorneys' fees and costs awards. Moreover, Campus' Indemnity Agreement provides for advancement of reasonable expenses <u>and</u> attorneys' fees. Because the Indemnity Agreement separately provides for payment of both reasonable expenses <u>and</u> attorneys' fees, under the express terms of the Indemnity Agreement, these expenses are subject to advancement in addition to Campus attorneys' fees as long as they are reasonable. Any other interpretation would render the term reasonable costs in the Indemnity Agreement meaningless, a result which is to be avoided.

      .     .     .

      TMC also asserts that Campus should be required to affirm that he has the

response brief[6])),[7] and counsel appeared before the undersigned for oral

---

ability to repay the expenses paid by TMC, provide proof of ability to repay, affirm that he will not impair his ability to repay those expenses, and provide a bond for the value of advancement. Here again, TMC attempts to rewrite the Indemnity Agreement after-the-fact to condition and limit Campus' right to advancement of defense costs, a position the District Court has already soundly rejected.

As the District Court has already determined, the only condition on Campus' right to receive advancement of defense costs is an undertaking to repay. If TMC had meant to condition Campus' advancement right on Campus affirming and proving his ability to repay or on Campus posting a bond, TMC could have and should have done so in the Indemnity Agreement.

Furthermore, with regard to TMC's request that Campus be required to post a bond [i]t is in the discretion of the district court to decide that, under the circumstances, no security is required.

.        .        .

TMC's arguments regarding Campus' counsel's billing practices, which costs qualify for advancement, and reductions that should be made to the amounts due, raise issues that need not be determined while the litigation between Campus and TMC is ongoing.

(*Id.* at 2-3, 5-6, 7-8 & 9 (internal citations, quotation marks, and footnotes omitted; emphasis in original))

---

[6]        TMC's response brief reads, in part, as follows:

Mr. Cox's affidavit [does] not meet the burden of establishing a reasonable rate in the market in which the action is filed, Mobile, Alabama. The burden of establishing that rate is on the moving party, which Mr. Cox never attempts to do. In so doing, a party cannot rely merely on its attorneys' bill for services. . . . As the rates of Johnstone Adams attorneys billed in this matter are in line with the Mobile market for legal services and these rates conform to what was charged by the firm attorneys in recent litigation which was the subject of a fee award before this Court and as TMC does not object to these rates, the Court

should impose these rates ($255 for attorneys with 25+ years experience; $155 for
senior associates like Mr. Harris of Carlton Fields and Mr. LaTrace of Johnstone
Adams) on all legal work performed.

.        .        .

TMC's–and the judicial system's–objections to block billing were well-
explored in its previous brief. The reduced redaction in the invoices attached to
Campus' brief of June 12, 2009, allows TMC to state unequivocally that Campus'
attorneys have engaged in block billing.

.        .        .

Paralegal expenses are unrecoverable overhead expenses. Yet the Carlton
Fields attorneys have attempted to recover significant paralegal costs. Not only
are the hourly rates charges by these non-attorneys in excess of what many an
associate charges in Mobile–and therefore unreasonable–but they are not
recoverable expenses under Eleventh Circuit law. Also, Carlton Fields copying
costs for April 2009 are hugely excessive, as well as unexplained, at $829.40.
Standard copying for the convenience of the attorneys is not a recoverable
expense.

.        .        .

For March and April, Cox billed 116.3 hours[] and Harris bill[ed] 176.6, a
significant and costly variation from the previous workload wherein Harris
performed the great majority of the work. Counsel for TMC had determined, as
best it could, from Carlton Fields' previous bill, that Cox had billed 42.3 hours to
Harris' 181.6. This Court has criticized senior attorneys who seek fees where they
perform the lion's share of the work involved rather than shifting that work to
capable and more junior attorneys.

.        .        .

For the period of March 1, 2009, until April 30, 2009, there is a
resurgence in the number of attorney time entries [which] appear to be rounded to
the half-hour. In its initial brief on this matter, TMC noted that from June 26,
2008, to October 31, 2008, that over 61% of Mr. Cox's time entries for that period
were in whole or half hour increments and that for the same period, over 77% of
Mr. Harris' entries were in whole or half hour increments. TMC also noted, that,

as far as it was aware, this pattern of imprecise billing appears to have recessed around November 1, 2008.

However, the new time records from the Carlton Fields' attorneys reveal that this practice renewed itself around March 1, 2009. For March and April 2009, over 65% of Mr. Harris['] entries were in whole or half hour increments. For the same period, <u>over 80%</u> of Mr. Cox's time entries were in whole or half hour increments; in fact, for April 2009, eighteen of Mr. Cox's twenty time entries (90%) were in hole or half hour increments.

.      .      .

In the Indemnity Agreement, TMC stated it would *conduct* the defense. If that language would not entitle it to select counsel in less hostile circumstances, then it at least allows reasonable, Mobile-based limitations on charges those attorneys incur. Mr. Cox and Mr. Harris are based out of Atlanta. Mr. Cox has charged for travel time, which would not have been charged by an attorney based in Mobile and is therefore inappropriate. Consider Mr. Cox's 17.50 hour day of April 23, 2009[.] . . . In addition to being an example of inappropriate block billing . . . and opposing counsels' tendency to charge by the half hour, it levies the charge of traveling on TMC for what was a local–to Mobile–deposition, which attorneys from Johnstone Adams could have ably conducted.

.      .      .

[A] few irregularities [in billing] have stood out in addition to those cited above:

> ■    Carlton Fields attempts to recover for having Mr. Harris attend the depositions of some deponents which Mr. Cox actually conducted. . . . Many clients and insurers reject paying for the presence of a second attorney in depositions.

> ■    The Carlton Fields invoices reveal billing for consultation and compiling documents with a Hartford attorney as early as June 2008. Hartford did not file its declaratory judgment action until October of 2008.

(Doc. 80, at 4, 6, 7, 8, 9 & 9-10 (internal citations and footnotes omitted; emphasis in original))

argument on June 29, 2009. Immediately following that hearing, the undersigned endorsed the following order on the docket sheet in CV 08-342: "Mr. Campus shall resubmit, not later than 5 p.m. on Friday, July 3, 2009, the invoices submitted by his attorneys without redaction and with a specific identification of any fees and/or costs not included in his request for reimbursement; TMC shall respond to this new submission of fees and costs and file its brief regarding the need for a Rule 65(c) bond not later than 5 p.m. on July 10, 2009." (Doc. 82)

      7.     In response to the undersigned's order dated June 29, 2009, Campus, on July 2, 2009, submitted the affidavit of James H. Cox, Esquire, and attached thereto "supporting documentation identifying all fees and expenses subject to advancement and specifically identifying any fees and expenses not included in his request for advancement." (Doc. 83) The affidavit

---

[7]     On June 17, 2009, the Court entered an order granting Campus' motion to dismiss the plaintiffs' complaint. (Doc. 78; *see* Doc. 44) "There is no allegation that TMC has any legally protected interest in either Model Homes and/or Hexagon, or vice-versa. Accordingly, Campus' motion to dismiss is due to be granted as to TMC's request for declaratory relief because TMC lacks standing to seek a declaration of the rights of Campus or the obligations of the LLCs under the Operating Agreement or to seek a stay of the LLCs['] obligations. . . . As to the LLCs, they contend that they have standing to request declaratory relief and a constructive trust over Campus' interest in the LLCs because in the near future it is 'likely' that Campus will have to disgorge some or all of his interests in the LLCs based on the outcome of TMC's underlying action against him. However, the LLCs cannot base their claim for equitable relief upon the purported interests and injuries of TMC." (Doc. 78, at 12)

of Cox, lead counsel for Campus, reads, in relevant part, as follows:

       3.    . . . I have reviewed all of the time records of Carlton Fields for legal services rendered and expenses incurred in Case No. 07-177-KD-C beginning June 25, 2008 through May 31, 2009, and in Case No. [] 08-342-KD-C beginning September 25, 2008 through May 31, 2009, for the purpose of determining the amount of fees and expenses that The Mitchell Company should be ordered to immediately advance to Campus pursuant to the Orders of this Court.

       4.    In conducting my review, I examined each time entry carefully in order to determine which services and expenses should be considered as having been incurred as "defense expenses" as a result of any claim arising from Campus' service as an officer of The Mitchell Company and his performance of his duties as an officer of The Mitchell Company. In the course of conducting my review, I excluded fees and expenses related to the prosecution of Campus's counterclaims in the Underlying Action and the Instant Action and fees billed for travel time by me or other members of Carlton Fields between Atlanta, Georgia, Mobile, Alabama and Pensacola, Florida. I also excluded fees and expenses related to our assertion of Campus' right to advancement (i.e., "fees on fees").

       5.    The attached invoices as marked up represent the result of my review as described in the preceding paragraph. The entries or portions of entries that are "lined through" represent fees and expenses that Campus is not requesting to be advanced to him pursuant to the Court's Orders. With respect to the time entries that have been partially excluded, I allocated the total time spent for a particular entry between advanceable and non-advanceable fees and expenses based on my familiarity with the work that was done. All the work was done either by me or under my supervision.

       6.    Based on the foregoing, The Mitchell Company

should be ordered to immediately advance to Campus $236,847.00 in legal fees and $12,451.96 in expenses for Case Nos. 07-177-KD-C (the Underlying Action) and 08-342-KD-C (the Instant Action) for services rendered by Carlton Fields pertaining to the defense of Mr. Campus in both actions through May 31, 2009. The Mitchell Company should further be ordered to immediately advance to Campus $6,072.50 in legal fees and $155.30 in expenses, for services rendered by Johnstone Adams pertaining to the defense of Mr. Campus in the Instant Action and the Underlying Action through May 31, 2009.

7.      Accordingly, The Mitchell Company should be ordered to advance a total of $242,919.50 in attorney's fees and $12,607.26 in expenses for Mr. Campus' defense in the Underlying Action and the Instant Action through May 31, 2009.

(Doc. 83, Exhibit A, Affidavit of James H. Cox, Esquire, at ¶¶ 3-7 (footnote omitted))

8.      TMC filed its response to Campus' new submission of fees and costs and its arguments regarding the need for a Rule 65(c) bond on July 10, 2009. (Doc. 91) Basically, TMC argues that this Court should require Campus to post an injunction bond in the amount the Court orders advanced to him since the defendant "has provided no evidence of his ability to repay, or actions taken to preserve his ability to repay," and "TMC is more likely to be harmed in the absence of the bond[.]" (*Id*. at 3-4 & 4; *see also id*. at 1-5) In addition, TMC, in arguing that billing disputes and errors remain in Campus' most recently-revised invoice, renewed "its arguments in the previous briefs

. . . regarding, among other things, the reasonable rate,[8] its right to *conduct* the

litigation (including selection of counsel),[9] the exclusion of staff and overhead

_____

[8]    TMC contends that the hourly rates for attorney work performed by Carlton Fields is unreasonable and excessive. (Doc. 75, at 2-5)

Campus' attorneys from Carlton Fields have charged an unreasonable hourly rate in this matter. James Cox, the most senior attorney from Carlton Fields . . ., a 1975 graduate of the University of Georgia School of Law, is charging $500 to $525 per hour as of March 2009. The primary other attorney from Carlton Fields . . . is Derek Harris, an associate who, according to the Carlton Fields website, has no more than eight years post-law school experience, is charging $300 to $320 per hour. It also appears that Carlton Fields charges $165 to $175 per hour for paralegals or other non-lawyer support. These rates are far outside fair market rates and are unreasonable.

A reasonable hourly rate is the prevailing market rate **in the relevant legal community** for similar services by lawyers of reasonably comparable skills, experience, and reputation. . . . Fortunately, for purposes of comparison, the Mobile firm Campus has selected to defend him, Johnstone Adams, LLC, has . . .submitted bills for two comparable attorneys. . . . Alan Christian, a litigator with 29 years of experience, has significant administrative, trial, and appellate experience. Mr. Christian is AV-rated by Martindale-Hubbell. . . . Mr. Christian is an attorney, in the relevant community, of similar experience to Mr. Cox. Mr. Christian charges $255 an hour . . . . Rick LaTrace of Johnstone Adams, like Derek Harris of Carlton Fields, graduated law school in 2002. Mr. LaTrace has billed $155 an hour in this matter.

.      .      .

Carlton Fields' hourly rates in this matter should be adjusted to conform with those of Johnstone Adams in this matter. That means that Mr. Cox's reasonable hours are reimbursed at a rate of $255 and Mr. Harris' at $155.

(*Id*. at 2-3, 3-4 & 5 (internal citations, quotation marks, and footnote omitted; emphasis in original))

[9]    "Per the Indemnity Agreement, TMC has the authority to 'conduct' the defense of the case. In exercise of that authority, Counsel for TMC sent a letter to Mr. Cox informing him that, as of March 13, 2009, TMC will reimburse no expenses from Carlton Fields, but only from

bills,[10] and its demand for reasonable billing practices (including accurate

timekeeping and recording,[11] no block billing,[12] cost-effective distribution of

_____

Campus' local counsel, Alan Christian of Johnstone Adams. Johnstone Adams, a Mobile, Alabama, law firm, was selected by Campus and offers significant cost and practical advantages in its proximity to the Court, most parties and witnesses, and TMC's counsel at Lyons, Pipes & Cook." (Doc. 75, at 9; *see also id*. at 4 ("TMC, per the agreement, has the authority to **conduct** the defense of the case. From a general insurance standpoint, that involves selection of qualified, local representation. The Agreement does not give Campus the right to select his own counsel, and it was not drafted with the intent of providing a litigation weapon to malfeasant executives by allowing them to select counsel in any locale, at any rate, to maximize costs and perhaps inconvenience to TMC."))

[10]      "Paralegal expenses are recoverable only to the extent that the paralegal performs work traditionally done by an attorney. Otherwise, paralegal expenses are unrecoverable overhead expenses. . . . Unexplained and unnecessary copies are not reasonable costs. Additionally, Carlton Fields has billed for significant copying costs, in excess of $1,220, to an entity called Digital Legal Tampa for the processing of documents into an Iconnect System. These costs would appear to be facially excessive, even if they were adequately explained. Document management, for the convenience and organization of counsel, is an overhead expense, and not a reasonable cost which TMC could (sic) be required to pay. Also, bills for fax and postage would seem to fall into the overhead category, and should be excluded." (Doc. 75, at 5 & 5-6 (internal citations and quotation marks omitted))

[11]      "From June 26, 2008, to October 31, 2008, Mr. Cox had 34 billing entries, 21 of which were for a quantity of hours ending in '.00' or '.50.' In other words, over 61% of Cox's time entries for that period were in whole or half hour increments. For the same period, Mr. Harris had 58 billing entries, 45 of which were for a quantity of hours ending in '.00' or '.50.' By proportion, over 77% of Mr. Harris' entries were in whole or half hour increments. During the same period, both attorneys also occasionally billed in quarter-hour or tenth-hour increments, per industry standard, so it is not as [if] these more usual billing increments were not used by the firm. It is unlikely that the majority of the undertakings for this matter in this period involved half-hour increments; and such a pattern of billing would arouse suspicion and inquiry in many diligent clients. This pattern of imprecise billing appears to have ended around November 1, 2008. . . . TMC proposes that each half-hour increment entry in the time period of June 26, 2008, through October 31, 2008, be reduced by 0.25 hours." (Doc. 75, at 8-9)

[12]      "Block-billing, or grouping several activities in one time entry, makes it much more difficult to determine time actually expended on a given assignment, document, or issue, making it impossible to assess the reasonableness of the entries. Block-billing is disfavored by

work), and a reasonable time table,[13] commensurate with actual industry practice, for review and payment." (Doc. 91, at 5)

> The District Judge ordered a determination on the reasonableness of fees and did not license Campus and his attorneys to collect pre-judgment or post-judgment interest on top of those fees, especially when Campus and his attorneys are only now turning over decipherable billing records, and this Court has not yet set standards for reasonableness. Accordingly, pre-judgment interest may not attach to any amounts due before this Court renders a ruling on the amount due because the amount to be advanced has, as yet, not been "'certain or are capable of being made certain.'" The Alabama Court of [Civil] Appeals has explained that to be certain or capable of being made certain, "'(1) The amount due must be certain; (2) the time when it is due must be certain; [and] (3) the amount due and time of payment must be known to the debtor.'" Until the Court defines an amount currently due (and parameters for obtaining that amount), the amount is not ascertainable under Alabama law. Since there has not been a judgment to finalize the amount to be advanced, there of course cannot be post-judgment interest either.

---

the court, and can be penalized by discounting time entries. . . . TMC proposes that all block-billing entries which are not otherwise objectionable be reduced by 20%." (Doc. 75, at 8)

[13]     "In his motion for preliminary injunction, Campus proposed a fairly punitive schedule of payment, including allowing TMC only ten days to object to any bill, and requiring that TMC [] pay 75% of the bill's total, regardless of its objections. . . . [T]o the extent Campus seeks an accelerated time line as a punitive measure, TMC has not been in contempt of court or disobeyed any final order that would merit punitive measures . . . . TMC has proposed a reasonable timeline[] that would provide timely payment or objections and responses that are generally in keeping with industry standard. Specifically, TMC proposes thirty days for its review and objections, ten days for the billing firm's response, up to fifteen days for a conference among counsel to resolve the matter without the court's intervention, and–if the issue is not resolved–then ten days after that conference for the billing firm to bring the dispute to this Court." (Doc. 75, at 9 & 10 (internal footnote omitted))

.     .     .

Having reviewed the affidavit of James Cox and the attached invoice submitted per this Court's order, in addition to the general issues raised in its previous briefs and summarized above, TMC notes the following issues in the most recent invoice:

1.) The reduction for travel time appears unrealistic. Mr. Cox reduced an entry by four hours for travel, and Mr. Harris only three hours for travel on April 14 and 17, respectively. Per a number of mapping websites and experience, the trip between Mobile and Atlanta is approximately 330 miles, and takes around 5 hours each way.

2.) Counsel did not actually omit all travel time. Mr. Cox's 17.5 billed-hour day on April 23, 2009, which included travel to Atlanta, was not reduced.

3.) There are inconsistencies in entries that are stricken or lined through and the apparent reductions in time.

   a. On November 12, 2008, Mr. Harris' entire entry is stricken except for "develop strategy for," with no explanation for the strategy, but the entry for "1.0" hours remains.

   b. On December 9, 2008, a substantial portion of Mr. Harris' narrative entry is stricken, but the entire entry for "6.4" hours remains.

4.) Campus has apparently accrued interest charges by not paying his attorneys. TMC should not be

37

required to pay these interest charges unless it is
tardy in payment <u>after</u> an order for a dollar
amount and future billing and review guidelines
are established by order of this Court.

.      .      .

TMC seeks the Court adjust Campus' attorneys' bills
pursuant to cover only the reasonable expenses, per its
arguments previously made. Relatedly, Campus' motion for a
stay in the Underlying Action is due to be denied for the reasons
set out in the prior briefs. And, as shown above, the Court's final
figuring of the amount to be advanced should be subject to an
adequate bond to protect TMC's fast-approaching right to
repayment.

(*Id.* at 5-6, 6-7 & 7-8 (internal citations omitted))

## **CONCLUSIONS OF LAW**

1.     The undersigned has set forth a detailed accounting of the

proceedings in this case to date in part to clearly establish what is or is not

before the undersigned for determination and in part simply because the

undersigned deems same necessary. As heretofore indicated, United States

District Judge DuBose specifically referred this matter to the undersigned "for

the handling of all issues related to the preliminary injunctive relief" granted

in favor of defendant Campus, as well as expedited enforcement of that relief

"and resolution of any remaining disputes as to what constitutes reasonable

expenses (including Campus' pending request for entry of a stay)." (Doc. 71)

In granting preliminary injunctive relief in favor of Campus in the underlying action (CV 07-0177) and in this action (CV 08-0342), the Court made the following relevant findings: (1) Campus had established actual success on the merits of one of his claims as evidenced by the Court's prior ruling which awarded him advancement of expenses in the underlying action[14] and that Campus' claim for advancement of defense expenses in the instant action was likely to succeed; (2) Campus would irreparably suffer a loss in of his right to advancement in absence of injunctive relief; (3) the threatened injury to Campus (loss of a contractual right and having to pay out-of-pocket for his own defense) outweighs the harm that an injunction requiring advancement of expenses may cause TMC;[15] and (4) Campus had established that an injunction would not disserve the public interest. (*Id*. at 4-6) "TMC is hereby preliminarily enjoined from refusing to provide such expenses to Campus and is required to immediately pay the reasonable expenses of Campus' defense." (*Id*. at 7) Based upon the foregoing, the undersigned must determine whether

---

[14]      In awarding Campus advancement of his expenses in the underlying action, the Court specifically found that a contract provision in the Indemnity Agreement executed by TMC and Campus rendered "mandatory TMC's duty to pay for [Campus'] defense before the litigation concludes[.]" (Doc. 54, at 15)

[15]      "TMC's prospective harm, at worst, is that it runs the risk of non-payment if it is ultimately found that Campus is not entitled to indemnification *and* Campus is unable to pay the amounts advanced. TMC, however, contracted for such when it entered into the Indemnity Agreement with Campus, contracting to pay for his defense at its own expense." (Doc. 71, at 6)

the expenses for which Campus seeks immediate payment constitute reasonable expenses and whether this Court should enter a stay of the underlying action pending TMC's payment of those expenses determined to be reasonable. The undersigned will not go beyond these strictures and address issues which the Court has previously disposed of either explicitly or implicitly. For instance, TMC's apparent position that in exercising its authority to conduct the defense of this case it can inform attorneys from Carlton Fields, Campus' lead attorneys, that it will no longer reimburse expenses from Carlton Fields is untenable in light of the Court's previous determination that the burden of providing Campus' defense does not mean TMC has "absolute control" over same and its implicit determination that such burden would not include the ability to fire counsel once counsel had been retained. (*See* Doc. 54, at 16-17) In other words, it would be at odds with a previous order entered by this Court for the undersigned now to allow TMC to tell Campus who may defend him in the underlying action, as well as in this action. Accordingly, the undersigned declines TMC's invitation to allow it to choose who may defend Campus in the underlying action. In addition, the undersigned will not require Campus to post a bond with this Court in the amount TMC is ordered to advance him because such an order would be

contrary to the Court's previous position that all Campus need do (and that which he has already done) is to provide an undertaking to repay the advance. (*Compare* Doc. 54, at 26, 32 & 33 ("TMC has conceded in its opposition that [u]nder the former Act, advancement required only an undertaking to repay the advance if it was ultimately determined he did not meet the indemnification standard[] [and in this case] Campus' attorney has provided such a statement on his behalf, arguably satisfying the former statute. . . . The pertinent question for this summary judgment then, has been not whether Campus may later be found to have engaged in negligence, gross negligence or intentional conduct, but rather, whether he has demonstrated that TMC has denied a right to advancement to which he is entitled. The merits of the underlying action are irrelevant to whether advancement . . . must be awarded here and now. . . . If it is ultimately determined that Campus' conduct is not indemnifiable due to negligence, gross negligence or intentional misconduct, then Campus will have to repay any expenses advanced. Unless or until such final order and judgment is issued, however, TMC is required to pay and advance the defense costs to Campus. The court is not in a position, after the fact, to relieve the parties of the burdens of the contract that they executed and that now, one party, wishes had been drafted differently.") *with* Doc. 71, at 6 ("TMC's prospective harm,

at worst, is that it runs the risk of non-payment if it is ultimately found that Campus is not entitled to indemnification *and* Campus is unable to pay the amounts advanced. TMC, however, contracted for such when it entered into the Indemnity Agreement with Campus, contracting to pay for his defense at its own expense.")) Having provided TMC with an undertaking to repay the advance, the undersigned will not now require Campus to post a bond with the Court in the amount advanced.[16]

---

[16]     Alternatively, to the extent necessary, the undersigned recommends that the Court exercise its discretion to not require Campus to post a Rule 65(c) bond because such requirement would be at odds with the Court's previous interpretation of the Indemnity Agreement, recognizing that the company agreed to pay for Campus' defense at its own expense with knowledge that Campus need only provide it with an undertaking to repay the advance if it was ultimately determined he did not meet the indemnification standard. *See In re Worldcom, Inc. Securities Litigation*, 354 F.Supp.2d 455, 470 (S.D. N.Y. 2005) ("It is in the discretion of the district court to decide that, under the circumstances, no security is required. . . . Continental has requested that, if Roberts is granted defense costs prior to an assessment of its rescission claim, he be compelled to post a security bond for such costs. This request must be denied. Paying Roberts' defense costs places no undue hardship on the Continental as its liability is capped. In addition, the excess policies require defense costs to be repaid if Roberts is ultimately not entitled to such payments. Finally, the posting of a bond would undermine the very protection the Excess Insurers offered to directors when they followed the National Union form."); *cf. Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 135 & 136 (2nd Cir.) ("The franchisees argue that the district court abused its discretion by issuing preliminary injunctions in January and March 1996, without requiring DAI to post bonds pursuant to Fed.R.Civ.P. 65(c). . . . The district court did not require DAI to post a bond for either injunction because it found that the franchisees would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases. . . . Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of likelihood of harm, or where the injunctive order was issued "to aid and preserve the court's jurisdiction over the subject matter involved."' . . . We therefore hold that the district court did not abuse its discretion by entering the injunctions without requiring DAI to post bonds."), *cert. denied*, 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 *and cert. denied sub nom. Riggs v. Doctor's Associates, Inc.,* 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997).

2.    Having established what is or is not before the undersigned for determination, guidance regarding what constitutes "reasonable expenses and attorney['\]s fees" (Doc. 80, Exhibit A, ¶ 1 of August 1, 1994 Indemnity Agreement) is first gleaned from a comprehensive consideration of *Westar Energy, Inc. v. Lake,*. 493 F.Supp.2d 1126 (D.Kan. 2007), *aff'd in part, rev'd in part and remanded by Westar Energy, Inc. v. Lake,* 552 F.3d 1215 (10th Cir. 2009).

> Because Lake is seeking to enforce a contract right to advancement of legal fees under Westar's Articles, the Court determines that a different analysis governs its implementation. The court's role in awarding attorney's fees predicated on contractual obligations is distinct from its function in fashioning awards under fee-shifting statutes. With statutory fee provisions, designed to enable parties to obtain legal help in seeking redress of injuries flowing from the actual or threatened violation of specific laws, the court must calculate an award independently, carefully scrutinizing the attorneys' time and expenses. In contrast, the purpose of a contract-based award "is to give the parties the benefit of the bargain, and the court's responsibility is to enforce that bargain." Although this "fundamental dichotomy" does not mean that there are no standards applicable to a contract-based right to attorneys' fees, "the court does not possess the same degree of equitable discretion to deny attorneys' fees under contractual-based awards as it does under fee-shifting statutory provisions. Instead, the court may deny or reduce the requested contractual-based fees if such an award would be inequitable or unreasonable.[17] If so, the court has

---

[17]    In reversing, in part, the decision of the District Court of Kansas, the Tenth Circuit specifically noted that under Kansas law, "the party seeking payment [would be required] to justify the reasonableness of the fees by reference to Rule 1.5 of the Kansas Rules of

discretion to deny or reduce the fee award. "However, the trial court is not responsible for independently calculating a 'reasonable' fee." In considering whether a fee is unreasonable or excessive, the court need not wholly disregard the familiar factors from the federal cases awarding fees in a statutory context. The Tenth Circuit has explained that a "district court may cho[o]se to use these factors, not to compute a reasonable fee, but to assist in determining if the fees claimed are unreasonable or inequitable."

"A district court is considered an expert on the issue of attorney fees. It may apply its own knowledge and professional experience in determining the value of services rendered." The Kansas Supreme Court has held that, in determining whether a contract-based fee request is inequitable or excessive, the trial court should consider the factors outlined in <u>Rule 1.5 of the Model Rules of Professional Conduct</u>[]. Those factors are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

*Id.* at 1144-1145 (internal footnotes omitted; footnote added).

3.      In line with *Westar*, the undersigned starts with the premise that

this Court does not possess the same measure of equitable discretion to deny

an award of attorney's fees under contractual-based requests as it does under

_____

Professional Conduct." *Westar, supra*, 552 F.3d at 1229.

fee-shifting statutory provisions. 493 F.Supp.2d at 1144. Nevertheless, this Court can reduce a contract-based request that is unreasonable,[18] excessive, or inequitable and in making such determination can consider the factors outlined in federal cases awarding fees in a statutory context, as well as those factors outlined in Rule 1.5 of Alabama's Rules of Professional Conduct. *See id.* at 1144 & 1145. Courts in the Eleventh Circuit are guided by the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-719 (5th Cir. 1974),[19] *overruled on other grounds, Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), with the caveat that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate."[20] *Hensley v. Eckerhart*, 461

---

[18]     *See Homestore, Inc. v. Tafeen*, 888 A.2d 204, 218 (Del. 2005) ("[T]his Court has held that all contracts providing for the advancement of expenses are implicitly limited to those that are reasonably incurred."). In framing the issue in this manner, the undersigned should not be understood as shifting the burden of proof to TMC to establish that Campus' request for attorney's fees and expenses is unreasonable. Rather, it should be apparent to the parties that the undersigned has properly assigned the burden of proof to Campus to establish the reasonableness of the fees and expenses requested.

[19]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[20]              The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an

U.S. at 434 n.9, 103 S.Ct. at 1940 n.9. These 12 factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the

----

award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

The district court also should exclude from this initial fee calculation hours that were not reasonably expended. Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. In the private sector, billing judgment is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Hensley v. Eckerhart*, 461 U.S. 424, 433-434, 103 S.Ct. 1933, 1939-1940, 76 L.Ed.2d 40 (1983) (internal citations and quotation marks omitted; emphasis in original). It is clear in the Eleventh Circuit that a fee applicant may recover for the hours of multiple attorneys upon a showing that "the time spent by those attorneys reflects the distinct contribution of each lawyer to the case and is the customary practice of multiple-lawyer litigation." *ACLU of Georgia v. Barnes,* 168 F.3d 423, 432 (11th Cir. 1999); *see also Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988) ("There is nothing inherently unreasonable about a client having multiple attorneys.").

professional relationship with the client; and (12) awards in similar cases.

*Johnson, supra,* 488 F.2d at 717-719; *see also Gaines v. Dougherty County Bd. of Educ.*, 775 F.2d 1565, 1571 n.13 (11th Cir. 1985); *Jones v. Central Soya Co.,* 748 F.2d 586, 588 n.1 (11th Cir. 1984); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1187 n.8 (11th Cir. 1983). The factors outlined in Rule 1.5 of Alabama's Rules of Professional Conduct are similar, and in some instances identical, to the *Johnson* factors, as follows:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

> (3) the fee customarily charged in the locality for similar legal services;

> (4) the amount involved and the results obtained;

> (5) the time limitations imposed by the client or by the circumstances;

> (6) the nature and length of the professional relationship with the client;

> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

> (8) whether the fee is fixed or contingent; and

(9) whether there is a written fee agreement signed by the client.

*Id*.

4.     Mindful of the discretion afforded district courts in fashioning attorney-fee awards, *see, e.g., Westar, supra,* at 1145 ("'A district court is considered an expert on the issue of attorney fees. It may apply its own knowledge and professional experience in determining the value of services rendered.'"), and cognizant of the foregoing principles of law, the undersigned recommends that the Court find that Campus has failed to establish that his request for attorney's fees is reasonable with respect to two fronts and that is in regard to the hourly rate requested for attorneys and paralegals at Carlton Fields and also with respect to the practice, reflected in the billing invoices from Carlton Fields, of billing in half-hour increments. All other objections raised by TMC are **REJECTED** by the undersigned and it is recommended that they be rejected by Judge DuBose.[21]

---

[21]     The undersigned is of the opinion that a reduction in hours claimed by Campus for work performed by Carlton Fields due to its pattern of billing in half-hour increments also sufficiently addresses TMC's claim that Carlton Fields engaged in block billing.

TMC makes the untenable argument that paralegal expenses are unrecoverable overhead expenses. Not only have courts in this circuit reimbursed (in the statutory context) for attorney work performed by paralegals, *see, e.g., Miller v. Kenworth of Dothan, Inc.,* 117 F.Supp.2d 1247, 1258 (M.D. Ala. 2000) ("Reasonable attorney's fees include the compensation of paralegals and law clerks at the prevailing market rate. . . . However, '[a] prevailing party may be compensated for work done by law clerks or paralegals only to the extent that such work is

5.      The invoice breakdown supplied by Carlton Fields reflects that

Campus' lead attorney, James H. Cox, charges an hourly rate of $500 to $525

and that the hourly rate of the other primary attorney in the case from that firm,

Harris, an associate, ranges from $300 to $320.[22] The evidence supplied by

Campus does not reveal any of these rates to be reasonable when compared to

the rates charged by comparable attorneys in Mobile, Alabama, the site of the

litigation, for attorney work performed in this case. For instance, the invoices

from Johnstone, Adams, a local law firm, reflect that Alan C. Christian, an

attorney with comparable experience to James Cox, has billed time in this case

at an hourly rate of $255 and that an associate at Johnstone, Adams, Rick A.

La Trace, with experience comparable to that of Derek Harris, has billed time

––––––––––––––––––

"traditionally done by an attorney."'"), but more importantly, the Indemnity Agreement in
question calls for TMC to advance to Campus all reasonable expenses and attorney's fees. Even
if the Court regards the work performed by paralegals in this case as "overhead expenses," those
expenses are reimbursable to the extent they are reasonable. As previously indicated, the
undersigned finds only that the hourly rate requested for paralegal work is not reasonable, as are
a few individual requests for reimbursement as set forth *infra*.

TMC's objections to the copying, and other, expenses reflected on the invoices from
Carlton Fields are rejected both because the Eleventh Circuit allows for reimbursement of such
expenses, *see, e.g., Cullens v. Georgia Dept. of Trans.,* 29 F.3d 1489, 1494 (11th Cir. 1984)
(corts allow for recovery of reasonable travel expenses, etc.), and, again, because the Indemnity
Agreement specifically provides for advancement of such expenses and this Court has no basis
for finding that those expenses are not reasonable.

[22]      In addition, it appears that several other attorneys from Carlton Fields, namely
Leonard ($475), Ciampa ($395), Schlich ($210) and Coalson ($210) performed work in this
case.

in this case at an hourly rate of $155. While the undersigned makes the foregoing comparisons to support a finding that the hourly rates requested by the attorneys at Carlton Fields for work performed in this case not reasonable, particularly given the absence of any evidence which speaks to rates actually billed and paid in similar lawsuits,[23] the comparisons are not meant to serve as any suggestion that this Court will compensate the attorneys at Carlton Fields only at the rates billed by the attorneys from Johnstone Adams because such a determination would ignore not only the overarching fact that this is a contract-based advancement of reasonable attorney's fees and expenses but, as well, numerous cases from Alabama awarding hourly rates higher than those charged by the Johnstone Adams firm in this case, *see, e.g., ALFA Corp., supra,* 560 F.Supp.2d at 1180 ("In [the Montgomery, Alabama] market, the Court has found the range of $300.00 to $375.00 applicable for attorneys with over 20 years experience. . . . It has also found the applicable range for attorneys with 10 years of experience at $200.00 to $250.00, and the applicable range for an attorney [with] one to two years of experience at

---

[23]     *Cf. ALFA Corp. v. ALFA Mortgage Inc.,* 560 F.Supp.2d 1166, 1179 (M.D. Ala. 2008) ("Satisfactory evidence of the market rate, however, requires more than the mere affidavit of the attorneys performing the work. . . . Also insufficient is testimony that a given fee is reasonable; evidence must be of rates actually billed and paid. . . . This evidence may be adduced from charges of lawyers under similar circumstances or by opinion evidence.").

$160.00 to $185.00."), the rates charged by TMC's attorneys, *see Zaman v. Amedeo Holdings, Inc.,* 2008 WL 2168397, *37 (Del Ch. 2008) (unpublished opinion) ("The defendants' position on this is compromised by the reality that their own fees and expenses for prosecuting the Federal and State Actions against the Derbyshires dwarf the amounts they seek for indemnification and advancement."), and the complexity of this litigation. Instead, this Court should rely on its own expertise in setting appropriate hourly rates for the attorneys at Carlton Fields, *Norman, supra,* 836 F.2d at 1303, and in so doing find the following hourly rates appropriate: (1) Mr. Cox–$400.00; (2) Mr. Leonard-$350.00; (3) Ms. Ciampa-$270.00; (4) Mr. Harris-$200.00; (5) Mr. Schlich & Ms. Coalson-$150.00. Of course, Alan Christian's time should be compensated at the rate of $255.00 per hour and Rick LaTrace's time should be compensated at the rate of $155.00 per hour.

6.     The paralegal rates ($170 to $185) billed by Carlton Fields in this case also are not reasonable. That these rates are unreasonable is borne out by the fact that one of the Mobile, Alabama attorneys representing Campus bills at a rate ($155) less than the foregoing rates. Therefore, this Court, again relying on its own expertise, and mindful of pertinent case law, *see, e.g., Miller, supra,* 117 F.Supp.2d at 1259 ("Based on the court's knowledge and

51

the aforementioned case law, the court finds that fees between $50.00 and $70.00 per hour constitute the range of prevailing market rates for a law clerk/paralegal."), finds that $100.00 per hour represents a reasonable hourly paralegal rate in this case .[24]

7.      Turning to what the undersigned finds is the only other problem in this case, that is, the practice of attorneys at Carlton Fields billing in one-half hour increments, as opposed to 6 minute increments (.1), the undersigned notes that, in small measure, this problem was addressed by Carlton Fields in its most recent submission of billing invoices (*see* Doc. 83, Exhibit 1 to Affidavit of James Cox).  However, there remain a multitude of entries which have not been correctly reduced due to this problem (as well as the accompanying problem of block billing) and, therefore, the following entries are reduced by one-half hour (.5) each: (1) Derek Harris' entry for June 26, 2008, is reduced from 6.5 hours to 6 hours; (2) Abbe Howard's June 26 & 27, 2008 entries are each reduced from 4.5 hours to 4 hours and her entry for June 30, 2008 is reduced from 4 hours to 3.5 hours; (3) James Cox' entry for June 25, 2008 is reduced from 6 hours to 5.5 hours; (4) Harris' entries for July 11 & 13, 2008 (each 3 hours) are reduced to 2.5 hours each; (5) Harris' July 18,

---

[24]      This case is nine years removed from the decision in *Miller, supra*, and, again, is a contract-based request for advancement of reasonable attorney's fees and expenses.

2008 entry (6 hours) is reduced to 5.5 hours; (6) Harris' July 24, 2008 entry is reduced from 6 hours to 5.5 hours; (7) Howard's July 24, 2008 entry is reduced from 6.0 hours to 5.5 hours; (8) Harris' July 31, 2008 entry is reduced from 6.5 hours to 6 hours; (9) Harris' August 4, 2008 entry is reduced from 2.5 hours to 2 hours; (10) Harris' August 5, 2008 entry is reduced from 4.2 hours to 3.7 hours; (11) Harris' August 7, 2008 entry is reduced from 2.1 hours to 1.6 hours; (12) Cox' August 8, 2008 entry is reduced from 1 hour to thirty minutes (.5); (13) Cox' August 11, 2008 entry is reduced from 1.8 hours to 1.3 hours; (14) Harris' August 11, 2008 entry is reduced from 4.6 hours to 4.1 hours; (15) Harris' August 12, 2008 entry is reduced from 1.5 hours to 1 hour; (16) Harris' August 13, 2008 entry is reduced from 1 hour to thirty minutes (.5); (17) Cox' August 14, 2008 entry is reduced from 1.8 hours to 1.3 hours; (18) Harris' August 14, 2008 entry is reduced from 1 hour to thirty minutes (.5); (19) Cox' August 18, 2008 entry is reduced from 1 hour to thirty minutes (.5); (20) Harris' August 18, 2008 entry is reduced from 1 hour to thirty minutes (.5); (21) Cox' September 3, 2008 entry is reduced from 1.5 hours to 1 hour; (22) Harris' September 5, 2008 entry is reduced from 6.4 hours to 5.9 hours; (23) Harris' September 8, 2008 entry is reduced from 1 hour to thirty minutes (.5); (24) Cox' September 9, 2008 entry is reduced from forty-two minutes (.7) to

twelve minutes (.2); (25) Harris' September 10, 2008 entry is reduced from 2 hours to 1.5 hours; (26) Cox' September 12, 2008 entry is reduced from 1 hour to thirty minutes (.5); (27) Harris' September 13, 2008 entry is reduced from 3.0 hours to 2.5 hours, his September 14, 2008 entry is reduced from 2.0 hours to 1.5 hours, and his entry for September 15, 2008 is reduced from 2.5 hours to 2.0 hours; (28) Howard's September 17, 2008 entry is reduced from 1.5 hours to 1 hour; (29) Harris' September 19, 2008 entry is reduced from 1.5 hours to 1 hour; (30) Cox' September 22, 2008 entry is reduced from 1.0 hour to 30 minutes (.5); (31) Cox' September 24, 2008 entry is reduced from forty-eight minutes (.8) to eighteen minutes (.3); (32) Howard's September 29, 2008 entry for 1.0 hour is reduced to 30 minutes (.5); (33) Cox' October 1, 2008 entry is reduced from 1.8 hours to 1.3 hours; (34) Harris' October 6, 2008 entry is reduced from 3.0 hours to 2.5 hours; (35) Cox' October 7, 2008 entry is reduced from 1.8 hours to 1.3 hours; (36) Harris' October 7, 2008 entry is reduced from 6.5 hours to 6 hours; (37) Cox' October 8, 2008 entry is reduced from 1.8 hours to 1.3 hours; (38) Harris' October 8, 2008 entry is reduced from 7.2 hours to 6.7 hours; (39) Greg Schlich's October 8, 2008 entry is reduced from 4.4 hours to 3.9 hours; (40) Jennifer Coalson's October 8, 2008 entry for 4.7 hours is reduced to 4.2 hours; (41) Harris' October 9, 2008 entry is reduced

from 5.5 hours to 5 hours; (42) Schlich's October 9, 2008 entry is reduced

from 5.3 hours to 4.8 hours; (43) Cox' October 13, 2008 entry is reduced from

1 hour to thirty minutes (.5); (44) Cox' October 14, 2008 entry is reduced from

1 hour to thirty minutes (.5); (45) Cox' October 15, 2008 entry is reduced from

1.5 hours to 1 hour; (46) Harris' October 15, 2008 entry is reduced from 2

hours to 1.5 hours; (47) Cox' October 16, 2008 entry is reduced from 1.3 hours

to .8 hours; (48) Harris' October 20, 2008 entry is reduced from 1.5 hours to

1 hour; (49) Harris' entry for October 21, 2008 is reduced from 2.0 hours to

1.5 hours; (50) Harris' October 22, 2008 entry is reduced from 3.2 hours to 2.7

hours; (51) Harris' October 23, 2008 entry is reduced from 3.0 hours to 2.5

hours; (52) Cox' October 24, 2008 entry is reduced from one hour to thirty

minutes (.5); (53) Cox' October 28, 2008 entry is reduced from one hour to

thirty minutes (.5); (54) Harris' October 28, 2008 entry is reduced from 6.5

hours to 6 hours; (55) Harris' October 29, 2008 entry is reduced from 4 hours

to 3.5 hours; (56) Jennifer Coalson's October 29, 2008 entry is reduced from

one hour to thirty minutes (.5); (57) Harris' October 30, 2008 entry is reduced

from 5 hours to 4.5 hours; (58) Harris' October 31, 2008 entry is reduced from

3 hours to 2.5 hours; (59) Cox' November 6, 2008 entry is reduced from one

hour to thirty minutes (.5); (60) Harris' November 11, 2008 entry is reduced

from 3.9 hours to 3.4 hours; (61) Cox' November 12, 2008 entry is reduced from forty-eight minutes (.8) to eighteen minutes (.3); (62) Harris' November 13, 2008 entry is reduced from 1.2 hours to forty-two minutes (.7); (63) Cox' November 14, 2008 entry is reduced from 2 hours to 1.5 hours; (64) Harris' November 14, 2008 entry is reduced from 4 hours to 3.5 hours; (65) Harris' November 17, 2008 entry is reduced from 2 hours to 1.5 hours; (66) Harris' October 18, 2008 entry is reduced from 2 hours to 1.5 hours; (67) Harris' November 19, 2008 entry is reduced from 2.8 hours to 2.3 hours; (68) Harris' November 20, 2008 entry is reduced from 5 hours to 4.5 hours; (69) Harris' November 21, 2008 entry is reduced from 2 hours to 1.5 hours; (70) Harris' November 24, 2208 entry is reduced from 5 hours to 4.5 hours; (71) Harris' November 25, 2008 entry is reduced from 3.5 hours to 3 hours; (72) Harris' November 26, 2008 entry is reduced from 3.2 hours to 2.7 hours; (73) Harris' December 8, 2008 entry is reduced from 8 hours to 7.5 hours; (74) Harris' December 9, 2008 entry is reduced from 6.4 hours to 5.9 hours; (75) Harris' December 10, 2008 entry is reduced from 2.5 hours to 2 hours; (76) Cox' December 12, 2008 entry is reduced from 1 hour to thirty minutes (.5); (77) Harris' December 16, 2008 entry is reduced from 2.5 hours to 2 hours; (78) Harris' December 17, 2008 entry is reduced from 2.2 hours to 1.7 hours; (79)

Cox' December 18, 2008 entry is reduced from forty-eight minutes (.8) to eighteen minutes (.3); (80) Harris' December 18, 2008 entry is reduced from 7 hours to 6.5 hours; (81) Cox' December 19, 2008 entry is reduced from 1 hour to thirty minutes (.5); (82) Harris' December 19, 2008 entry is reduced from 7.4 hours to 6.9 hours; (83) Harris' December 22, 2008 entry is reduced from 2.5 hours to 2 hours; (84) Cox' December 29, 2008 entry is reduced from forty-eight minutes (.8) to eighteen minutes (.3); (85) Harris' January 6, 2009 entry is reduced from 1 hour to thirty minutes (.5); (86) Harris' January 8, 2009 entry is reduced from 1.5 hours to 1 hour; (87) Cox' January 13, 2009 entry is reduced from forty-eight minutes (.8) to eighteen minutes (.3); (88) Harris' January 16, 2009 entry is reduced from 1.2 hours to forty-two minutes (.7); (89) Harris' entry for January 22, 2009 is reduced from 2.9 hours to 2.4 hours; (90) Harris' January 25, 2009 entry is reduced from 3.2 hours to 2.7 hours; (91) Cox' January 27, 2009 entry is reduced from 1 hour to thirty minutes (.5); (92) Harris' January 27, 2009 entry is reduced from 2.2 hours to 1.7 hours; (93) Harris' January 28, 2009 entry is reduced from 6.5 hours to 6 hours; (94) Harris' January 29, 2009 entry is reduced from 4.5 hours to 4 hours; (95) Harris' January 20, 2009 entry is reduced from 4.5 hours to 4 hours; (96) Harris' January 31, 2009 entry is reduced from 6.2 hours to 5.7

hours; (97) Harris' February 2, 2009 entry is reduced from 8.5 hours to 8 hours; (98) Harris' February 3, 2009 entry is reduced from 7.2 hours to 6.7 hours; (99) Cox' February 4, 2009 entry is reduced from 1 hour to thirty minutes (.5); (100) Harris' February 4, 2009 entry is reduced from 8.5 hours to 8 hours; (101) Cox' February 5, 2009 entry is reduced from 1.5 hours to 1 hour; (102) Harris' February 5, 2009 entry is reduced from 10.3 hours to 9.8 hours; (103) Cox' February 6, 2009 entry is reduced from 2.3 hours to 1.8 hours; (104) Harris' February 6, 2009 entry is reduced from 3.5 hours to 3 hours; (105) Harris' February 24, 2009 entry is reduced from 1.5 hours to 1 hour; (106) Harris' February 25, 2009 entry is reduced from 1.5 hours to 1 hour; (107) Harris' March 6, 2009 entry is reduced from 1 hour to thirty minutes (.5); (108) Cox' March 9, 2009 entry is reduced from 1.5 hours to 1 hour; (109) Cox' March 10, 2009 entry is reduced from fifty-four minutes (.9) to twenty-four minutes (.4); (110) Cox' March 13, 2009 entry is reduced from 1 hour to thirty minutes (.5); (111) Cox' March 19, 2009 entry is reduced from 1.2 hours to forty-two minutes (.7); (112) Cox' March 23, 2009 entry is reduced from 2 hours to 1.5 hours; (113) Cox' March 25, 2009 entry is reduced from 1 hour to thirty minutes (.5); (114) Harris' March 25, 2009 entry is reduced from 2.5 hours to 2 hours; (115) Cox' March 27, 2009 entry is

reduced from 1 hour to thirty minutes (.5); (116) Cox' March 31, 2009 entry is reduced from forty-eight minutes (.8) to eighteen minutes (.3); (117) Cox' April 1, 2009 entry is reduced to thirty minutes (.5) from 1 hour; (118) Harris' April 1, 2009 entry is reduced to 1.5 hours from 2 hours; (119) Harris' April 2, 2009 entry is reduced from 5.5 hours to 5 hours; (120) Cox' April 3, 2009 entry is reduced from 1.5 hours to 1 hour; (121) Harris' April 3, 2009 entry is reduced from 4.5 hours to 4 hours; (122) Harris' April 5, 2009 entry is reduced from 3.5 hours to 3 hours; (123) Cox' April 6, 2009 entry is reduced from 1.3 hours to forty-eight minutes (.8); (124) Cox' April 7, 2009 entry is reduced from 1 hour to thirty minutes (.5); (125) Harris' April 7, 2009 entry is reduced from 1 hour to thirty minutes (.5); (126) Cox' April 8, 2009 entry is reduced from 1.5 hours to 1 hour; (127) Cox' April 9, 2009 entry is reduced from 6.5 hours to 6 hours; (128) Harris' April 9, 2009 entry is reduced from 9.5 hours to 9 hours; (129) Nancy Ciampa's April 9, 2009 entry is reduced from 4.2 hours to 3.7 hours; (130) Cox' April 10, 2009 entry is reduced from 7.5 hours to 7 hours; (131) Harris' April 10, 2009 entry is reduced from 8.3 hours to 7.8 hours; (132)   Lisa Mitchell's April 10, 2009 entry is reduced from 1.6 hours to 1.1 hours; (133) Cox' April 13, 2009 entry is reduced from 4 hours to 3.5 hours; (134) Harris' April 13, 2009 entry is reduced from forty-eight minutes

(.8) to eighteen minutes (.3); (135) Lisa Mitchell's April 13, 2009 entry is reduced from 2 hours to 1.5 hours; (136) Cox' entry for April 14, 2009 is reduced from 3 hours to 2.5 hours; (137) Harris' April 14, 2009 entry is reduced from 7 hours to 6.5 hours; (138) Cox' April 15, 2009 entry is reduced from 8 hours to 7.5 hours; (139) Harris' April 15, 2009 entry is reduced from 8.3 hours to 7.8 hours; (140) Harris' April 16, 2009 entry is reduced from 9.5 hours to 9 hours; (141) Mitchell's entry for April 16, 2009 is reduced from 1 hour to thirty minuted (.5); (142) Cox' entry for April 17, 2009 is reduced from 4 hours to 3.5 hours; (143) Harris' entry for April 17, 2009 is reduced from  10.8 hours to 10.3 hours; (144) Cox' entry for April 19, 2009 is reduced from 6.5 hours to 6 hours; (145) Cox' April 20, 2009 entry is reduced from 9 hours to 8.5 hours; (146) Harris' entry for April 20, 2009 is reduced from 5.5 hours to 5 hours; (147) Harris' April 21, 2009 entry is reduced from 5.8 hours to 5.3 hours; (148) Mitchell's April 21, 2009 entry is reduced from 1.5 hours to 1 hour; (149) Harris' April 22, 2009 entry is reduced from 7.2 hours to 6.7 hours; (150) Mitchell's April 22, 2009 entry is reduced from 1.3 hours to forty-eight minutes (.8); (151) Cox' April 23, 2009 entry is reduced from 17.5 hours to 17 hours; (152) Harris' April 26, 2009 entry is reduced from 1.5 hours to 1 hour; (153) Cox' April 27, 2009 entry is reduced from 2 hours to 1.5 hours;

(154) Harris' April 27, 2009 entry is reduced from 8.2 hours to 7.7 hours; and

(155) Mitchell's April 28, 2009 entry is reduced from 1.2 hours to forty-two minutes (.7).[25]

8.      In light of the foregoing, Campus is due to be advanced as reasonable attorney's fees and expenses the following amounts for compensable work performed by attorneys and paralegals form the Carlton Fields law firm: (1) Abbe Howard–20.5 hours of work at $100.00 per hour, that is, $2,050.00; (2) Lisa Mitchell–15.1 hours of work at $100.00 per hour, that is, $1,510.00; (3) Ryan Smith–.8 hours of work at $100.00 per hour, that is, $80.00; (4) David Leonard–.3 hours of work at $350.00 per hour, that is, $105.00; (5) Nancy Ciampa–19.7 hours of work at $270.00 per hour, that is, $5,319.00; (6) Greg Schlich–8.7 hours of work at $150.00 per hour, that is, $1,305.00; (7) Jennifer Coalson–4.7 hours of work at $150.00 per hour, that is, $705.00; (8) Derek Harris–392.2 hours at $200.00 per hour, that is, $78,440.00; and (9) James Cox–132.3 hours at $400.00 per hour, that is, $52,920.00. These different amounts total $142,434.00. In addition, Campus

---

[25]      In addition to these reductions, the following entries are eliminated in their entirety because Campus' attorneys have either entirely "lined through" these entries or the undersigned is unable to discern a reimbursable task: (1) Harris' January 12, 2008 entry for 1 hour; (2) Cox' February 2, 2009 entry (.3); and (3) Jennifer Coalson's March 19, 2009 entry (1.5).

is to be advanced the copying, research, and travel expenses reflected on the billing invoices provided by Carlton Fields, that is, $12,451.96. *Cf. Cullens, supra,* 29 F.3d at 1494 (allowing reasonable travel expenses, etc.); *NAACP v. City of Evergreen*, 812 F.2d 1332, 1337 (11th Cir. 1987) (copying costs are reimbursable under § 1988)

9.      TMC does not object to any of the invoices submitted by Johnstone Adams. Accordingly, the amount of attorney's fees to be advanced Campus for reasonably compensable work performed by Alan Christian and Rick LaTrace is $6,072.50, as well as $155.30 in expenses.

10.     In light of the foregoing, TMC should be ordered to immediately advance to Campus $148,506.50 in legal fees and $12,607.26 in expenses for services rendered pertaining to the defense of Campus in the underlying action (07-0177-KD-C) and the instant action (08-0342-KD-C). TMC should be ordered to pay these monies to Campus within ten (10) days of the date of entry of judgment.

11.     While Campus has requested an award of prejudgment interest, the undersigned recommends that this request be denied given the considerable lengths the parties and this Court have gone to in determining the amount of advancement due at this point in time. *See Jernigan v. Happoldt*, 978 So.2d

62

764, 767 (Ala.Civ.App. 2007) ("[P]re-judgment interest runs . . . on such sums as are *certain or are capable of being made certain* . . . and . . . [t]hree general rules have been laid out for determining the allowance of interest in Alabama: (1) The amount due must be certain; (2) the time when it is due must be certain; [and] (3) the amount due and time of payment must be known to the debtor." (internal quotation marks omitted; emphasis in original)); *cf. Health Care Authority of the City of Huntsville v. Madison County*, 601 So.2d 459, 462 & 463 (Ala. 1992) ("[I]n contract cases, where an amount is certain or can be made certain as to damages at the time of breach, the amount may be increased by the addition of legal interest from that time until recovery. . . . And [a]ll liquidated demands for a sum certain, fixed by agreement or otherwise, bear interest from the time the party becomes liable and bound to pay them." (internal quotation marks omitted)). Conversely, once judgment is entered by the Court in this regard post-judgment interest will accrue on same at the rate of twelve percent (12%) per annum in accordance with Ala. Code § 8-8-10 (1975) ("Judgments for the payment of money, other than costs, if based upon a contract action, bear interest from the day of the cause of action, at the same rate of interest as stated in said contract; all other judgments shall bear interest at the rate of 12 percent per annum, the provisions of Section 8-8-

1 to the contrary notwithstanding[.]"). *Cf. Underbrink v. Warrior Energy Services Corp.*, 2008 WL 2262316, *19 (Del. Ch. 2008) (unpublished opinion) ("Delaware courts routinely grant post-judgment interest in advancement cases.").

12.    In addition to the foregoing, the undersigned recommends that in the event TMC fails to advance Campus the foregoing monies within ten (10) days of the date of judgment that the underlying action (CV 07-0177-KD-C) be **STAYED** pending such payment. *Cf. Sanderson v. Ford Motor Co.,* 90 F.R.D. 375, 376 (N.D. Ala. 1981) ("The general rule is well recognized that a court may enter an order staying further proceedings until costs taxed in an earlier proceeding have been paid. . . . Although this rule is discretionary, it is ordinarily applied unless there are special facts and circumstances which make application of the rule unjust or inequitable."); *Ex parte Mathews*, 145 Ala. 505, 40 So.78, 79 (Ala. 1906) ("The main theory upon which the courts exercise this right of staying the proceedings until costs have been paid is founded upon the necessary control which courts have over their own proceedings, and their duty to prevent them being made the means of oppression and vexation. The power of granting a stay is equitable in its nature, and intended to prevent the vexatious multiplication of suits. . . .

Whatever be the theory upon which the courts proceed in the enforcement of it, the rule is well established that the proceedings in the second suit will be stayed until the costs in the prior case have been paid." (internal quotation marks omitted)). The only way for this Court's advancement judgment to have any teeth is for it to be made clear to TMC that the failure to make such advancement to Campus within ten days of judgment will result in the underlying action being stayed pending advancement.

13.     The final matter for the undersigned to consider is the procedure the parties are to follow with respect to future advancement requests made by Campus. This Court should decline, as other courts have, any invitation by the parties to be "a monthly monitor of the precision and integrity of advancement requests." *Fasciana v. Electronic Data Sys. Corp.,* 829 A.2d 160, 177 (Del. Ch. 2003); *see Reinhard & Kreinberg*, 2008 WL 868108, *5 (Del. Ch. 2008) (unpublished opinion) ("[T]his Court . . . will not perform the task of playground monitor, refereeing needless and inefficient skirmishes in the sandbox. . . . '[A] balance of fairness and efficiency concerns would seem to counsel deferring fights about details until a final indemnification proceeding.'"). Informing the parties that this Court will not involve itself in any disagreement over future monthly advancement requests, unless the

following procedures are not followed, will hopefully engender a more cooperative spirit with respect to such requests: (a) Keeping in mind the reasonableness guidelines previously addressed by the undersigned, particularly the fee rates specifically sanctioned by the Court, each month counsel for Campus shall provide to counsel for TMC an invoice for the fees and expenses which should be advanced by TMC to Campus; (b) TMC **SHALL PAY** to Campus 100% of the fees and expenses it does not dispute within ten (10) days of receipt of the invoice; (c) In no event shall TMC pay less than 75% of the amount of fees or less than 100% of costs and expenses invoiced each month by counsel for Campus and this payment is to be accomplished within twenty (20) days of receipt of the invoice; (d) To the extent TMC disputes any of the fees or costs and expenses submitted by counsel for Campus, and is unable to resolve those disputes with Campus' attorneys, TMC will submit that dispute to the Court with knowledge, as aforesaid, that the final determination of what is advanceable, indemnifiable, and repayable will be reserved for the final hearing on these issues following trial and any appeals.

## **CONCLUSION**

In light of the foregoing, the undersigned recommends that the Court

order TMC to immediately advance to Campus, within ten (10) days of entry of judgment, $148,506.50 in legal fees and $12,607.26 in expenses for services rendered through the end of May, 2009 pertaining to the defense of Campus in the underlying action (07-0177-KD-C) and the instant action (08-0342-KD-C), with post-judgment interest accruing at the rate of 12% per annum. In the event TMC fails to timely make this advancement, the Court should **STAY** the underlying action pending advancement. The procedure outlined by the undersigned in paragraph 13 of the Conclusions of Law shall be followed with respect to all future monthly advancement requests made by Campus.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** and **ORDERED** this the 29th day of July, 2009.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

l.       *Objection*.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)©; *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.       *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.