**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **THE MITCHELL COMPANY, INC.,** ) | |
| **MODEL HOMES, LLC, and HEXAGON** ) | |
| **INVESTMENTS, LLC,** ) | |
|    **Counterclaim Defendants,** ) | |
| **v.** ) | **CIVIL ACTION NO 08-0342-KD-C** |
| ) | |
| **JOSEPH J. CAMPUS, III,** ) | |
|    **Counterclaim Plaintiff.** ) | |
| **v.** ) | |
| ) | |
| **JOHN B. SAINT,** ) | |
|    **Counterclaim Defendant.** ) | |

**ORDER**

This matter is before the Court on Counterclaim Defendants' (The Mitchell Co., Inc.(hereinafter "TMC"), Model Homes, LLC, Hexagon Investments, LLC, and John B. Saint) Motion for Partial Summary Judgment (Docs. 84, 85, 86), Counterclaim Plaintiff's (Joseph J. Campus, III) Motion for Partial Summary Judgment (Docs. 87, 88, 89), and the responses and replies thereto (Docs. 94, 98, 104, 105, 106).[1]   For the reasons set forth herein, it is **ORDERED** that Campus' motion for partial summary judgment as to his counterclaim for equitable relief (Count Five) is **GRANTED** in part and **DENIED** in part;[2] Campus' motion for partial summary judgment is **DENIED** as to his counterclaims for tortious interference with contractual relations (Count Six)

---

[1]   On October 7, 2009, Campus filed a motion to exclude Counterclaim Defendants' Expert Witness L. Page Stalcup.  (Doc. 115).  Any challenges to expert testimony, including Daubert motions, were due to be filed by October 1, 2009.  (Doc. 65 at 2).  Campus has failed to assert any basis to excuse his failure to comply with the Rule 16(b) Scheduling Order (as amended) deadlines and so the motion is untimely.

[2]   In so doing, this Court finds that Campus' counterclaim for injunctive relief – which has not been specifically addressed in the cross-motions for summary judgment – is resolved through the granting of this equitable relief.  Moreover, as noted in this Order, there is no basis to enjoin the LLCs from lending or advancing monies to TMC.

and *prima facie* tort (Count Seven); and Counterclaim Defendants' motion for partial summary judgment is **GRANTED** as to Campus' counterclaims for tortious interference with contractual relations (Count Six), *prima facie* tort (Count Seven), fraudulent suppression (Count Eight); and civil conspiracy (Count Nine).

## I.   Background

## A.   Procedural History

Counterclaim Defendants initiated this action on June 16, 2008, by filing a Complaint against Campus for equitable relief and to obtain a declaration of rights and obligations. (Doc. 1). In so doing, they sought an order that the LLCs maintain in trust certain real properties in its possession which "shall sum to a value" approximately equal with the "Pawlowski" valuation (approximately $1,250,000) "until the measure of Campus' obligation to disgorge himself of increased valuation while he was engaged in faithless service for TMC" is determined. (Id.) TMC alleged that granting the requested relief would protect Campus' maximum possible interest (if no disgorgement is ordered), the LLCs' interests (by not liquidating the real property) and TMC's interest and the interests of fairness (in avoiding Campus' wasting, hiding or spending of the money). (Doc. 1 at 7).

On July 28, 2008, Campus filed his Answer, a motion to add John B. Saint as a party, and counterclaims asserting (in part) that TMC and the LLCs should be required to advance him legal fees and expenses (pursuant to the terms of an indemnity agreement executed with TMC) incurred in connection with a related lawsuit (the "underlying action") pending in this Court (The Mitchell Co. Inc. v. Joseph J. Campus, III, CV 07-177-KD-C (S.D. Ala. Mar. 7, 2007)). (Docs. 15, 16). Campus' counterclaim also seeks to determine his rights to require the two LLCs to purchase his membership interests; to obtain equitable relief to prevent injury to him as a result of Model Home

LLC's actions to liquidate assets and make unsecured loans to TMC (wasting the LLC's assets and impairing its ability to buy his membership interest as required by the Operating Agreement); and to recover damages for the conduct of Saint, TMC and the LLCs for tortious interference with contractual relations, fraudulent suppression, *prima facie* tort, civil conspiracy and injunctive relief. (Doc. 15).

On August 22, 2008, Campus filed a motion for partial summary judgment, asserting that he was entitled to judgment on his claims for reimbursement of his defense expenses in the underlying action as well as a declaration that his defense in that action must be provided at TMC's expense.  (Docs. 24, 25, 26).  On March 3, 2009, the Court granted Campus' motion for partial summary judgment as to his advancement counterclaim (Count One) and denied his motion with regard to his counterclaim for fees on fees (Count Two).  (Doc. 54).   Also, on June 17, 2009, the Court granted Campus' motion to dismiss Plaintiffs' Complaint (Doc. 78), such that the only claims remaining are Campus' counterclaims.

**B.**   **Factual History**

Counterclaim Defendants are comprised of The Mitchell Co., Inc. ("TMC"); Model Homes, LLC, Hexagon Investments, LLC ("the LLCs"); and John B. Saint ("Saint").[3]  (Doc. 1; Doc. 52). TMC is a comprehensive real estate development company and Campus' former employer.  (Id.) TMC is an Alabama corporation with its principal place of business in Mobile, Alabama.  (Id.)  See also (Doc. 52).  Model Homes, LLC is an Alabama LLC with its principal place of business in Mobile, Alabama.  (Doc. 52 at 2).  Model Homes' members are Alabama residents Saint, Donald

---

[3] TMC asserts that the LLCs were formed to provide additional compensation to a select group of employees who were also directors, officers or shareholders of TMC, and who "would be performing special services for the Mitchell Company for its long range success."  (Doc. 1 at 2).

P. Kelly, Jr., Chester J. Stefan and Paul C. Wesch (Doc. 108); the members assist with home sales and real estate transactions and are or were shareholders, directors or officers of TMC.  (Doc. 48 at 2-3; Doc. 52 at 2).  Hexagon Investments, LLC is an Alabama LLC with its principal place of business in Mobile, Alabama.  (Id.).  Hexagon's members are Alabama residents Saint, Donald  P. Kelly, Jr., Chester J. Stefan, Paul C. Wesch and Christopher T. Sylvester (Doc. 108); the members assist with home sales and real estate transactions and are or were shareholders, directors or officers of TMC.  (Doc. 48 at 3; Doc. 52 at 2).  Saint is an Alabama resident who is President of TMC and Manager of the LLCs.  (Doc. 48 at 2-3; Doc. 52 at 2).

Counterclaim Plaintiff Joseph J. Campus, III ("Campus") is a former member of both LLCs as well as former employee, director and officer of TMC (Executive Vice-President and Head of Single Family Home Division).  (Doc. 48 at 1-2).  Campus is a Florida citizen.  (Id.)  From June 6, 1990 or February 13, 1991[4] through March 7, 2007, Campus was employed by TMC as one of its officers (Executive Vice-President and Head of Single Family Home Division).  (Doc. 1 at 3).

On August 9, 1996, Model Homes was formed.  (Doc. 1-3).  At that time, Campus was made a member with a 20% membership interest.  (Id.)  On November 11, 2005, Hexagon was formed. (Doc. 1-4).  At that time, Campus was made a member with a 16.667% membership interest.  (Id.)

On April 26, 2006, an entry on the "year to date-accrual" record for "Mitchell" indicates that $1,049,692.94 million was put on the books as "Oak Grove Apartments, Ltd." in the "Debit" column.  (Doc. 98-2 at 29).  On September 6, 2006, an entry on this same record indicates "Oak Grove Distribution" in the amount of $1,562,188.34 in the "Debit" column.  (Id. at 30).  Testimony reveals that Saint, acting for Model Homes, transferred the proceeds from the sale of the apartment

---

[4] The parties set forth different start dates.

complex to TMC as an "intercompany receivable," and that Campus learned of this in December 2006.  (Doc. 86-2 at 41-42; Doc. 86-6 at 109 (3/23/08 e-mail from Pawlowski); Doc. 86-6 at 110 (4/8/08 e-mail to Pawlowski); Doc. 86-6 at 123-124)).  The receivable appears on the books as of December 29, 2006 showing accrued interest at prime plus 1% (or 9.25%) until January 2007 when the interest rate was changed to the Federal semi-annual long term rate (which varied from 4.68% in January 2007 to as high as 5.24% in August 2007 before falling to 4.83% in November 2007); there was no note for the transfer; and there was no collateral for the transfer.  (Id.)  As of December 29, 2006, this receivable had accrued interest such that it totaled $3,315,990 as "due from related party" on Model Homes' Historic Balance Sheet, and moreover, continued to do so such that as of November 30, 2007, the receivable totaled $3,959,346.  (Doc. 86-6 at 97).

The record reveals that money flowed freely and regularly between the two LLCs and TMC. According to TMC President and Model Homes Manager Saint: "[i]f Model Homes needed money, The Mitchell Company just advanced it."  (Doc. 86-3 at 10 (Dep. J.Saint).  Saint testified, when asked what consideration was given by him as a TMC board member with regard to Model Homes' ability to repay: "I don't know that I really gave it any thought."  (Id.)  Model Homes also loaned TMC money: "[t]here wasn't a formal approval[]" for those loans and only in some instances were the loans  made with Saint's knowledge and consent.  (Id.)  Saint explained:

> [w]e operate with a master operating account. All the money from The Mitchell Company affiliates goes into that account. Separate records are kept for each company. And as one company might need cash this month, then money is advanced to that company. When it has money, it goes back into that account and it's used by the other affiliates. And the records are kept keeping track of the moneys. Just like a bank only has one account.

(Id. at 11).  As to any consideration for the monies flowing back and forth (as to the recipient's ability to repay), Saint testified that "I think that we would assume that all of them had the ability

5

to repay." (<u>Id</u>.)  Saint testified that Hexagon owes TMC about $300,000.  (<u>Id</u>. at 11).  TMC owes Model Homes "[p]robably about 4 million[,]" and Saint testified that he did not think that amount was advanced as a lump sum but was an accumulation of loans made over time that may have gone up or down. (Doc. 86-3 at 12 (Dep. J.Saint)).  Saint testified that it would, presently, be difficult for TMC to repay Model Homes the $4 million loan.  (<u>Id</u>. at 12-13).  Saint "never really thought that was a conflict[--]" the loaning of money to TMC from Model Homes, by virtue of his position with each company.  (<u>Id</u>. at 13-14).

Likewise, TMC Board Member Chester J. Stefan ("Stefan") testified that all the funds that started Model Homes came from TMC; TMC provided all of the equity to build the houses; TMC paid all the rent other than on some computers; and "when funds were required by either entity, a ledger was kept on the funds that went back and forth between the two of them and interest was paid. So they were fairly closely wed."  (Doc. 86-4 at 3-4 (Dep. Chester J. Stefan).  TMC loaned money to both LLCs when they did not have sufficient funds to conduct their operations, and Model Homes (but not Hexagon) loaned money to TMC when TMC was short of funds.  (<u>Id</u>. at 5-6). Stefan and Saint made the decisions on behalf of Model Homes to make such loans, and the factors considered were TMC's "need for the cash to pay the bills."  (<u>Id</u>. at 6).  Stefan testified that he did not consult with the other owners of Model Homes when the loans were made, but statements went out quarterly which "were clearly labeled on the statements as advancements from The Mitchell Company."  (<u>Id</u>. at 6-7).  As a manager of Model Homes, the only consideration Stefan gave to TMC's ability to repay was signing a note that was payable without any nonrecourse language so that "if everything fell apart, they'd have the ability to sue on that note[,]" a general note unsecured by any collateral: "[i]t would just be a general obligation of The Mitchell Company."  (<u>Id</u>. at 7-8).

Stefan testified that TMC is not in a financial position to immediately repay the loan to Model Homes but that TMC could liquidate some other assets – "[y]ou'd have to sell something to do it." (Id. at 8-9).

On March 7, 2007, TMC terminated Campus and filed the first action (CV 07-177), alleging that Campus breached his fiduciary duties and/or was negligent in performance of his duties.  In that action TMC seeks disgorgement of Campus' membership interests in the LLCs. (Doc. 1 at 4).

On April 5, 2007, Campus provided the LLCs with his notice of his intent of withdrawal from membership in the LLCs pursuant to the terms of the LLCs' Operating Agreements.  (Doc. 48 at 5; Doc. 86-6 at 19, 26, 27 (Delctn. J.Saint and Ex. A thereto)).  The LLCs' Operating Agreements with Campus provide as follows with regard to the procedures for a member's withdrawal:

- a member may withdraw at any time;
- "[a] member . . .shall notify the Mangers of its intention to withdraw not less than 180 days prior to the date the Members . .. desires its withdrawal to become effective[;]"
- "[t]he withdrawing member . . . . shall be entitled to receive any distributions to which is entitled at the time of withdrawal[;]"
- "[t]he withdrawing member shall be entitled to receive the fair market value of its Membership Interest . . . [;]"
- "[t]he fair market value shall be determined by agreement by the withdrawing Member . . . and the Managers[;]"
- "[i]f they do not agree on the fair market value on or before the ninetieth day following the notice of intention to withdrawal either the Member . . . or the Managers, by notice to the other, may require the determination of fair market value to be made by an independent appraiser specified in that notice[;]"
- "[t]he withdrawing Member . . . and the Company each shall pay one-half of the costs of the appraisal[;]"
- "'Fair market value' . . . shall be unreduced and otherwise unadjusted by reason of the lack of marketability of the Membership Interest . . . [;]"
- "[i]f the withdrawal of the Member . . . causes the Company to sustain damages, the Company may offset the amount of any such damages against the fair market value of the Member's Membership Interest . . . in determining the amount to be paid to the withdrawing Member . . .[;]" and
- "[t]he Company shall pay the fair market value, reduced by the amount . . .

7

> [of offset] if applicable, in a lump sum or in installments as the Member . . . . . and the Company may agree. If the Member . . . and the Company do not agree, then the purchase price of the Membership Interest . . . shall be paid in four equal cash installments, the first due on the effective date of the withdrawal and the remaining installments (together with accumulated interest on the amount unpaid at the General Interest Rate) due on each of the first three anniversaries thereof."

(Doc. 1-3 at 33-34 at Article XI, Section 11.01(a)-(d)).

Campus demanded an immediate valuation of each LLC and a prompt lump sum payment for his membership interests. (Doc. 48 at 5; Doc. 86-6 at 26, 27). Campus subsequently requested financial information from the LLCs in order to determine the fair market value of his membership interests, but the information was not provided until months later. (Doc. 48 at 5). Campus claims that when the requested information was finally provided, he learned that the LLCs' assets were being liquidated and that TMC owed Model Homes nearly $3.5 million for an "intracompany receivable" (an unsecured loan with interest accruing rather than being paid) in violation of Section 6.09[5] of the Model Homes Operating Agreement. (Id. at 6).

On April 9, 2007, Campus sued the LLCs (along with others) seeking an injunction and an accounting of his interest. This suit was dismissed on November 6, 2007, due to lack of diversity of citizenship because at the time of filing, Campus was still a member of the LLCs as his withdrawal had not yet become effective (the 180 days had not yet passed)). (CV 07-257, Doc. 36).

Subsequently, the parties engaged in the valuation process pursuant to the LLCs' Operating Agreements. (Doc. 28 at ¶ 24). On October 3, 2007 (six (6) months (or 180 days) after the April 5, 2007 notice), Campus' withdrawal from the LLCs became effective. (Doc. 1-3 at 33 at Section

---

[5] This section addresses conflicts of interest and states that the LLCs may transact business with any member, manager or affiliate provided that the terms of the transactions are no less favorable than those the LLCs could obtain from unrelated parties. (Doc. 1-3 at 25).

11.01(a); Doc. 86-6 at 20 (Delctn. J.Saint and Ex. A thereto; Doc. 86-6 at 109-110).  On October 22, 2007, counsel for Campus sent a letter to counsel for the LLCs providing them with Campus' valuation numbers and requesting confirmation that the over $3 million receivable due from TMC was a secured loan and was being repaid.  (Doc. 48 at 6).  On November 2, 2007, counsel for the LLCs notified Campus's counsel that his valuation was  "excessive" and so, pursuant to the terms of Section 11.01(b) of the Operating Agreements, informed Campus that "we elect for a determination of the fair market value to be made by an independent appraiser." (Doc. 15-4).  The LLCs stated that they had *already* "selected" Mark Pawlowski, CPA ("Pawlowski"), "a CPA with a special certification in business valuations[,]" and requested that Campus pay one-half ($5,000) of Pawlowski's $10,000 retainer by November 16, 2007.  (Id.)

On November 20, 2007, counsel for Campus corresponded with the LLCs' counsel, referencing the financial data that he had received from Model Homes for the valuation of Campus' interests, and notifying counsel of a "shocking and disturbing 'intra-company transfer'" from Model Homes to TMC in the amount of $3,738,618 with interest "apparently accruing but not being paid[]" and requesting relief with regard to same.  (Doc. 15-5).  Counsel for Campus asserted that this reflected funds transferred by Saint to TMC without the knowledge or authorization of Campus, on an unsecured basis without any repayment terms and without any personal guaranty agreements from the principals of TMC – asserting that it was self-dealing on the part of Model Homes Manager Saint, and violated Sections 2.04 and 6.09 of the Operating Agreement.  (Id.)  Campus' counsel stated that the letter served as written demand by Campus that this "intra-company transfer" be immediately collateralized by assets of TMC, among other things.  (Id.)  On November 26, 2007, Campus again expressed concern about Model Homes' unsecured loan to TMC which created the

"TMC Receivable" and which, at that date, had increased to over $3.7 million, demanding that the loan and TMC Receivable be immediately collateralized.  (Id. at 6-7).  The LLCs did not respond. (Id.)

On December 18, 2007, Pawlowski requested business records from the LLCs.  (Doc. 86-6 at 108).  On December 28, 2007, TMC canceled all of its leases with the LLCs.  (Doc. 86-6 at 119-120).  By 2008, "payouts" by TMC were subject to scrutiny and approval by the banks with which it had lines of credit.  (Doc. 86-6 at 21 (Decltn. J.Saint)).  On March 23, 2008, Pawlowski inquired via e-mail about the proper valuation date for conducting the fair market value determination of Campus' membership interests.  (Doc. 86-6 at 109-111).  On April 8, 2008, counsel for TMC and the LLCs responded, instructing him to conduct the determination with two different fair market value dates – one in April 2007 and one in November 2007.  (Id.)  On May 26, 2008, the initial determination by Pawlowski ("the Pawlowski valuation") of Campus' interests in the LLCs was completed, calculating the fair market value of his interests as of the valuation date of November 30, 2007.[6]  (Doc. 1 at 3).  The valuation concluded that Campus' share of Model Homes was $1,152,450 and Hexagon was $96,642.  (Id.)  See also (Doc. 86-6 at 20).  On June 1, 2008,

---

[6]  This date appears to be the date selected by TMC and the LLCs.  (Doc. 86-6 at 109-111).  Significantly, as part of his valuation process, Pawlowski specifically asked counsel for both parties about the dates (stating his need to be certain as to the date of valuation that they were using for Campus), in an e-mail on March 23, 2008, because after reading the Operating Agreements in conjunction with Campus' April 5, 2007 notice, he calculated the effective date of withdrawal as October 3, 2007, even though his valuation process used November 30, 2007 as a valuation date.  (Doc. 86-6 at 109-111).  Pawlowski added, however, that "[i]n my opinion [ ] the fair market value would not differ between October 3, 2007 +/- November 30, 2007 based upon what I have seen in the financials."  (Id.)  In response, counsel for TMC and the LLCs asserted that "The Mitchell Company believes that the earliest effective date of Campus' withdrawal is October 3, 2007 (if the FMV would not differ between that date and November 30, 2007, then the later date may be substituted for the earliest effective date)."  (Doc. 86-6 at 110).  TMC's counsel added, however, that "Campus believes the valuation should be conducted April 4, 2007, the date of Campus' notice. Please perform a valuation utilizing both dates."  (Id.)

Pawlowski provided the parties with a supplemental determination which calculated the fair market value of Campus' interests in the LLCs as of the valuation date of April 27, 2007, concluding that his share of Model Homes was $1,111,709 and Hexagon was $86,600.  (Doc. 89-3 at 2-6).

On June 2, 2008, Campus demanded full payment of the Pawlowski valuation amounts pursuant to Section 11.01(d) of the Operating Agreements within 10 business days, or notification of the LLCs' intentions to make installment payments.  (Doc. 1-5; Doc. 1-6; Doc. 48 at 7).  On June 16, 2008, counsel for the LLCs responded, stating that "Pawlowski's valuation is not the final consideration in this instance[]"[7] because: 1) the LLCs are entitled to an offset "caused by the loss in value each would suffer if required to satisfy Campus' demand at this time[;]" and 2) "Campus' actual interest in the value of these shares of ownership is a contested issue in other, ongoing litigation, *The Mitchell Company, Inc. v. Campus*, CV-07-177-KD-C, meaning that awarding him the full value of those shares at this time will result in unjust enrichment."[8]  (Doc. 15-6).  Counsel stated that they were seeking equitable relief for a trust to be imposed "over these amounts or assets valued at the same amount."  (Id.)  The LLCs along with TMC then filed the present (now dismissed) action.  (Doc. 1 at 5-6; Doc. 48 at 7).  Subsequently, TMC and the LLCs retained expert witness certified public accountant L. Page Stalcup, III.  (Doc. 86-5 at 3 (Decltn. J.Saint); Doc. 86-6).  On May 15, 2009, Stalcup concluded that "[t]he assumptions and methodology used by Mr.

---

[7] The LLCs did not dispute the soundness or reasonableness of his valuation at that time.

[8] The LLCs asserted that: 1) Campus' withdrawal from the LLCs in a time of general economic downturn that is damaging to the housing market harms the LLCs by creating a substantial liability at a time when most of its assets are declining in value and becoming increasingly illiquid; 2) the discovery of Campus' self-dealing and fraudulent activities at TMC, the reason for his withdrawal, damaged the LLCs' business reputation; and 3) Model Homes holds an unsecured loan against TMC in a substantial amount and Campus' withdrawal impacted the recoverability of the note because his deception allowed him to pocket large portions of profits that TMC should have earned and so by damaging Model Homes' debtor, he impaired the probability that Model Homes would recover the debt.  (Id.)

Pawlowski render his conclusion of value inaccurate and unreasonable." (Doc. 86-6 at 3).

## II.     Analysis[9]

## A.     Applicable Law

Summary judgment should be granted only if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[10]  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its

---

[9] The Court is mindful that "'[w]hen both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.'" Muzzy Products, Corp. v. Sullivan Indus., Inc., 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002) (quoting Gart v. Logitech, Inc., 254 F.3d 1334, 1338-1339 (Fed. Cir. 2001)). The Court has reviewed the facts submitted by each party and has made its own examination of the evidentiary record in formulating the relevant facts and issues.

[10] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).

burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).  The mere existence of any factual dispute will not automatically necessitate denial of summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

**B.**     **Discussion**

    **1.**     **Count Five: Equitable Relief** **(alleged against Model Homes and Hexagon)**

Campus seeks a determination that he is entitled to payment of the fair market value of his membership interests in the LLCs (per Pawlowski) under the contractual terms of the Operating Agreements; to enjoin the LLCs' improper conduct (in making unsecured loans to TMC which he contends is "improper liquidation" of the assets); to enforce the Operating Agreements under 10-12-24(c) Ala. Code;[11] to impose a constructive trust on the assets of the LLCs in amounts necessary to pay the fair market value of his membership interests; and to award pre-judgment interest as set forth in the Operating Agreements.  (Doc. 48 at 12-13).

Alabama law construes contracts to give effect to the parties' intent and when a contract's terms are plain and unambiguous, there is no room for construction and the contract must be enforced as written.  See, e.g., Hall v. Am. Indemn. Group, 648 So.2d 556, 559 (Ala. 1994); Ex parte

---

[11] Section 10-12-24(c) provides: "[a] court of equity may enforce an operating agreement by injunction or by other relief that the court in its discretion determines to be fair and appropriate in the circumstances. As an alternative to injunctive or other equitable relief, when the provisions of Section 10-12-38 are applicable, the court may order dissolution of the limited liability company."

<u>Conference America, Inc</u>., 713 So.2d 953, 956 (Ala. 1998).  The general rule of contract law is that if a written contract exists, the parties' rights are controlled by that contract.  <u>Mobil Oil Corp. v. Schlumberger</u>, 598 So.2d 1341, 1345-1346 (Ala. 1992).   Specific to Operating Agreements governing limited liability companies:

> Operating agreements of limited liability companies serve as contracts that set forth the rights, duties, and relationships of the parties to the agreement. <u>See</u> <u>Love v. Fleetway Air Freight & Delivery Serv., L.L.C.</u>, 875 So.2d 285 (Ala.2003). "[I]t is elementary that it is the terms of the written contract, not the mental operations of one of the parties, that control its interpretation." <u>Kinmon v. J.P. King Auction Co.</u>, 290 Ala. 323, 325, 276 So.2d 569, 570 (1973)(citing <u>Todd v. Devaney</u>, 265 Ala. 486, 92 So.2d 24 (1957)). "Stated another way, the law of contracts is premised upon an objective rather than a subjective manifestation of intent approach." <u>Lilley v. Gonzales</u>, 417 So.2d 161, 163 (Ala.1982). " '[A] court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state." <u>Turner v. West Ridge Apartments, Inc</u>., 893 So.2d 332 (Ala.2004)(quoting <u>Ex parte Dan Tucker Auto Sales, Inc</u>., 718 So.2d 33, 36 (Ala.1998)).

<u>Harbison v. Strickland</u>, 900 So.2d 385, 391 (Ala. 2004).

Here, the LLCs' Operating Agreements provide for withdrawal in clear and unambiguous terms.  **First**, Sections 11.01(a) and 13.02 state that to withdraw, a member has to provide written notice of his intent to withdraw; Campus did this on April 5, 2007.  **Second**, Section 11.01(a) provides that the withdrawal does not become effective until 180 days <u>after</u> the date upon which the withdrawing member provided his notice.  Campus provided his written notice on April 5, 2007; one-hundred and eighty days later provides for an effective date of withdrawal of October 3, 2007.

**Third**, Sections 11.01(a)-(b) provide that the withdrawing member "shall be entitled to receive the fair market value" of his membership interest as determined by either: 1) Option One – by agreement by the withdrawing member and the managers; or 2) Option Two – if no agreement is reached on or before the 90th day following the notice of intention to withdraw, then either party

14

may[12] *require* that the fair market value be determined by an independent appraiser.  Accordingly, the parties could have agreed about the fair market value of Campus' membership interest by July 4, 2007 (90 days after the April 5, 2007 notice).  However, they did not.  While the record indicates that the parties were requesting and/or exchanging financial records between April 2007 and October 2007, Campus claims that he did not receive the necessary records from the LLCs timely and so was only able to provide his valuation of his membership interests to the LLCs on October 22, 2007 (19 days after his withdrawal became effective).  In response, the LLCs on November 2, 2007, informed Campus that his valuation numbers were "excessive" and that instead, they were electing to exercise their contractual right to *require* that the fair market value of Campus' membership interest be determined by an independent appraiser (Pawlowski), who they had already selected.

The valuation was subsequently conducted, and Pawlowski concluded that the fair market value of his interests in the LLCs (using a fair market valuation date of November 30, 2007) was as follows:  Model Homes $1,152,450 and Hexagon $96,642.  Next, Pawlowski conducted a supplemental valuation (using a fair market valuation date of April 27, 2007) which resulted in a valuation of Model Homes at $1,111,709 and Hexagon at $86,600.

**Fourth**, under Section 11.01(d), the LLCs are required to pay the fair market value (minus any offsets as provided for in Section11.01(c) if applicable) in either a lump sum or in installments (whichever they agree to do), but if no agreement about the payment method is reached then the fair market value payment shall be paid in four (4) installments, the first of which is due on the *effective*

---

[12]  No specific dates are provided for how long a party has to come to an agreement, or to exercise the independent appraiser option after day 90 has passed, just that the option for an independent appraiser cannot be exercised before day 90 (Section 11.01(b)).

*date of withdrawal*, with the remaining installments to be paid (along with interest) on each of the first three anniversaries thereafter. In this case because the parties did not agree on a payment method and date, the payments should be made in installments with the first payment due by the effective date of withdrawal.

Next it must be determined what date should be used to determine the fair market value of Campus' interest in the LLCs. While perhaps not as clear as the prior sections, a reading of Section 11.01(d), with Sections 11.01(a)-(c), results in an obvious conclusion that the fair market value date from which the valuation is determined would have to have be a date at some point <u>before</u> the payment due deadline (the effective date of withdrawal). Moreover, because the Operating Agreements provide that the fair market value would be agreed upon within the first ninety days after notice of withdrawal or could thereafter be turned over to an independent appraiser, the fair market value contemplated in the agreement must be at a point within the first ninety days.

Pawlowski's initial determination utilized a fair market value date of November 30, 2007 (*i.e.*, measured fair market value as of that date). This, according to the terms of the Operating Agreements, is a date outside of the requisite timeframe. As such, the Court cannot consider the November 30, 2007 Pawlowski valuation. The parties are then left with Pawlowski's supplemental determination which utilized a fair market value date of April 27, 2007. The date of April 27, 2007 falls within the timeframe (the first ninety days) contemplated by the Operating Agreements and as such, is the appropriate valuation.

As previously outlined, the Operating Agreements provide for two options for fair market value determinations: either Campus and the LLCs had to agree on the value, or one or the other could require that the fair market value be determined by an independent source. The LLCs (not

Campus) chose the latter option and the fair market value was determined pursuant to the terms of the Operating Agreements. The fact that the LLCs disagree with Pawlowski's results is irrelevant. The Operating Agreements do not provide for contractual remedies to allow the LLCs to escape the results of that choice. Moreover, the Court notes that the LLCs claim that according to their expert Stalcup, Pawlowski's conclusions and valuations are "fundamentally flawed," "unsound," "worthless and unusable" and "were performed under incorrect and mistaken assumptions and methodology." (Doc. 95 at 5-6). However, again, this is simply irrelevant. This is not permitted under the terms of the agreements. The LLCs admit as much. (Doc. 94 at 7 (there is "no contractual recourse")). To allow Stalcup's opinion, report or findings to undermine, thwart or render invalid Pawlowski's determination would require this Court to rewrite the contractual terms of the Operating Agreements. A court may not rewrite a contract to make it more reasonable for one of the parties, or to relieve that party from what turns out to have been a bad choice. See, e.g., Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 35-36 (Ala. 1998). Because Campus and the LLCs were contractually bound to arrive at the fair market value determination either by agreement, or through an independent appraiser, and the LLCs chose the latter, Stalcup's opinion has no relevance.

The Court next addresses the issue of offset. The Operating Agreements provide for offset of a withdrawing member's interests in Section 11.01(c) if the withdrawal causes the LLCs to sustain damages: "[i]f the withdrawal of the Member . . . causes the Company to sustain damages, the Company may offset the amount of any such damages against the fair market value of the Member's Membership Interest . . . .in determining the amount to be paid to the withdrawing member . . . ." (Doc. 1-3 at 34 at ¶11.01(c)). At the outset, there is no requirement in the Operating Agreements that offsets be "declared" by the effective date of withdrawal as Campus contends (Doc.

88 at 12; Doc. 106 at 4), only that (under Section 11.01(d)) offsets be included (if applicable) in the fair market value payment of a withdrawing member's membership interests before the first payment of membership interests is made.  However, the terms of the Operating Agreements clearly state that "'[f]air market value' . . . shall be unreduced and otherwise unadjusted by reason of the lack of marketability of the Membership Interest . . . [.]" (Doc. 1-3 at ¶ 11.01(b)).  The Court agrees with the LLCs that any judicial determination regarding offsets is premature, as the determination of any offset will be definitely made when the first payment of membership interest is made.  Until this occurs any determination by the Court regarding the legitimacy of the offset would be premature.  The issue of offsets is not ripe in the present case and controversy.[13]

Campus also requests that this Court enjoin "the LLCs' improper conduct" (Counterclaim Defendants' business practices of advancing or lending or transferring monies to and from the LLCs and TMC).  The Court finds no basis for this request.  This is because, as admitted by Campus, he was aware of this business practice and moreover, this practice was occurring well before he notified the LLCs of his intent to withdraw and he has provided no evidence demonstrating a temporal link to these practices with his withdrawal from the LLCs (*i.e.*, Campus has not demonstrated that the LLCs suddenly began funneling monies to TMC to swiftly deplete their assets after Campus provided his notice of withdrawal).

At present, over two (2) years have passed since Campus' withdrawal as a member of the LLCs became effective on October 3, 2007, yet Campus remains unpaid.  Based on the terms of the

---

[13]  The Court notes that to the extent that LLCs assert that offset is applicable due to TMC's litigation (CV 07-177) against Campus, the clear contractual terms of the Operating Agreement do not provide for any exception to payment of membership interests simply because one party believes that the withdrawing member has engaged in bad acts concerning other related entities.  There must be damage *to the LLCs* based on Campus' act of withdrawal from the LLCs.  In plain terms, the fair market value cannot be offset based on any judgment of damages in TMC's litigation against Campus.

Operating Agreements, the LLCs are required to pay (and have been required to pay) Campus for his membership interests based on the Pawlowski April 27, 2007 fair market valuation. Accordingly, pursuant to Section 10-12-24(c) of the Alabama Code, this Court's enforcement of the Operating Agreements in equity is appropriate.

However, while specific enforcement of the Operating Agreements is required, it is not appropriate for a constructive trust, as requested by Campus, to be imposed over the assets of the LLCs. A constructive trust is an equitable remedy and a request to impose such a trust is not a cause of action that will stand independent of some wrongdoing. Radenhausen v. Doss, 819 So.2d 616, 620 (Ala. 2001) (citing Gulf States Steel, Inc. v. Lipton, 765 F. Supp. 696 (N.D. Ala. 1990)).[14] The Court does not find "wrongdoing" on the part of the LLCs. While the LLCs apparently combine or commingle their monies and have a business practice of regularly lending or transferring money between the LLCs and TMC so that no entity fails to fulfill its financial obligations from one month

---

[14]   As explained In re Financial Federated Title and Trust, Inc., 347 F.3d 880, 891 (11th Cir. 2003):

> The doctrine of constructive trusts is a recognized tool of equity designed in certain situations to right a wrong committed and to prevent unjust enrichment of one person at the expense of another either as a result of fraud, undue influence, abuse of confidence or mistake in the transaction. In re Powe, 75 B.R. 387, 393 (Bankr.M.D.Fla.1987). In In re First Fidelity Fin. Serv., Inc., 36 B.R. 508 (Bankr.S.D.Fla.1983), the Bankruptcy Court held that:
>
> > The reason for imposing a constructive trust is to avoid unjust enrichment to the recipient of the windfall, and to do equity for the party whose property has been misused. But a desire to do equity alone is not enough. The essence of the equitable remedy of imposing a constructive trust, as opposed to the legal remedy of damages, is the concept that the very property in question can be returned to its rightful owner. The law gradually broadened so that the proceeds of the original property may be pursued, but the basic requirement of tracing the original property, albeit in its various forms, remains an element of proof for constructive trusts.

> Id. at 511 (citation omitted).

19

to the next, this business practice has not been established by Campus to be "wrongdoing" and as such, is irrelevant to Campus' claims for equitable enforcement of the Operating Agreements. Accordingly, Campus' motion as to his counterclaim for equitable relief is **GRANTED** in part and **DENIED** in part.

### 2.   Count Six: Tortious Interference with Contractual Relations[15]

Campus asserts that Saint and TMC intentionally interfered with his business relationship/contractual relations with the LLCs "by pretextually asserting that any claims which TMC may assert against Campus in the Underlying Action [CV 07-177] constitute a basis for refusal to pay Campus the fair market value for his Membership Interests in the LLCs[.]" (Doc. 48 at 13). In his motion for summary judgment, Campus claims that TMC interfered with the withdrawal process by delaying payment to him through baseless litigation (the filing of this action which this Court dismissed) as well as through its participation in a series of loans from Model Homes to TMC ($4 million) which TMC is unable to repay and which has also allegedly made it impossible for Model Homes to pay Campus.  (Doc. 88 at 15).

To establish a claim of tortious interference with contractual/business relations in Alabama, a plaintiff must prove: 1) the existence of a contract or business relation, 2) the defendant's knowledge of the contract or business relation, 3) intentional interference with the contract or business relation, and 4) damage to the plaintiff as a result of the interference.  See, e.g., MAC East, LLC v. Shoney's, 535 F.3d 1293, 1297 (11th Cir. 2008); Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc., 990 F.2d 598, 603 n. 8 (11th Cir. 1993).  A key requirement, however, is that the

---

[15]  Counterclaim Defendants assert that Campus has abandoned his claim for tortious interference against Saint. This is not accurate. While Campus may not have addressed this claim against Saint in his motion for partial summary judgment, he did address the claim in his response in opposition to Counterclaim Defendants' motion for partial summary judgment (Doc. 98 at 7-10).

defendant must be a stranger to the relationship or contract with which he allegedly interfered.  <u>See</u>, <u>e.g.</u>, <u>Tom's Foods, Inc. v. Carn</u>, 896 So.2d 443, 454 (Ala. 2004).  According to the Alabama Supreme Court, a defendant is <u>*not*</u> a stranger to a contract or business relationship when: 1) the defendant is an essential entity to the purported injured relations; 2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; 3) the defendant would benefit economically from the alleged injured relations; or 4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contract or relations.  <u>Waddell & Reed, Inc. v. United Investors Life Ins. Co.</u>, 875 So.2d 1143, 1156 (Ala. 2003).  Notably:

> . . . . One cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract. In such an instance, the participant is not a stranger to the business relationship and the interwoven contractual arrangements define the participant's rights and duties with respect to the other individuals or entities in the relationship. If a participant has a legitimate economic interest in and a legitimate relationship to the contract, then the participant enjoys a privilege of becoming involved without being accused of interfering with the contract. We conclude that . . . . [the] argument-that one can be considered a stranger to the relationship if one does not effectively control performance under the contract-is too narrow. . . .

<u>Id</u>. at 1157.  Under Alabama law, a defendant is a party in interest to a business or contractual relationship for purposes of a tortious interference claim, if the defendant has any beneficial or economic interest in, or control over, that relationship.  <u>See</u>, <u>e.g.</u>, <u>Parsons & Whittemore Enterprises Corp. v. Cello Energy, LLC</u>, 613 F. Supp. 2d 1271, 1282 (S.D. Ala. 2009); <u>Peacock v. Merrill</u>, 2005 WL 2739138 (S.D. Ala. Oct. 24, 2005).

TMC has established that it has an economic interest in the LLCs because it has, for years and as a matter of business practice, regularly loaned them money, and vice-versa.  Most notably, in 2006, Model Homes made an "intercompany loan" to TMC which is now valued at approximately

$4 million (the "TMC Receivable"), and presently TMC is earning interest on that amount in its coffers.  Likewise, Hexagon presently owes TMC $300,000.  The regular intermingling of their funds as a business practice is sufficient to establish an economic interest in the relationship between Campus and the LLCs.  Moreover, Saint is a managing member of both LLCs and so has an economic interest in the LLCs' relationships.  Thus, under Alabama law neither Saint nor TMC is a stranger to Campus' relationship with the LLCs, which is fatal to Campus' counterclaim.  Accordingly, TMC's and Saint's motion as to Campus' counterclaim for tortious interference with contractual relations is **GRANTED**; and Campus' motion as to his counterclaim for tortious interference with contractual relations is **DENIED.**

### 3.    <u>Count Seven: *Prima Facie* Tort</u>

Campus asserts in his counterclaim that Saint, the LLCs and TMC, are liable under a *prima facie* tort theory due to the LLC's refusal to pay the fair market value for his membership interests "at the behest of TMC and Saint" (an unjustified, intentional infliction of harm), which damaged Campus and which was occasioned with malice, oppression, fraud and wantonness.  (Doc. 48 at 14).  Counterclaim Defendants assert that Campus has abandoned his *prima facie* tort claim against the LLCs and TMC, only proceeding against Saint.  As to Saint, the argument is made that a *prima facie* tort is not recognized under Alabama law and even it were, Campus has failed to show that Saint had the requisite disinterested malevolent motive for his actions.

Campus has not argued a *prima facie* theory against either TMC or the LLCs in his oppositions to the Counterclaim Defendants' motion.  (Doc. 98 at 11-12; Doc. 106 at 8-9).  Likewise, Campus' motion for summary judgment seeks summary judgment on a *prima facie* tort

only as to Saint, asserting that he is liable because corporate officers are liable for tortious conduct.[16] (Doc. 88 at 16).   Nevertheless, the Court must still determine whether the motion and supporting documents establish the absence of a genuine issue of material fact regarding this claim.  See, e.g., United States v. One Piece of Property, 5800 S.W. 4th Ave., Miami, Fla., 363 F.3d 1099, 1101-1102 (11th Cir. 2004).[17]

Whether as to Saint, TMC and/or the LLCs, summary judgment is due to be granted in favor of Counterclaim Defendants on Campus' *prima facie* tort counterclaim.  First, as noted in Liberty Nat. Life Ins. Co. v. University of Ala. Health Services Foundation, P.C., 881 So.2d 1013, 1024-1025 (Ala. 2003), Alabama has not  recognized a cause of action for a *prima facie* tort.  However, even if a claim for *prima facie* tort were recognized in Alabama, Campus' counterclaim fails for lack of evidence of the requisite malice.  "[T]he sole motivation for the damaging acts must have been a malicious intention to injure the plaintiff. When there are other motives, such as profit, self-interest, or business advantage, there is no recovery under the doctrine of *prima facie* tort."

[16]   In Campus' pleading he appears to argue that Saint breached his fiduciary duties to the LLCs (by making unsecured loans to TMC) or breached the Operating Agreement (by depleting corporate assets); however, Campus has not asserted either as a counterclaim.  Moreover, these theories of liability against Saint are not encompassed in the allegations of the *prima facie* tort as stated in Campus' amended counterclaim.  Also, because breach of fiduciary duty is an established tort in Alabama, see Hensley v. Poole, 910 So.2d 96, 106 (2005), a claim for a *prima facie* tort would not be viable.  See, e.g., Chen v. U.S., 854 F.2d 622, 628 (2nd Cir. 1988) (finding that a *prima facie* tort is recognizable only when the factual basis of the complaint does not fall within the parameters of an established tort).

[17]   In One Piece of Property, 363 F.3d 1099, the Eleventh Circuit held that "[t]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion," Id. at 1101, and noted the provision in Fed.R.Civ.P. 56(e) that when "'the adverse party does not respond, summary judgment, *if appropriate*, shall be entered against the adverse party.'" Id. at 1101 (emphasis in original).  See also Trustees of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers v. Wolf Crane Service, Inc., 374 F.3d 1035, 1040 (11th Cir. 2004) (vacating and remanding the district court's grant of summary judgment, in part, "[b]ecause summary judgment cannot be granted as a sanction for merely failing to file a response to a motion for summary judgment[]").

Marcella v. ARP Films, Inc., 778 F.2d 112, 119 (2nd Cir. 1985).  See also 74 AM. JUR. 2D TORTS §

38 (2009).  Campus  has failed to present sufficient evidence from which a reasonable jury could

find that Saint's, TMC's or the LLCs' sole motivation in bringing this lawsuit or delaying payment

was malice.  Accordingly, as a matter of law, Counterclaim Defendants' motion as to Campus'

*prima facie* tort counterclaim is **GRANTED**; and Campus' motion as to his *prima facie* tort

counterclaim is **DENIED.**

### 4.        Count Eight: Fraudulent Suppression

Campus asserts that TMC and Saint fraudulently suppressed the fact that Model Homes

(where Saint is Manager) made unsecured loans to TMC (where Saint is President), impairing

Campus' right to oppose the loans as well as his future ability to collect the full value of his

membership interest.  (Doc. 48 at 15-16).  While Campus did not directly address this counterclaim

in his response or reply thereto (Doc. 98; Doc. 106) and did not move for summary judgment on this

counterclaim, he has continually argued that Saint's actions (having the LLCs lend money to TMC

and vice-versa on an unsecured basis) are improper.  Thus, while Counterclaim Defendants assert

that Campus has abandoned this counterclaim, just as with Campus *prima facie* tort counterclaim,

the Court must nevertheless assess same.  See, e.g., One Piece of Property, 363 F.3d at 1101-1102.

To assert fraudulent suppression in Alabama, Campus must establish: 1) a duty by Saint or

TMC to disclose material facts to him; 2) suppression of the material facts by them, by concealment

or nondisclosure; 3) inducement of him to act; and 4) that he acted to his injury.  See, e.g. Parsons

& Whittemore Enter. Corp. v. Cello Energy, LLC, 613 F. Supp. 2d 1271, 1288 (S.D. Ala. 2009); Ex

Parte Novartis Pharm. Corp., 991 So.2d 1263, 1276 (Ala. 2008); Brock v. Baxter Healthcare Corp.,

96 F. Supp. 2d 1352, 1359 (S.D. Ala. 2000); Ex Parte Household Retail Servs., Inc., 744 So.2d 871,

879 (Ala. 1999); <u>First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.</u>, 899 F.2d 1045, 1056 (11th Cir. 1990).  Central to a fraudulent suppression claim is that a material fact was suppressed. <u>See</u>, <u>e.g.</u>, <u>Roper v. Assoc. Fin. Serv. of Ala., Inc</u>., 533 So.2d 206, 209 (Ala. 1988).

Here, even assuming *arguendo* the existence of all the other requisite elements for this claim, there is <u>no</u> evidence that TMC or Saint suppressed the fact that monies/loans regularly flowed between the LLCs and TMC or that "intercompany loans" were made.  Significantly, Campus testified that he was aware that Model Homes made loans to TMC and vice-versa when one or the other did not have sufficient cash to meet its obligations.  (Doc. 86-2 at 39 (Dep. J.Campus); Doc. 86-4 at 3-7 (Dep. C.Stefan); Doc. 86-3 at 9-12 (Dep. J.Saint)).  Campus also testified that he received periodic financial reports for the LLCs; these reports included notations about intercompany or affiliate transfers of funds and reflected receivables from affiliates and information about the LLCs' operations.  (Doc. 86-2 at 39 (Dep. J.Campus); Doc. 86-4 at 6-7 (Dep. C.Stefan)).  Additionally, Campus testified that he was never denied any material information which he sought from either LLC.  (Doc. 86-2 at 40 (Dep. J.Campus)).  Further, as for the multi-million dollar "Receivable" that Model Homes loaned to TMC, the record indicates that it was disclosed to Campus in the periodic financial reports and that Campus was definitely made aware of it, if not when it occurred, at the latest "[s]ometime mid December '06."  (Doc. 86-2 at 41).  Indeed, Campus testified that when he asked TMC Board Member Wesch about the loan, Wesch told him that it was income from the sale of an apartment complex which was loaned to TMC from Model Homes; and while Campus was "disappointed" that the money did not stay with Model Homes, he did nothing. (<u>Id.</u>)  Contrary to Campus' claim then, he knew about the business practice.  Accordingly, as a matter of law, Counterclaim Defendants' motion for summary judgment with regard to Campus'

counterclaim for fraudulent suppression is **GRANTED.**[18]

### 5.        Count Nine: Civil Conspiracy

In his Amended Counterclaim, Campus asserts a claim for civil conspiracy against TMC, the LLCs and Saint, alleging that they conspired to unlawfully interfere with the contractual relations and/or business relationship of Campus with the LLCs, to unlawfully inflict harm on him without justification by directing the LLCs to refuse to pay the fair market value for his membership interests, and to suppress the material fact of the unauthorized TMC receivable from him.  (Doc. 48 at 16-17).  In other words, Campus asserts that TMC, the LLCs and Saint conspired to commit tortious interference with contractual/business relations, fraudulent suppression and *prima facie* tort. An action for civil conspiracy requires the existence of an underlying tort.  See, e.g., Flying J Fish Farm v. Peoples Bank of Greensoboro, 12 So.3d 1185, 1196 (Ala. 2008); Goolesby v. Koch Farms, LLC, 955 So.2d 422, 430 (Ala. 2006).  Where the underlying tort which the parties supposedly conspired to commit is dismissed on summary judgment, the civil conspiracy action based on that tort is likewise due to be dismissed.  Id.  See also e.g., Nicholson v. City of Daphne, Slip Copy, 2009 WL 1789385, *10 (S.D. Ala. Jun. 24, 2009).  Accordingly, Counterclaim Defendants' motion as to Campus' civil conspiracy counterclaim (based upon his tortious interference, fraudulent suppression and *prima facie* tort counterclaims) is **GRANTED** as a matter of law, because those counterclaims have been dismissed.

---

[18]  Because there is no evidence of suppression, the Court need not address the remaining elements for this claim because a party faced with a motion for summary judgment on a fraudulent suppression claim must offer substantial evidence as to *each* of the elements.  See, e.g., Cork v. Marriott Int'l, Inc., 426 F. Supp. 2d 1234, 1246-1247 (N.D. Ala. 2006) (citing Mason v. Chrysler Corp., 653 So. 2d 951, 954 (Ala. 1995)).

**III.**     **<u>Conclusion</u>**[19]

Based upon the foregoing, it is **ORDERED** that Campus' motion for partial summary judgment as to his counterclaim for equitable relief (Count Five) is **GRANTED** in part and **DENIED** in part.  The Court finds that the first payment of Campus' interest in the LLCs was due on October 3, 2007, the second payment was due on October 3, 2008, the third payment was due on October 3, 2009, and that the final payment will be due on October 3, 2010.  Moreover, the Court finds the fair market value to be **$1,198,309.**  The past due payments, plus pre-judgment interest, shall be made by the LLCs to Joseph J. Campus, III no later than **December 23, 2009.**

It is further **ORDERED** that Campus' motion for partial summary judgment is **DENIED** as to his counterclaims for tortious interference with contractual relations (Count Six) and *prima facie* tort (Count Seven); and that Counterclaim Defendants' motion for partial summary judgment is **GRANTED** as to Campus' counterclaims for tortious interference with contractual relations (Count Six), *prima facie* tort (Count Seven), fraudulent suppression (Count Eight), and civil conspiracy (Count Nine).

**DONE** and **ORDERED** this the **23rd** day of **October 2009.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[19]  A final determination on Count Three (advancement of fees in this action) and Count Four (fees on fees) remains pending as neither party has moved for summary judgment on these claims. Accordingly, the Court has not entered a final judgment.